**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| BURKHALTER RIGGING, INC. | § | Case No. 19-30495 (MI) |
| | § | |
| Debtor. | § | |
| | § | |
| Tax I.D. No. 64-0538314 | § | |
| | § | |
| In re: | § | Chapter 11 |
| | § | |
| BURKHALTER SPECIALIZED | § | Case No. 19-30497 (MI) |
| TRANSPORT, LLC | § | |
| | § | |
| Debtor. | § | |
| | § | |
| Tax I.D. No. 03-0401511 | § | |
| | § | |
| In re: | § | Chapter 11 |
| | § | |
| BURKHALTER TRANSPORT, INC., | § | Case No. 19-30496 (MI) |
| | § | |
| Debtor. | § | (Joint Administration Requested) |
| | § | (Emergency Hearing Requested) |
| Tax I.D. No. 64-0822096 | § | |

**DECLARATION OF MICHAEL TINSLEY IN SUPPORT
OF CHAPTER 11 PETITIONS AND FIRST-DAY MOTIONS**

I, Michael G. Tinsley, do hereby declare, under penalty of perjury, that:

1.    I am the Chief Financial Officer of Burkhalter Rigging, Inc. ("Burkhalter Rigging"

and together with Burkhalter Specialized Transport, LLC and Burkhalter Transport, Inc. the

"Debtors"). I became the CFO of Burkhalter Rigging on February 1, 2019.  I am generally familiar

with the Debtors' day-to-day operations, business affairs, and books and records, as well as the

Debtors' restructuring efforts because of my work with the Debtors prior to the initiation of the

above-captioned chapter 11 cases (the "Chapter 11 Cases"). I am above 18 years of age, and I am competent to testify.

2.      I have been involved in the Debtors' restructuring process (the "Restructuring Process"), including, without limitation, (i) participating in the development, negotiation and implementation of various strategic alternatives for restructuring, reducing or modifying the Debtors' indebtedness, (ii) managing professionals engaged by the Debtors in connection with the Restructuring Process, and (iii) supervising the preparation of documentation needed to implement the Restructuring Process since November 2017.

3.      Prior to the initiation of these Chapter 11 Cases, I served as a financial analyst or consultant to the Debtors.  My involvement with or around the Debtors started in November 2017, when I was engaged by Metro (defined below) to consult on Metro's potential refinancing with the Debtors.  Prior to that engagement, I had no relationship or connection to Metro.  I served as Metro's consultant on the proposed refinancing until January 8, 2018; at that time, in connection with the financing, I started to consult for the Debtors.  I continued to consult for the Debtors until June 2018; at which time, I became an employee of Burkhalter Rigging.  As Burkhalter Rigging's employee, I was involved in all financial and operational aspects of the business.  I continue to work for the Debtors because of my turnaround experience and experience in the heavy-crane industry.  In addition, for over 30 years, I have worked in C-level roles, frequently in leveraged businesses in diverse industries, including in the crane rental/heavy haul industry, including working at Alix Partners and what is now CR3.  While at Alix Partners, I acted as the CFO of a $450-million mobile-home parts manufacturer.  I also served as the interim CFO of New Century Financial, a $66 billion mortgage lender, and assisted it through a liquidating chapter 11.   I have also led other liquidations, including L.D. Brinkman, a distributor of flooring with $75 million of

revenue as well as Crescent Machinery, that sold and rented construction and earth moving equipment and had $120 million of revenue. Most recently, I served as interim chief executive officer or chief restructuring officer of various companies, including a hydraulics manufacturing business and a medical-testing company.

4.       On January 31, 2019, (the "Petition Date"), the Debtors filed voluntary petitions (the "Petitions") for relief under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code"), in an effort to preserve and maximize the value of their Chapter 11 estates.

5.       The Debtors intend to operate their businesses and to manage their properties as debtors-in-possession under §§ 1107(a) and 1108 of the Bankruptcy Code.

6.       The Debtors have requested certain relief in "first day" applications and motions filed with the Court (singularly, "First-Day Motion," collectively, the "First-Day Motions")[1] to minimize potential adverse effects of the bankruptcy filings and to maximize the value of their estates. I submit this Declaration to assist the Court and parties-in-interest in understanding the circumstances that led to the commencement of these Chapter 11 Cases and in support of the Debtors' voluntary petitions and First-Day Motions.

7.       Except as otherwise indicated herein, all facts set forth in this Declaration are based on my personal knowledge, my discussions with members of the Debtors' management teams and other personnel, my knowledge and review of relevant documents, including the Debtors' books and records, or my opinion based on my experience, knowledge, and information concerning the Debtors' operations and financial condition. If called on to testify, I would testify competently to

---

[1] Capitalized terms used but not defined herein have the meanings ascribed to them in the applicable First-Day Motion.

the facts set forth in this Declaration. I am authorized to submit this Declaration on behalf of the Debtors.

8.      I am familiar with the contents of each First-Day Motion (including the exhibits) and the facts set forth therein are true and correct to the best of my knowledge. The relief sought in each First-Day Motion will provide an orderly transition of the Debtors into these Chapter 11 Cases and ultimately permit the Debtors to maximize recoveries for all parties-in-interest. Further, I believe the relief sought in the First-Day Motions is in each case narrowly tailored and necessary to achieve the goals identified above, and, accordingly, best serves the interests of the Debtors' estates and stakeholders.

## I.      OVERVIEW OF THE DEBTORS' BUSINESSES AND HISTORY

### A.      The Debtors' Businesses

9.      The Debtors are industry leaders, providing complete solutions in engineered heavy lifting, rigging, and transport for petrochemical, power, civil, and marine industries around the world. The Debtors provide services for heavy lift, rigging and super-heavy transport and have delivered services for a number of high-profile projects.  For example, Burkhalter Rigging was recently engaged to remove thirteen spans of the iconic 1936 San Francisco – Oakland Bay Bridge, each span weighing in excess of 1.7 million pounds. The pictures below are from that project— Burkhalter Rigging's equipment is shown supporting a bridge span, sporting Burkhalter Rigging's signature blue color.





10.     Burkhalter rigging is currently one of the largest heavy-lift rigging and transport companies in the United States.  Burkhalter Rigging accomplishes field operations often requiring complicated and sophisticated maneuvers with talented and often "home-grown" engineers, project managers, and technicians.  Many of these employees have tenures with Burkhalter Rigging spanning 10 – 30 years but the company has also brought along a younger group to support and continue Burkhalter Rigging's operations for years to come.

11.     Burkhalter Rigging is a member of the Specialized Carriers & Rigging Association ("SCRA").  Delynn Burkhalter is a Past President (1999-2000) and Chairman (2000-2001) of the SCRA and currently serve as its treasurer.

12.     Burkhalter Rigging has operated with one of the highest safety records in the industry and has received multiple awards and recognitions for this performance from the SCRA over the years.  For example, in 2017 Burkhalter Rigging won the SCRA's Crane and Rigging Safety and Zero Accidents Awards, recognizing Burkhalter Rigging's superior safety record.  That same year, nine of Burkhalter Rigging's crane operators received SCRA's Crane Operator Safety Award, recognizing their "exemplary work achievements while accumulating 10,000 consecutive man-hours and recording zero accidents and incidents,"[2] and one of Burkhalter Rigging's drivers received the SCRA's Million Miler Safety Award, recognizing one million consecutive miles of safe driving.[3]  The foundation for Burkhalter Rigging's safety record is its philosophy of planning and executing its work "One Time Right."

13.     In 2012, Burkhalter Rigging was awarded the SCRA's awards for Rigging Job of the Year and Moving Job of the Year for its work on the Galveston Causeway Railroad Bridge Replacement project.  In that project, Burkhalter Rigging first had to (a) remove an existing bridge that weighed 1.7 million pounds, (b) tow that bridge three miles to a dock and (c) move it on land to its final destination.  Burkhalter then installed a new "Lift Span Bridge" that was nearly 400 feet long and weighed 3 million pounds. Pictures from that project are below.

---

[2] *See* Press Release, 29 Crane Operator Safety Awards Announced at the Annual Conference (May 4, 2017) available at:
https://www.scranet.org/SCRA/Press_Releases/2017/29_Crane_Operator_Safety_Awards_Announced_at_the_Annual_Conference.aspx
[3] *See* Press Release, 2017 Million Miler and Driver Safety Awards Presented (May 4, 2017) available at:
https://www.scranet.org/SCRA/Press_Releases/2017/2017_Million_Miler_and_Driver_Safety_Awards_Presented.aspx






14.     Burkhalter Rigging's award-winning reputation has enabled it to compete for and win many coveted contracts over the years, contracts that have provided stability and a better quality of life for all of its long-tenured employees.  These tightly coordinated, dedicated, and unified employees are a key component of what has made Burkhalter Rigging an industry leader.

**B.     Burkhalter Rigging's Corporate Structure**

15.     In 1973, Leon Burkhalter founded Crane Service, Inc., which would eventually become Burkhalter Rigging. Burkhalter Rigging is a Mississippi corporation, incorporated on November 1, 1973, that continues today as a family-owned and operated, closely-held corporation:

Delynn Burkhalter hold 75% of the outstanding shares and the remaining outstanding shares are held by the Delynn W. Burkhalter Family Trust f/b/o Brooke Burkhalter U/A 2/24/2017.

16.     Delynn Burkhalter joined Burkhalter Rigging on a part-time basis in 1973 and then accepted a full-time position of Vice-President in 1975, with a focus on expanding the company into other regions and states.  Delynn is currently Burkhalter Rigging's CEO whose primary responsibility is as a sponsor working with the sales team.

17.     Today, Burkhalter Rigging is headquartered in Columbus, Mississippi, and has a depot yard there. In 2013, Burkhalter Rigging opened an additional depot yard near Houston, Texas (16525 FM 521, Rosharon, TX 77583). Burkhalter Rigging has also had sales offices in Mobile, Alabama, and San Francisco, California, each respectively opening in 2014 and 2016.

18.     Burkhalter Rigging currently employs approximately 91 people.  Delynn's son and Leon's grandson, Brooke Burkhalter, manages the day-to-day business and is Burkhalter Rigging's President.

19.     The current directors of Burkhalter Rigging are: Delynn Burkhalter, Brooke Burkhalter, and Ellen Burkhalter.

**C.     Burkhalter Transport's Corporate Structure**

20.     Burkhalter Transport, Inc. ("Burkhalter Transport") was incorporated as a Mississippi corporation on December 8, 1992, and is a Mississippi-centered company with a focus in the Gulf states. Burkhalter Transport is wholly owned by Delynn Burkhalter.  In the past Burkhalter Transport provided trucking and transport services.  But its primary purpose is to provide payroll support to Burkhalter Rigging.

21.     Burkhalter Transport's current directors are: Delynn Burkhalter, Brooke Burkhalter, and Ellen Burkhalter.

### D.   Specialized Transport's Corporate Structure

22.   Burkhalter Specialized Transport, LLC ("Specialized Transport") is a Delaware limited liability company that was formed on February 28, 2002. Delynn Burkhalter is a member of Specialized Transport, along with his sons, Brooke and Brett Burkhalter. Specialized Transport provides specialized, over-highway trucking services.

23.   Delynn is the managing member of Specialized Transport.

### E.   Debt Structure

24.   In late 2016, Burkhalter Rigging entered into an Asset Based Lending Facility (the "ABL Facility") with PNC Bank ("PNC").  The ABL Facility was used for working-capital and general-business purposes with the understanding that the assets of the business were substantial and that they provided a sufficient borrowing base for the ABL Facility.  In around March and April of 2017, the Debtors missed a covenant by $76,000.  As a result, PNC decreased the availability from the borrowing base by $4 million and subsequently placed a $1,250,000 hold on a remaining portion of the borrowing base.

25.   PNC's decision to place a hold on the remaining borrowing base resulted in a severe strain on the Debtors, both financially and operationally.  PNC also forced Burkhalter to sell assets that were critical to the Debtors' operations and had substantial utilization.  The primary asset that the Debtors were required to sell was an LR 1600/2 crawler crane with a fair market value exceeding $6 million.  The Debtors were also forced to sell various over-the-road tractors.  The sale of this equipment decreased the Debtors ability to internally mobilize and demobilize portions of their equipment to projects sites and increased their mobilization and demobilization costs.

26.   Prior to PNC freezing the remaining portion of Burkhalter Rigging's borrowing base, the Debtors had already enacted cost-saving measures to eliminate underutilized assets and to reduce labor and overhead to meet current demand. Nonetheless, to address the Debtors'

working-capital needs, the Debtors evaluated various alternatives to refinance the ABL Facility. To help in that process, the Debtors hired Michael Rosendahl of PCE Investment Bankers. With Mr. Rosendahl's assistance and recommendation, the Debtors ultimately reached agreement with Metropolitan Partners Group Administration LLC ("Metro") on the terms of a loan to refinance the ABL Facility.

27.     As of the Petition Date, the Debtors are the primary obligor on that certain Loan and Security Agreement, dated as of January 8, 2018, (as amended, supplemented, amended and restated or otherwise modified from time to time in accordance with the terms thereof, the "Prepetition Credit Agreement"), by and among the Debtors, as Borrower, Metro, as administrative agent and collateral agent thereunder (the "Prepetition Agent"), and the financial institutions and other entities party thereto as "Lenders" thereunder (collectively, the "Lenders" and together with the Prepetition Agent, the "Prepetition Secured Parties"). To secure the obligations under the Prepetition Credit Agreement (the "Prepetition Secured Obligations"), the Prepetition Agent, for its benefit and the benefit of the Prepetition Lenders, was granted a security interest in and lien on substantially all assets of the Debtors, as set forth in the Prepetition Credit Agreement. As of the Petition Date, the aggregate outstanding principal amount of Prepetition Secured Obligations is at least $19.5 million.

28.     In addition, the Debtors have alleged unsecured debt in an aggregate amount of approximately **$7.6 million,** as of the Petition Date.

**F.     Events Leading to the Debtors' Bankruptcy Filing**

29.     The Debtors have performed services across the United States but have historically focused on the heavy-lifting and hauling markets in the Gulf states. In 2010, the Deepwater

Horizon oil spill had a strong economic impact on the Gulf Coast's economy, which ultimately impacted the demand for the Debtors' services in 2010.[4]

30.     In 2015, heavy-lifting and hauling market prices experienced another significant price decrease.  At the same time, global competitors within the Debtors' industry moved rigging and heavy-hauling equipment from western Canada into the gulf states, mid-south and mid-west, where the Debtors undertake a significant percent of their contracts. Thus, the demand for the Debtors services decreased as competition increased.

31.     If the demand for rigging and heavy-hauling services by many of its customers shifts for reasons outside of the Debtors' control, the Debtors nonetheless are required to service the outstanding debt on their equipment and to continue to pay their personnel, irrespective of the incoming monthly cash flow.  Failure to maintain access to highly specialized and skilled workers would render impossible the Debtors' ability to provide heavy-lift rigging and transport services to their customers.

32.     Under these conditions, the Debtors sought to diversify into market segments outside of its normal sectors, including many major civil and bridge projects.  But despite their best efforts, the Debtors fell further behind on their obligations to creditors in 2016 – 2017, and had to refinance their ABL Facility to address their working-capital needs.

---

[4] Litigation arising from the Deepwater Horizon oil spill resulted in BP Exploration and Production Inc. ("BP") entering into a class-action settlement with, among others, businesses in the five Gulf states.  The settlement provides a claims process allowing, in part, businesses to submit a claim to compensate for business economic losses. Burkhalter Rigging was a member of the class and submitted a claim as part of the settlement program.  This claim was evaluated pursuant to the rules of the settlement program and the settlement program issued an award to Burkhalter Rigging.  BP unsuccessfully appealed and then requested discretionary review of the award, which was denied by the Honorable Carl J. Barbier of the U.S. District Court for the Eastern District of Louisiana.  BP appealed this denial to the Fifth Circuit.  The Fifth Circuit appeal has been briefed and is currently pending before the Fifth Circuit.

33.     Despite the refinancing with Metro, the Debtors did not have sufficient capital to maintain and grow their business.  As a result of the Debtors' lack of capital, on August 1, 2018, and January 17, 2019, Metro informed Burkhalter Rigging that Events of Default had occurred with respect to the failure to comply with certain terms under the Prepetition Credit Agreement.

34.     The Debtors have diligently evaluated, in consultation with their professionals, a number of options to address the Debtors' current financial issues. During the last six months of 2018, the Debtors engaged an investment banker to locate a strategic buyer. The investment banker contacted a number of potential strategic buyers, and engaged in extensive negotiations with at least three interested parties.

35.     Ultimately, Barnhart Crane and Rigging Co. ("Barnhart Crane") emerged as a viable purchaser.

36.     While the Debtors were negotiating with potential strategic buyers, a judgment creditor attached Burkhalter Rigging's operational bank account and the Debtors' bank, Trustmark National Bank, also froze the Debtors' account and line of credit.  The freezing of the Debtors' bank accounts necessitated immediate bankruptcy relief to allow the Debtors to complete and finalize a sale with Barnhart Crane.

37.     The Debtors have commenced these cases to fully implement their restructuring effort.  The Debtors believe that the Chapter 11 process will allow for a proper balance of (i) their capital structure and equipment footprint with (ii) the expected demand for heavy lift, rigging, and trucking services, and (iii) provide a forum for a sale process that will benefit the Debtors' estates and creditors.  Prior to the first-day hearing, the Debtors will file an application to employ a Chief Restructuring Officer (the "CRO").  This CRO will manage the day-to-day operations of the Chapter 11 Cases and the upcoming sale process.

## FIRST-DAY MOTIONS

38.     Below is a brief discussion of the Debtors' First-Day Motions and an explanation of why such motions are critical to the success of the Chapter 11 Cases.  More detailed descriptions of the facts pertaining to the Debtors' operations and the bases for the requested relief in each motion can be found in the relevant First-Day Motions.

39.     As described more fully below, the relief requested in the First-Day Motions was carefully tailored by the Debtors, in consultation with their professionals, to ensure that the Debtors' immediate operational needs are met, and that the Debtors will suffer no immediate and irreparable harm.  At all times, the Debtors' management and professionals will remain cognizant of the limitations imposed on debtors-in-possession, and, in light of those limitations, the Debtors narrowed the relief requested at the outset of these cases to those issues that require urgent relief to sustain the Debtors' operations.

## II.     ADMINISTRATIVE AND PROCEDURAL MOTIONS

### A.     Request for Emergency Consideration of Certain "First Day" Matters

40.     The Debtors have applied to have the First-Day Motions heard on an emergency basis, and I believe that such relief is necessary and appropriate on an immediate basis.  If such relief is not granted immediately, the Debtors risk substantial disruption to their ongoing operations, which could result in immediate and irreparable harm to the Debtors and their estates and creditors.  The need for this emergency hearing was not caused by any lack of due diligence or any act or failure to act by the Debtors'but by the circumstances of these Chapter 11 Cases.

### B.     Motion for Joint Administration

41.     I believe that many of the motions, applications, hearings, and orders that will arise in these Chapter 11 Cases will jointly affect each Debtor.  Under these circumstances, the Debtors believe the interest of the Debtors, their estates, their creditors and other parties-in-interest would

be best served by the joint administration of these Chapter 11 Cases for procedural purposes only. I further believe that joint administration of these Chapter 11 Cases will ease the administrative burden on the Court and all parties in interest, and will protect creditors of the respective estates against potential conflicts of interest. For these reasons, the Debtors submit, and I believe, the relief requested in this motion is in the best interests of the Debtors, their estates and their creditors; therefore, it should be approved.

C.   **Motion for Authority to File a Consolidated List of the 20 Largest Unsecured Creditors, Authorizing the Debtors to Redact Certain Personal Identification Information for Individual Creditors, and Approving the Form and Manner of Notifying Creditors of the Commencement of the Chapter 11 Cases**

42.   By this motion (the "Consolidated List Motion"), the Debtors seek (a) authority to file a consolidated list of the 20 largest general unsecured creditors in lieu of submitting separate creditor lists for each Debtor, (b) authority to redact certain personal identification information for individual creditors, and (c) approval of the form and manner of notice of commencement of these Chapter 11 Cases and the scheduling of the meeting of creditors under section 341 of the Bankruptcy Code.

43.   Because a large number of creditors are shared amongst the Debtors, the Debtors request authority to file a single, consolidated list of their 20 largest general unsecured creditors (the "Top 20 List").  I believe using a Top 20 List will help alleviate administrative burdens, costs, and the possibility of duplicative service.

D.   **Motion for Entry of an Order (I) Authorizing Consolidated Creditors Lists, (II) Authorizing Redaction of Certain Personal Identification Information, (III) Approving the Form and Manner of Notifying Creditors of the Commencement of the Chapter 11 Cases and Other Information.**

44.   By this motion (the "Creditor Matrix Motion"), the Debtors seek entry of an order (a) authorizing the Debtors to file a consolidated creditor matrix and list of the 20 largest general unsecured creditors in lieu of submitting separate mailing matrices and creditor lists for each

Debtor, (b) authorizing the Debtors to redact certain personal identification information for individual creditors, and (c) approving the form and manner of notice of commencement of these chapter 11 cases and the scheduling of the meeting of creditors under section 341 of the Bankruptcy Code.

45.     The preparation of separate lists of creditors for each Debtor would be expense, time consuming, and administratively burdensome.  I believe that permitting the Debtors to maintain a single consolidated list of creditors, in lieu of filing a separate creditor matrix for each Debtor, will maximize the value of the Debtors' estates and is in the interests of all of the Debtors' stakeholders.

### E.     Motion for Entry of an Order Extending Time to File Schedules of Assets and Liabilities, Schedules of Current Income and Expenditures, Schedules of Executory Contracts and Unexpired Leases, and Statements of Financial Affairs.

46.     By this motion (the "Extension Motion"), the Debtors seek entry of an order extending the deadline by which the Debtors must file their schedules of assets and liabilities, schedules of current income and expenditures, schedules of executory contracts and unexpired leases, and statements of financial affairs (collectively, the "Schedules and Statements") by 30 days, for a total of 44 days from the Petition Date, through and including March 16, 2019, without prejudice to the Debtors' ability to request additional extensions for cause shown.

47.     To prepare their Schedules and Statements, the Debtors will have to compile information from books, records, and documents relating to hundreds of claims, assets, and contracts.  Accordingly, collection of the necessary information will require a significant expenditure of time and effort on the part of the Debtors and their employees.  Additionally, because invoices related to prepetition goods and services have not yet been received and entered

into the Debtors' accounting system, it may be some time before the Debtors have access to all of the information required to prepare the Schedules and Statements.

48.     In the days leading up to the Petition Date, the Debtors' primary focus has been preparing for the Chapter 11 Cases.  I believe that focusing the attention of key personnel on critical operational and chapter 11 compliance issues during the early days of these Chapter 11 Cases will facilitate the Debtors' smooth transition into chapter 11, thereby maximizing value for their estates, their creditors, and other parties in interest.

## III.   OPERATIONAL MOTIONS

### A.   Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Pay Prepetition (A) Wages, Salaries, Other Compensation, and Reimbursable Expenses, and (C) Continue Employee Benefits Programs, and (II) Granting Related Relief

49.     By this motion (the "Wages Motion"), the Debtors seek an order (I) authorizing the Debtors to (a) pay prepetition wages, salaries, other compensation, and reimbursable expenses, and (b) continue employee benefits program and (II) granting related relief.

50.     The Debtors' success in their restructuring efforts will be highly dependent on the continued support and performance of its workforce.

51.     The Debtors' employees and independent contractors perform a wide variety of functions critical to the Debtors' operations, the administration of these Chapter 11 Cases, and the Debtors' successful reorganization.  I believe that their skills, knowledge, and understanding of the Debtors' operations and infrastructure are essential to preserving operational stability and efficiency.   In many instances, the Debtors' employees and independent contractors include highly-trained personnel who are not easily replaced.  I believe that without the continued, uninterrupted services of their employees and independent contractors, the Debtors' reorganization efforts likely will be jeopardized.

52.     Although the Debtors primarily operate their business through three entities, as of the Petition Date, Burkhalter Rigging, Inc. is the sole employer of the Debtors' employees.  The Company employs 88 full-time employees and 3 part-time employees (each an "Employee" and collectively, the "Employees").  Twenty-five (25) Employees are paid a fixed salary, and the remaining 66 Employees are paid on an hourly basis.

53.     Currently, three of the Debtors' Employees are members of a union whose employment is governed by the terms and conditions of a certain collective bargaining agreement (the "CBA") to which the Debtors are party (collectively the "Union Employees").  Among other things, the CBA provides compensation and benefit standards the Debtors must meet for their Union Employees.

54.     The vast majority of the Employees rely exclusively on their compensation and benefits to pay their daily living expenses and provide for their households.  The Employees (and their families) would be exposed to significant financial hardship if the Debtors are not permitted to ensure uninterrupted payment of compensation (including obligations related to benefits) and maintain other programs benefiting the Employees.

55.     In the ordinary course of business, the Company incurs payroll obligations for its Employees.  The majority of such obligations consist of wages and salaries.

56.     The Debtors pay Employees' wages, salaries, and other compensation on a bi-weekly basis for salaried employees and on a weekly basis for hourly employees (collectively, the "Employee Compensation").  The Debtors pay their Employees' wage-and-salary obligations (the "Wages") on either a salaried or hourly basis, and pay approximately $99,769 in the aggregate on a weekly basis.

57. Because the majority of Employees are paid in arrears, certain Employees will be owed accrued but unpaid Wages as of the Petition Date. Wages also may be due and owing as of the Petition Date because of, among other things, potential discrepancies between the amounts paid and the amounts that Employee believes should have been paid, which, upon resolution, may reveal that additional amounts are owed to such Employee.

58. As of the Petition Date, the Debtors estimate they owe approximately $80,550 to Employees on account of all accrued wages, salaries, overtime, and other compensation (including reimbursable expenses, paid time off, and amounts related to the 401(k) plan) earned before the Petition Date (collectively, the "Unpaid Wages"), all of which will come due and owing in the first 21 days of these chapter 11 cases.

59. Notwithstanding this fact, the Company does not believe it owes any Employee any Unpaid Wages in excess of the $12,850 cap imposed by section 507(a)(4) of the Bankruptcy Code.

60. During each applicable pay period, the Debtors routinely deduct certain amounts from Employees' paychecks for, among other things, garnishments, union dues, and child support (collectively, the "Deductions"). Certain of the Deductions are forwarded to various third-party recipients. The Deductions exclude pre-tax deductions payable pursuant to certain of the Health and Welfare Programs (defined below). The Debtors deduct approximately $4,624.00 in the aggregate from Employees' paychecks on account of the Deductions on a monthly basis.

61. The Debtors also are required by law to withhold from the Employees' Compensation amounts related to, among other things, federal, state, and local income taxes as well as Social Security and Medicare taxes (collectively, the "Employee Payroll Taxes") for remittance to the appropriate federal, state, and local taxing authorities. The Debtors must then match the Employee Payroll Taxes from their own funds and pay, based on a percentage of gross

payroll, additional amounts for state and federal unemployment insurance (the "Employer Payroll Taxes," and together with the Employee Payroll Taxes, the "Payroll Taxes").  The Payroll Taxes generally are processed and forwarded to the appropriate federal, state, or local taxing authority at the same time Employees' payroll checks are disbursed.  The Debtors remit approximately $42,836.00 in the aggregate on account of the Payroll Taxes on a weekly basis.

62.     As of the Petition Date, the Debtors estimate that the aggregate amount of accrued but unpaid Deductions and Payroll Taxes (together, the "Withholding Obligations") is approximately $187,110.07, all of which will become due and owing within the first 21 days of the Chapter 11 Cases.

### (1)     Employee Business Expenses

63.     In the ordinary course of business, the Debtors reimburse Employees for certain reasonable and customary expenses that such Employees personally incur in the scope of their employment (collectively, the "Expense Reimbursements").  Expense Reimbursements typically include expenses associated with travel, lodging, airfare, ground transportation, meals, pre-approved special entertainment (golf/sporting event, etc.) and other business-related expenses related to the discharge of an Employee's duties.  The Expense Reimbursements are incurred by Employees through the use of personal funds, and the applicable Employees may be held personally liable for any unpaid obligations even though the obligations were incurred for the Debtors' benefit.  I believe that the Debtors' inability to reimburse the Expense Reimbursements likely would impose significant hardship on Employees.

64.     On average, the Debtors pay Expense Reimbursements of approximately $2,000 per month in the aggregate.  However, recent liquidity issues have resulted in a larger-than-normal accrual of outstanding Expense Reimbursements.  However, due to the timing of when Employees

submit expense reimbursements, it is difficult for the Debtors to precisely estimate the amount of prepetition Expense Reimbursements outstanding as of the Petition Date.  It is my understanding that there is approximately $20,000.00 of accrued prepetition Expense Reimbursements.

### (2)    Employee Benefit Programs

65.    The Debtors offer a comprehensive employee-benefits package to all of their full-time Employees for medical, dental, and vision-care coverage and certain other benefits (collectively, the "Health and Welfare Programs"), including health-care coverage, life insurance, disability benefits, workers' compensation, and the 401(k) Plan (as defined herein).

### (a)    Health Plans

66.    The Debtors offer all full-time Employees the opportunity to participate in a number of health benefit plans, including medical (the "Medical Plan"), dental (the "Dental Plan"), and vision (the "Vision Plan") (collectively, the "Health Plans").

67.    The Medical Plan is administered by Blue Cross Blue Shield of Mississippi ("Blue Cross").  The Debtors are not self-insured.  The Debtors have an "all-states" policy that covers most of the states required for doing business.

68.    The Employees are responsible for the following monthly contributions under the Medical Plan as follows: Employee Only - $80.00; Employee & Spouse - $315.00; Employee & Child - $200.00; Family - $420.00.   The deductible is $2,500.00/person (Maximum $7,500.00/family = 3 family members).  Prescription coverage is provided to all Employees who enroll in the Medical Plan.  The calendar year deductible per person for prescription coverage is $100.00.  The applicable drug copays (after deductible) are as follows: $15.00 – generic; $35.00 – preferred brand name; $75.00 – non-preferred brand name; and $100.00 – small group of new or experimental drugs.

69.     The Debtors pay approximately $57,183.00 per month on account of the Medical Plan, which includes employee deductions.  As of the Petition Date, the Debtors estimate that there are no prepetition amounts accrued and outstanding with respect to amounts owed on account of the Medical Plan; however, amounts are due post-petition for February premiums.

70.     The Dental Plan is administered by Guardian PPO ("Guardian"), and the Vision Plan is administered by Davis Vision/Guardian.

71.     The Debtors pay approximately $10,097.00 per month to Guardian for the Dental Plan and the Vision Plan, which amount includes employee deductions.

72.     The Debtors pay approximately $71,000.00 per month in the aggregate on account of the Health Plans, which includes employee deductions.  I believe that, as of the Petition Date, there are no accrued and outstanding amounts on account of the Health Plans.  But amounts will become due under the Health Plans after the Petition Date.

**(b)     Disability Programs, Workers' Compensation, and Other Insurance Programs.**

73.     The Debtors provide the Employees the opportunity to purchase supplemental insurance (the "Supplemental Insurance") from AFLAC ("AFLAC") for coverage of things such as cancer, accidents, and critical-illness coverage.  The Debtors pay approximately $2,815.00 per month to AFLAC for the Supplemental Insurance, which amount includes employee deductions.

74.     Employees may purchase short-term and long-term disability through Guardian, with premiums paid through payroll deductions (the "Disability Benefits"), which amounts are included in the amount owed to Guardian, as referenced above.

75.     The Debtors also provide life and accidental death and dismemberment insurance coverage (the "Standard Life and AD&D Insurance") to Employees through Guardian, which provides $15,000.00 Basic Term Life Coverage for all full time employees.  The Basic Life

coverage includes Accidental Death and Dismemberment coverage equal to one times the employee's life benefits.  Employees may also purchase supplemental life insurance (the "Voluntary Life Insurance," and together with the Standard Life and AD&D Insurance, the "Life and AD&D Insurance") through Guardian.  The Debtors are fully insured through the Life and AD&D Insurance and the Debtors pay approximately $27 per year per Employee with respect to their portion of the premiums for the Life and AD&D Insurance.  As of the Petition Date, the Debtors estimate that there are no prepetition amounts that have accrued and are outstanding on account of the Life and AD&D Insurance, which amounts would be included in the amount owed to Guardian as referenced above.

76.     The Debtors maintain workers' compensation insurance for Employees at the levels required by law in the states in which the Debtors operate (collectively, the "Workers' Compensation Program").  All Employees are entitled to participate in the Workers' Compensation Program.

77.     Currently, the Debtors maintain coverage under the Workers' Compensation Program through Pennsylvania MFRS Assn. ("Pennsylvania MFRS").  The Debtors use a guaranteed cost program with no deductible but subject to year-end adjustments.  The annual cost of the Workers' Compensation Program is approximately $117,676.00.  The Debtors paid 10 percent of the annual premium within 2 days of the January 1, 2019, renewal date, with the remaining $105,908.00 financed over a 10-month period.  As of the Petition Date, the Debtors do not believe they have any outstanding amounts owed on account of the Workers' Compensation Program.

78.     Additionally, certain of the Debtors' Employees are covered by the United States Longshore and Harbor Workers Compensation Act ("USL&H"), which applies to maritime

employees who work on or over navigable waters.  Historically, the Debtors have made an annual contribution of $10,000 to this program.

79.     It is my understanding that the Debtors must continue the claim-assessment, determination, adjudication, and payment process pursuant to the Workers' Compensation Program without regard to whether such liabilities are outstanding before the Petition Date to ensure that the Debtors comply with applicable workers' compensation laws and requirements during the pendency of these chapter 11 cases.[5]  I understand that there are currently no open claims under the Workers' Compensation Program to which this would apply.

80.     I believe that, because the Debtors are statutorily or contractually obligated to maintain the Workers' Compensation Program, their inability to do so may result in adverse legal consequences that potentially could disrupt the reorganization process.  As of the Petition Date, the Debtors do not believe any amounts are accrued and outstanding on account of the Workers' Compensation Program.

### (c)     401(k) Plan

81.     The Debtors provide all Employees with the ability to participate in a 401(k) defined contribution program, which is a multi-employer 401(k) profit-sharing plan through Associated General Contractors ("AGC") of America (the "401(k) Plan").  Employees generally are eligible to participate in the 401(k) Plan on the first day of the quarter following a six-month waiting period from hire date with Burkhalter Rigging, Inc.  The 401(k) Plan generally provides for pre-tax deductions of compensation up to limits set by the Internal Revenue Code, as

---

[5]The Debtors' Workers' Compensation Program may change postpetition in the ordinary course of business due to changes in applicable laws and regulations and the Debtors' ability to meet requirements thereunder.  By this motion, the Debtors request authority to continue the Workers' Compensation Program postpetition, including making any changes to current policy and practices that become necessary without further order of the Court.

well as for certain post-tax deductions.  Each Employee's contribution under the 401(k) Plan is deducted automatically from each paycheck and transferred to a trust established under the 401(k) Plan (collectively, the "401(k) Deductions").  As of the Petition Date, the Debtors estimate that they are obligated to remit approximately $16,156.00 on account of the 401(k) Deductions.

82.     The Debtors match the Employees' 401(k) Plan contributions on a discretionary, 30-percent basis up to four percent of the Employees' compensation (collectively, the "401(k) Contributions").  The Debtors contribute approximately $45,000 per year, which includes all matching and $950 annual dues required for AGC, on account of the 401(k) Contributions.  As of the Petition Date, approximately $2,000.00 in 401(k) Contributions are accrued and outstanding.

83.     The 401(k) Plan currently is administered by AGC.  All administrative costs associated with the 401(k) Plan are deducted from the assets contributed by the Employee.

84.     Many Employees' retirement savings solely consist of the 401(k) Plan, and many Employees choose to participate in the 401(k) Plan because of the 401(k) Contributions.  I believe that continuing the 401(k) Plan and the 401(k) Contributions is essential to maintaining Employee morale and protecting Employee expectations.  In addition, I understand that the 401(k) Deductions generally are held in trust by the Debtors and are not property of their estates.

**(d)     Paid Time Off and Other Leaves of Absence.**

85.     The Debtors maintain several paid-leave benefit programs for Employees, providing paid leave for Holidays, Vacation, Sick Leave, and Other Paid Leave (each as defined below, and together, the "Paid Leave").

86.     In the ordinary course of business, the Debtors provide vacation days ("Vacation") to the Employees as a Paid Leave benefit.  Full-time employees receive one week of vacation after one year of continuous employment with the Debtors.  Employees may not carry over unused

Vacation into the next calendar year at the end of any calendar year.  Employees who are terminated or resign are not entitled to a cash payment in lieu of their unused Vacation.  In addition, the Debtors also offer Employees six paid holidays (Christmas Day, New Year's Day, Memorial Day, July 4, Labor Day and Thanksgiving Day) throughout the year (each a "Holiday").  Generally, eligible Employees are not required to work on a designated Holiday and are paid for Holiday time plus 200 percent of their base rate of pay to the extent such Employee does work on a Holiday.

87.     The Debtors also permit their Employees to take certain other paid and unpaid leaves of absence for personal reasons, many of which are required by law.  The Debtors pay Employees for certain missed work time in the ordinary course of business for bereavement, leave provided under the Family and Medical Leave Act, voting, military leave, and all legally required leaves, including, without limitation, crime-victim and victim-of-domestic-violence leave, volunteer-firefighter leave, and leave for visits with children's teachers and school administrators, where applicable (collectively, the "Other Paid Leave").  Employees are not entitled to any separate cash payments in addition to their normal compensation for the Other Paid Leave.

88.     I believe that maintaining the Paid Leave policies in accordance with prior practice is essential to maintaining Employee morale during these chapter 11 cases.  The policies are broad-based programs on which all Employees have come to depend.  Furthermore, I do not believe that allowing Employees to use Paid Leave in the ordinary course of business will create any material cash-flow requirements beyond the Debtors' normal payroll obligations.

### (3)      Independent Contractor Compensation

89.     The Debtors rely on Independent Contractors in the ordinary course of their business to perform a wide range of services critical to the Debtors' operations, including, among other things, providing computer support services, and various other administrative functions. The

Debtors rely on the support of Independent Contractors to complete discrete projects in furtherance of the Debtors' businesses and to fill short-term positions that are not economically feasible to employ on a full- or part-time basis. I believe that the ability to continue paying the Debtors' Independent Contractor is critical to minimizing disruption of the Debtors' continued business operations.

90.    On average, the Debtors spend approximately $1,700.00 per month on account of Independent Contractors (the "Unpaid Contractor"). The Debtors estimate that $2,000.00 will become due within the first 21 days of these Chapter 11 Cases and owing for some amounts accrued prepetition.

91.    I do not believe that there are amounts owed to any Independent Contractors that exceed $12,850, the priority-expense compensation and benefit cap set forth by sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code.

### (4)    Honoring Prepetition Checks and Electronic Transfers

92.    Debtors request that, to the extent of funds on deposit, all applicable banks and other financial institutions shall be authorized, but not directed, to receive, process, honor and pay all checks presented for payment and to honor all funds transfer requests made by the employees, whether such checks were presented or fund-transfer requests were submitted prior to, or subsequent to, the Petition Date, I estimate prepetition checks in transit aggregate up to $33,711.95.

93.    I believe that, to maintain the Debtors' operations and preserve the value of their estates, it is essential that the Debtors continue to operate, to the extent possible, in the ordinary course of business. To achieve that result, the Debtors must retain the uninterrupted service and loyalty of its lifeline, which is the Employees. I believe that Payment of the Employee

Compensation and continuation or satisfaction of the Employee Benefits and related arrangements is essential to this goal.

**B.** **Motion for Entry of Interim and Final Orders (I) Approving the Debtors' Proposed Adequate Assurance of Payment for Future Utility Services, (II) Prohibiting Utility Companies from Altering, Refusing, or Discontinuing Services, and (III) Approving the Debtors' Proposed Procedures for Resolving Additional Assurance Requests**

94.     By this motion (the "Utility Motion"), the Debtors seek an Order (a) approving the Debtors' proposed adequate assurance of payment for future utility services; (b) prohibiting utility companies from altering, refusing, or discontinuing service; (c) approving the Debtors' proposed procedures for resolving additional adequate assurance requests; and (d) granting related relief.

95.     The Debtors incur utility expenses for water, natural gas, electricity, telephone, cellular telephone, waste disposal, internet, and other essential services (collectively "Utility Services") in the ordinary course of their business.   These Utility Services are provided by approximately five utility providers (as that term is used in section 366 of the Bankruptcy Code, collectively, the "Utility Providers") that deliver Utility Services to the Debtors as of the Petition Date include, without limitation, those listed on Exhibit C attached to the motion (the "Utility Provider List").

96.     On average, the Debtors spend in the aggregate approximately $19,000 each month in the aggregate on Utility Services, calculated as a historical average payment for the past five-month period that ended in January 31, 2019.   As of the Petition Date, the Debtors owed approximately $11,354.21 for current and past utility bills and obligations to the Utility Providers.

97.     I believe that preserving Utility Services on an uninterrupted basis to the Debtors is essential to the Debtors' ongoing operations and to the success of their reorganization.   Any unplanned interruption of utility services for even a brief period of time will likely negatively impact the Debtors' operations, customer and business relationships, revenues, and profits,

seriously jeopardizing the Debtors' reorganization efforts.  Thus, it is imperative that the Utility

Providers continue to provide their Utility Services without interruption.

### C. Motion for Order Authorizing, But Not Directing, Debtors to Maintain Existing Insurance Programs and Existing Insurance Premium Financing Agreement, and Fund All Obligations in Respect Thereof

98.     By this motion (the "Insurance Motion"), the Debtors seek an order (i) authorizing,

but not directing, the Debtors to (a) maintain the Debtors' existing Insurance Policies and Premium

Financing Agreements on an uninterrupted basis in accordance with their historical practices, (b)

satisfy payment of prepetition obligations related to that insurance coverage in the ordinary course

of business, (c) renew, supplement or enter into new insurance coverage in the ordinary course of

business, and (ii) granting such other and further relief as is requested herein or as the Court

otherwise deems necessary or appropriate.

99.     In the ordinary course of their business the Debtors maintain approximately eight

(8) insurance policies providing coverage for, among other things, automobile liability, property

liability, general liability, and workers' compensation liability, (collectively, the "Insurance

Policies," and with all premiums and other obligations related thereto, including any broker or

advisor fees, taxes, other fees, and deductibles, collectively, the "Insurance Obligations") through

several different third-party insurance carriers (collectively, the "Insurance Carriers").  A detailed

list of the Insurance Policies and Insurance Carriers is listed on Exhibit C to the Insurance Motion.

To the best of their knowledge, the Debtors do not owe any prepetition amounts, including

deductibles, on account of the Insurance Programs.

100.     The aggregate annual premium for the Insurance Policies is approximately

$736,527.00, not including applicable taxes and surcharges, deductibles, broker and consulting

fees, and commissions.  The Insurance Policies generally are one year in length and renew at

various times throughout the year.

101.     Some of the premiums with respect to the Insurance Policies are financed pursuant to four premium financing agreements (collectively the "Premium Financing Agreements") with AFS/IBEX A division of MetaBank ("AFS") and Premium Assignment Corporation ("PAC"), respectively, true and correct copies of which are attached as Exhibit D, Exhibit E, Exhibit F, and Exhibit G to the Insurance Motion.  The total annual obligation for the Premium Financing Agreements is approximately $843,868.00 which is paid with approximately $78,988.00 as a down payment and then ten monthly payments of approximately $76,488.00.  To the best of my knowledge, as of the Petition Date, the Debtors are current under the terms of the Premium Financing Agreements.

### (1)     Insurance Policies

102.     The insurance programs protect the Debtors and their personnel against various risks that may arise in the course of the Debtors' business.

103.     To protect the Debtors against such risks, it is my understanding that the Debtors' Insurance Policies include the following types of coverage:

### (a)     General Liability Policies

104.     The Insurance Policies include a general liability policy and a related excess third-party liability and provide coverage for claims relating to, among other things, personal injury, bodily injury, and umbrella excess liability.

### (b)     Property and Inland Marine Policy

105.     In the ordinary course of their business, the Debtors maintain property and inland marine insurance (the "Property Policy") that covers, among other things, the Debtors' real and personal property and covers damage from fire, theft, or other damage to the Debtors' property. The inland marine portion of the policy protects the Debtors' cranes and other heavy equipment

while it is being transported to other locations or is being used at a job site.  Additionally, the Property Policy covers the Debtors' riggers' and movers' exposures.

(c)      <b>Workers' Compensation Policies</b>

106.    In the ordinary course of their business, the Debtors maintain workers' compensation insurance policies (the "<u>Workers' Compensation Policy</u>") for the benefit of the Debtors' employees.  These policies provide coverage for injuries suffered by the Debtors' employees in the course of their employment.

(d)      <b>Business Automobile Liability Policy</b>

107.    In the ordinary course of their business, the Debtors maintain an automobile liability insurance policy (the "<u>Automobile Liability Policy</u>"), which provides damage and liability coverage for vehicles used in the Debtors' business.

(e)      <b>Commercial Property</b>

108.    In the ordinary course of their business, the Debtors maintain a commercial property policy (the "<u>Commercial Property Policy</u>") which provides damage and liability coverage for commercial property used in the Debtors' business.

(f)      <b>Employment Practices Liability</b>

109.    In the ordinary course of their business, the Debtors maintain an employment practices policy (the "<u>Employment Practices Policy</u>"), which provides damage and liability coverage to protect against employee lawsuits.

(g)      <b>Catastrophe Liability</b>

110.    In the ordinary course of their business, the Debtors maintain catastrophe policy (the "<u>Catastrophe Policy</u>"), which provides damage and liability coverage to protect against certain disasters, such as tornadoes and earthquakes.

### (h)    Surety Bonds

111.    In the ordinary course of their business, the Debtors are required to maintain certain surety bonds (the "Transport Bonds") to comply with the various laws and regulations governing the transport of the Debtors' heavy-crane equipment over certain highways and to register their vehicles, including in Pennsylvania and Louisiana, among other locations.  A list of the Transport Bonds is attached as Exhibit H to the Insurance Motion.

112.    Additionally, the Debtors are required to maintain subcontract performance bonds (the "Performance Bonds") to enter into subcontracts with certain contractors.  A list of the Performance Bonds is attached as Exhibit I to the Insurance Motion.

### (2)    Insurance Obligations

113.    Absent payments by the Debtors for the purpose of funding the Insurance Obligations, the Insurance Policies and the Premium Financing Agreement will not be funded and the Debtors' coverage under the Insurance Policies may be voided.  I believe that the disruption of the Debtors' insurance coverage will expose the Debtors to serious risks, including possibly (a) incurring direct liability for the payment of claims that otherwise would have been payable by the Insurance Carriers under the Insurance Policies: (b) incurring material costs and other losses that otherwise would have been reimbursed by the Insurance Carriers under the Insurance Policies; (c) being unable to obtain similar types of insurance coverage: (d) incurring higher costs for re-establishing lapsed policies or obtaining new equivalent coverage; and (e) an inability to obtain ongoing business as almost every project in the Debtors' industry requires minimum coverages for work to be awarded.

114.    The different categories of Insurance Obligations include (a) fixed-rate premiums based on a rate established by each Insurance Carrier, which are generally payable on an annual basis, some of which are financed through the Premium Financing Agreements; (b) deductibles

and other fees related to the Insurance Programs; (c) payments to insurance agents and brokers who assist with the procurement and negotiation of the Insurance Programs; and (d) monthly payments in the approximate amount of $76,488.00, which the Debtors make pursuant to the Premium Financing Agreements.  The Debtors also paid approximately $78,988.00 as a down payment on the Premium Financing Agreements.

115.    I believe that preserving the Debtors Insurance Policies and maintaining the Debtors Insurance Obligations is essential to the Debtors' ongoing operations and to the success of their reorganization.  The Debtors inability to continue their Insurance Policies would likely negatively impact the Debtors' operations and seriously jeopardize the Debtors' reorganization efforts.

D.    **Motion for Authorization, But Not Directing, Debtors to Pay Taxes and Fees, and Authorizing Banks and Financial Institutions to Honor and Process All Related Checks and Electronic Payment Requests**

116.    By this motion (the "Taxes Motion"), the Debtors request an Order authorizing, but not directing, the Debtors to pay certain unpaid taxes and fees in the ordinary course of business, whether arising prepetition or post-petition.

117.    In the ordinary course of their business, the Debtors collect, withhold, and incur sales, use, excise, income, withholding, franchise, severance, and property taxes, as well as other business, environmental, and regulatory fees (collectively, the "Taxes and Fees").  The Debtors remit the Taxes and Fees to various federal, state, and local governments, including taxing and licensing authorities (collectively, the "Authorities").  A schedule identifying the Authorities is attached to the Tax Motion as Exhibit A.  Taxes and Fees are remitted and paid by the Debtors through checks and electronic funds transfers that are processed through their banks and other financial institutions.

118.     It is my understanding that the Debtors pay the Taxes and Fees to the Authorities on a periodic basis, remitting them monthly, quarterly, semiannually, or annually depending on the nature and incurrence of a particular Tax or Fee.  It is my belief that the Debtors are substantially current with respect to their payment of Taxes and Fees.

119.     It is my understanding that the Debtors' weekly payroll taxes, state withholding states, state unemployment taxes and federal unemployment taxes amount to approximately $185,556.17 for Burkhalter Rigging and $1,553.90 for Burkhalter Transport, Inc.

120.     It is my further understanding that, as of the Petition Date, the Debtors owe $5,000 in franchise taxes to the Mississippi Department of Revenue and $26,000 in property taxes to Lowndes County, Mississippi.

121.     The Debtors also pay a variety of business fees including, without limitation, bankcard fees, crane-operator certifications, and transportation permits.

122.     I believe that failing to pay the Taxes and Fees could materially disrupt the Debtors' business operations.

**E.      Motion for Entry of Order (I) Allowing Debtors to Temporarily Use Their Existing Bank Accounts (II) Granting a 45 Day Extension for Debtors to Comply With The Operating Guidelines and Reporting Requirements for Debtors In Possession and (III) Granting Related Relief**

123.     By this motion (the "Cash Management Motion"), the Debtors seek entry of an order (a) authorizing the Debtors to (i) temporarily maintain their existing bank accounts, including honoring certain prepetition obligations related thereto; (ii) allowing the Debtors 45 days to open new bank accounts to comply with the *Operating Guidelines and Reporting Requirements for Debtors in Possession and Trustees* (the "U.S. Trustee Operating Guidelines"); and (iii) granting related relief.

124.    The Debtors have an established cash management system that they utilize to collect, manage, and disburse funds used in the Debtors' operations in the ordinary course of business.

**Bank Accounts**

125.    In the ordinary course of business, the Debtors maintain separate bank accounts at Trustmark National Bank ("Trustmark") and Regions Financial Corporation ("Regions," and collectively, the "Banks").   Cash from customers is deposited into these accounts and all disbursements are made out these accounts.

126.    The Debtors accounts (the "Bank Accounts") are as follows:

| Last 4 Digits of Account No. | Description |
|---|---|
| *0304 | Held by Burkhalter Rigging, Inc. – used for all Burkhalter Rigging, Inc.'s cash disbursements, including payroll. |
| *9723 | Held by Burkhalter Specialized Transport, LLC – used for all of Burkhalter Specialized Transport, LLC's cash disbursements. |
| *9715 | Held by Burkhalter Transport, Inc. – used for all of Burkhalter Transport, Inc.'s cash disbursements, mostly used for any union payroll. |
| *0483 | Held by Burkhalter Rigging, Inc. – used for all of Burkhalter Rigging, Inc.'s cash disbursements, including payroll. |

127.    Transfers between the Debtors, if required, are done using the Banks' online sites, typically not more than once a week.   The Banks are Federal Deposit Insurance Company ("FDIC") insured banks.   Therefore, the Bank Accounts currently comply with section 345(b) of the Bankruptcy Code.

128.    The Debtors pay the Banks monthly fees incurred in connection with the Bank Accounts (the "Bank Fees").   It is my understanding that the Bank Fees amount to approximately $500 a month.

<u>The Frozen Account</u>

129.    On December 28, 2018, Capital City Group, Inc. ("<u>Capital City</u>"), an alleged judgment creditor of Burkhalter Rigging, filed a Writ of Garnishment on the account ending in 0304 based on a judgment in the total amount of $272,579.75, which is disputed by the Debtors. As a result, Account *0304 as frozen (the "<u>Frozen Account</u>").  The writ was issued from the Circuit Court of Lowndes County, Mississippi (the "<u>Circuit Court</u>").

130.    On January 18, 2019, Trustmark filed its answer to the garnishment stating that it was indebted to Burkhalter Rigging in the amount of $110,191.35 and that it was holding that amount and would remit it to Capital City upon entry of court order.  On January 25, 2019, Capital City filed its Motion to Direct Turnover of Funds.

131.    The Debtors dispute the amount owed and intend to seek relief relating to the Frozen Account, which is covered by the automatic stay.

<u>Plans for Full Compliance With the U.S. Trustee Operating Guidelines</u>

132.    The Guidelines for Debtors-in-Possession (the "<u>Operating Guidelines</u>") promulgated by the Office of the United States Trustee for the Southern District of Texas (the "<u>U.S. Trustee</u>") generally require chapter 11 debtors to, among other things, deposit all estate funds into an account with an approved depository ("<u>Approved Depository</u>") that has agreed to comply with certain requirements set by the U.S. Trustee for handling bankruptcy estate funds.

133.    Regions is currently an Approved Depository but Trustmark is not.  The Debtors intend to close their Trustmark accounts and open debtor-in-possession accounts with Regions. However, because the Debtors cannot access the Frozen Account as of the time of this filing, there will necessarily be some delay in the Debtors' ability to transfer the Frozen Account funds to Regions.  On February 1, 2019, the Debtors, through counsel, notified the Circuit Court, Trustmark, and Capital City of the Chapter 11 Cases' commencement and the imposition of the

automatic stay.  The Debtors hope that Capital City and Trustmark will promptly and voluntarily comply with section 362 of the Bankruptcy Code by, respectively, releasing the Writ of Garnishment and unfreezing the Frozen Account so the Debtors can begin moving toward compliance with the Operating Guidelines soon.  However, if these parties do not do so promptly and voluntarily, the Debtors will file a subsequent motion with this Court asking for a direction that Capital City and Trustmark release property of the estate to the Debtors.

### (1)     The Debtors' Existing Business Forms

134.    The Debtors utilize certain limited preprinted correspondence and business forms, such as letterhead and checks (collectively, the "Business Forms"), in the ordinary course of their businesses.  The Debtors also maintain books and records to document, among other things, their profits and expenses.  To minimize unnecessary additional expenses to their estates, the Debtors request that the Court authorize their continued use of their Business Forms to the limited extent that they are preprinted and in existence on the Petition Date, without reference to the Debtors' status as debtors-in-possession for the next 45 days, rather than requiring the Debtors to incur the unnecessary expense and delay of ordering entirely new forms immediately as required by the U.S. Trustee Operating Guidelines.

135.    It is my understanding that Trustmark is not a depository approved by the United States Trustee.  I believe that it will take time to identify and open accounts in a new depository and that immediate closure of the Bank Accounts would negatively impact the Debtors' operations and seriously jeopardize the Debtors' reorganization efforts.

**F.     Motion for Authority for the Debtors to Use Cash Collateral, Obtain Debtor In Possession Financing, and Determining Adequate Protection, Superpriority Claim and Liens (the "DIP-Financing Motion")**

136.    To continue their operations in an orderly manner on a postpetition basis, the Debtors require the ability to use Metro's cash collateral and to borrow funds (the "DIP Loan")

pursuant to a debtor-in-possession credit agreement negotiated with Metro (the "DIP Lender"). The specific terms and conditions of the DIP Loan are still under negotiation.  But it is agreed by Metro and the Debtors that the DIP Loan will be a traditional, asset-based loan and will provide enough funds for the Debtors to operate in the ordinary course of business during the Chapter 11 Cases, allowing the Debtors to preserve going-concern value for a sale or other restructuring alternative.  Further details about the DIP Loan will be provided in the DIP-Financing Motion, which will be filed prior to the first-day hearing.  Because Metro is the Debtors' current secured lender and the Debtors' largest creditor, it is reasonable to expect Metro to provide the DIP Loan, especially given the Debtors' urgent need for working capital, and request for adequate-protection and super-priority protection related to the DIP Loan.  The Debtors will continue to look for debtor-in-possession financing terms better than what is offered by Metro.

>  **G.    Application to Employ and Retain [Stetto] Corporate Restructuring as Claims, Noticing, and Solicitation Agent, Effective *Nunc Pro Tunc* to the Petition Date**

137.    The Debtors anticipate that hundreds of persons or entities may file proofs of claim in the Chapter 11 Cases.

138.    In light of the significant number of anticipated claimants and other parties in interest in these Chapter 11 Cases, as well as the need for the Debtors' limited personnel to focus on running the business, the Debtors believe that the appointment of [Stetto] as the Claims and Noticing Agent will provide the most effective and efficient means of–and relieve the administrative burden on the Debtors and/or the Office of the Clerk of the Bankruptcy Court (the "Clerk") of–noticing, administering certain claim-related tasks, and soliciting and tabulating votes.

>  **H.    Motion for an Entry of Order authorizing the Retention and Compensation of Certain Professionals Utilized in the Ordinary Course of Business**

139.     By this motion (the "OCP Motion"), the Debtors seek entry of an order, authorizing, but not directing, the Debtors to retain and compensate certain law firms, attorneys, consultants, engineers and other non-attorney professionals utilized in the ordinary course of business (each, an "OCP" and, collectively, the "OCPs"),[6] pursuant to the certain compensation procedures.  A list of OCPs is attached as Exhibit 1 to Exhibit A of the OCP Motion.

140.     The Debtors employ 12 OCPs, consisting of various law firms, attorneys, accountants, consultants, and other non-attorney professionals used in the ordinary course of their businesses.  The OCPs provide services to the Debtors in a variety of matters unrelated to the Chapter 11 Cases, including specialized legal advice, litigation services, and business advisory services relating to, among other things, corporate, litigation, financial, tax, regulatory, human resources, and environmental matters.

141.     The OCPs have a great deal of knowledge, expertise, and familiarity with the Debtors and their operations.  Although the Debtors anticipate that the OCPs will want to continue to represent the Debtors on an ongoing basis, some may not do so if the Debtors cannot meet their payment obligations on a regular basis.  I believe that the continued employment and compensation of the OCPs is in the best interests of the Debtors estates, creditors, and other parties in interest.

## IV.     CONCLUSION

142.     In conclusion, for the reasons stated herein and in each of the First-Day Motions filed concurrently or in connection with the commencement of the Chapter 11 Cases, I respectfully

---

[6] The OCPs are listed on Exhibit 1 to Exhibit A attached to the proposed order filed with the Motion for Entry of An Order Authorizing the Retention and Compensation of Certain Professionals Utilized in the Ordinary Course of Business and incorporated herein by reference (collectively, the "OCP List"). The Debtors also seek to reserve the right to retain additional OCPs from time to time during these chapter 11 cases, as the need arises, by filing a list or lists of such additional professionals and complying with the notice requirements set forth in the Compensation Procedures, without further order of the Court.

request that each of the First-Day Motions be granted in its entirety, together with such other and further relief as this Court deems just and proper.

[*Signature Page Follows*]

I certify under penalty of perjury that, based upon my knowledge, information and belief as set forth in this Declaration, the foregoing is true and correct.

Dated: February 3, 2019             Respectfully Submitted,

                                     */s/ Michael G. Tinsley*
                                     Michael G. Tinsley
                                     Chief Financial Officer
                                     Burkhalter Rigging, Inc.

4815-4197-9525.8