**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| BURKHALTER RIGGING, INC. | § | Case No. 19-30495 (MI) |
| | § | |
| Debtor. | § | |
| | § | |
| Tax I.D. No. 64-0538314 | § | |
| | § | |
| In re: | § | Chapter 11 |
| | § | |
| BURKHALTER SPECIALIZED | § | Case No. 19-30497 (MI) |
| TRANSPORT, LLC | § | |
| | § | |
| Debtor. | § | |
| | § | |
| Tax I.D. No. 03-0401511 | § | |
| | § | |
| In re: | § | Chapter 11 |
| | § | |
| BURKHALTER TRANSPORT, INC., | § | Case No. 19-30496 (MI) |
| | § | |
| Debtor. | § | (Joint Administration Requested) |
| | § | (Emergency Hearing Requested) |
| Tax I.D. No. 64-0822096 | § | |

**DEBTORS' <u>EMERGENCY</u> MOTION FOR ENTRY OF INTERIM
AND FINAL ORDERS (I) AUTHORIZING THE DEBTORS TO OBTAIN POST-
PETITION FINANCING, GRANTING SENIOR POSTPETITION SECURITY
INTERESTS AND ACCORDING SUPERPRIORITY ADMINISTRATIVE EXPENSE
STATUS PURSUANT TO SECTIONS 364(C) AND 364(D) OF THE BANKRUPTCY
CODE; (II) AUTHORIZING THE USE OF CASH COLLATERAL; (III) GRANTING
ADEQUATE PROTECTION; (IV) MODIFYING
THE AUTOMATIC STAY; AND (V) GRANTING RELATED RELIEF**

THIS MOTION SEEKS ENTRY OF AN ORDER THAT MAY ADVERSELY AFFECT YOU. IF YOU OPPOSE THE MOTION, YOU SHOULD IMMEDIATELY CONTACT THE MOVING PARTY TO RESOLVE THE DISPUTE. IF YOU AND THE MOVING PARTY CANNOT AGREE, YOU MUST FILE A RESPONSE AND SEND A COPY TO THE MOVING PARTY. YOUR RESPONSE MUST STATE WHY THE MOTION SHOULD NOT BE GRANTED. IF YOU DO NOT FILE A TIMELY RESPONSE, THE RELIEF MAY BE GRANTED WITHOUT FURTHER NOTICE TO YOU. IF YOU OPPOSE THE MOTION AND HAVE NOT REACHED AN AGREEMENT, YOU MUST ATTEND THE HEARING. UNLESS THE PARTIES AGREE OTHERWISE, THE COURT MAY CONSIDER EVIDENCE AT THE HEARING AND MAY DECIDE THE MOTION AT THE HEARING.

EMERGENCY RELIEF HAS BEEN REQUESTED. IF THE COURT CONSIDERS THE MOTION ON AN EMERGENCY BASIS, THEN YOU WILL HAVE LESS THAN 21 DAYS TO ANSWER. IF YOU OBJECT TO THE REQUESTED RELIEF OR IF YOU BELIEVE THAT THE EMERGENCY CONSIDERATION IS NOT WARRANTED, YOU SHOULD FILE AN IMMEDIATE RESPONSE. A HEARING WILL BE HELD ON THIS MATTER FOR FEBRUARY 6, 2019, AT 1:30 P.M. (CT) BEFORE THE HONORABLE MARVIN ISGUR, 515 RUSK STREET, COURTROOM 404, HOUSTON, TEXAS 77002.

REPRESENTED PARTIES SHOULD ACT THROUGH THEIR ATTORNEY.

The above-captioned debtors and debtors-in-possession (collectively, the "Debtors") respectfully state the following in support of this motion (the "Motion"):

## Relief Requested

1.     By this Motion, the Debtors request entry of a bridge financing order (the "Bridge Financing Order")

(I) authorizing the Debtors to (a) to incur the DIP Financing, including with respect to an interim borrowing of $350,000.00, (b) granting senior postpetition security interests and superpriority administrative expense status, and (c) use of the Cash Collateral;

(II) granting adequate protection as provided herein;

(III) modifying the automatic stay; and

(IV) scheduling a hearing to consider the relief requested herein on a final basis (the "Final Hearing").

2.      In support of this Motion, the Debtors submit the *Declaration of Michael Tinsley in Support of Chapter 11 Petitions and First Day Motions*,[1] and Proffer of John O'Neill in Support of Debtor-in-Possession Financing Motion (the "O'Neill Proffer"), both filed contemporaneously herewith (collectively, the "First Day Declarations").[2]

## Jurisdiction

3.      The United States Bankruptcy Court for the Southern District of Texas (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the Amended Standing Order of Reference from the United States District Court for the Southern District of Texas, dated May 24, 2012 (the "Amended Standing Order").  The Debtors confirm their consent, pursuant to rule 7008 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), to the entry of a final order by the Court in connection with this motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

4.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).

5.      The statutory bases for the relief requested herein are sections 105, 361, 362, 363(c), 364(c)(1); 364(c)(2); 364(c)(3), 364(d)(1), 364(e), and 507 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"), Rules 2002, 4001, 9013 and 9014 of the

---

[1] The Debtors' filed their voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), on January 31, 2019 (the "Petition Date").  A detailed description of the Debtors and their businesses, and the facts and circumstances supporting this motion and the Debtors' chapter 11 cases (the "Chapter 11 Cases") are set forth in greater detail in the Declaration of Michael Tinsley in support of Chapter 11 Petitions and First Day Motions (the "First Day Declaration"), filed on February 3, 2019.

[2] A budget presenting the Debtors' projected receipts and disbursements is additionally attached as **Exhibit 1** to the Bridge Financing Order.

Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rules 2002-1, 4001-1, and 9013-1 of the Bankruptcy Local Rules for the Southern District of Texas (the "Local Rules"),

### Preliminary Statement

6.      The Debtors' ability to obtain access to liquidity is critical to fund their operations and these chapter 11 cases.  Recognizing this, the Debtors, with the assistance of John O'Neill of Riverbend Solutions Group, Inc., undertook a marketing process that involved discussions with a variety of financial institutions, lenders, and the Debtors' incumbent secured lenders to secure debtor-in-possession financing ("DIP Financing").  Failing to find DIP financing from any party other than their prepetition lenders, the Debtors seek the authority to obtain post-petition financing pursuant to a senior secured super-priority debtor-in-possession term loan facility (the "Bridge DIP Facility") in an aggregate principal amount of up to $350,000.00 (the "Bridge DIP Loans") from their prepetition lenders, Metropolitan Partners Group Administration LLC, as administrative agent and collateral agent (in such capacities, the "DIP Agent"), and the lenders party thereto from time to time (the "DIP Lenders" and, together with the DIP Agent and any other party to which Bridge DIP Obligations (as defined herein) are owed, the "DIP Parties"), on the terms and conditions set forth  in the Bridge Financing Order and to incur the obligations set forth thereunder (the "Bridge DIP Obligations").

7.      The Bridge DIP Loans will provide sufficient liquidity to fund these Chapter 11 Cases and the Debtors' general corporate operations, finance operational restructuring, and cost-savings initiatives until a more fulsome DIP facility can be negotiated between the DIP Parties and Debtors. Ultimately, the Bridge DIP Facilities will give the Debtors the funds necessary to maintain enterprise value while it consummates a value-maximizing transaction, which they explored in the months prior to bankruptcy and continue to explore today.  The Debtors firmly

believe that approval of the Bridge DIP Facilities will maximize value for their stakeholders and is a sound exercise of the Debtors' sound business judgment. Accordingly, the Debtors respectfully request that the Bankruptcy Court grant the requested relief.

**Concise Statement Pursuant to Bankruptcy Rule 4001 and the United States Bankruptcy Court for the Southern District of Texas Procedures for Complex Chapter 11 Cases[3]**

8.    The Debtors seek entry of the Bridge Financing Order:

a.    ***Bridge DIP Facility***: authorizing the Debtors to enter into a bridge financing facility in an aggregate principal amount of $350,000.00 (the "Bridge DIP Facility"), the proceeds of which shall be used by the Debtors to, subject to the terms and conditions set forth in the Bridge Financing Order and in accordance with the Approved Budget (as defined in the Bridge Financing Order) for operational and administrative expenses.

b.    ***Adequate Protection***: authorizing the Debtors to grant adequate protection in connection with the prepetition secured notes and credit agreement and all related security agreements (the Prepetition Loan Documents") and all of the Debtors' secured obligations arising thereunder;

c.    ***Cash Collateral***: authorizing the Debtors to continue to use Cash Collateral subject to the restrictions set forth in the Bridge Financing Order and in accordance with the Approved Budget and the granting of adequate protection to the prepetition secured lenders (the Prepetition Secured Lenders") with respect thereto;

d.    ***Superpriority Claims and DIP Liens***: granting superpriority priming liens on all property of the Debtors' estate, including all assets, reserves, inventory, accounts receivables, and fixed assets (but excluding any causes of action under chapter 5 of the Bankruptcy Code, the proceeds thereof, any excluded accounts (as defined in the Bridge Financing Order);

e.    ***Automatic Stay***: modifying the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms of the Bridge Financing Order; and

f.    ***Indemnification***: authorizing the Debtors to indemnify and hold harmless the DIP Parties and against any and all liabilities, obligations, losses, damages,

---

[3] The summaries contained in this Motion are qualified in their entirety by the provisions of the documents referenced, including the DIP Loan Agreements and the Interim Order. To the extent anything in this Motion is inconsistent with such documents, the terms of the applicable documents shall control. Capitalized terms used in this summary chart but not otherwise defined have the meanings ascribed to them in the DIP Financing Documents or the Interim Order, as applicable.

penalties, actions, judgments, suits, costs, expenses (including, without limitation, reasonable attorney's fees), or disbursements.

g.   ***Interim and Final Hearing***: scheduling an interim ("Interim Hearing") and final hearing (the "Final Hearing") on the motion.

9.   The following chart contains a summary of the material terms of the proposed DIP Facilities, together with references to the applicable sections of the relevant source documents, as required by Bankruptcy Rules 4001(b)(1)(B) and 4001(c)(1)(B) and the Complex Case Procedures.[4]

| Bankruptcy Code/Local Rule | Summary of Material Terms |
|---|---|
| **Borrower**<br>Bankruptcy Rule 4001(c)(1)(B)<br>LBR 4001-2(a)(14) | All Debtors, with each jointly and severally liable to pay the commitment under the DIP Revolving Facility.<br><br>*Bridge Financing Order, ¶B(i)* |
| **DIP Agent**<br><br>Bankruptcy Rule 4001(c)(1)(B) | Metropolitan Partners Group Administration LLC<br><br>*Bridge Financing Order, Introduction* |
| **Approved Budget and Variance Reporting**<br>Bankruptcy Rule 4001(c)(l)(B)<br>LBR 4001- 2(a)(2) | The DIP Facilities include standard and customary conditions that require the Debtors to provide periodic reports to the DIP Parties and their respective professionals regarding the Budget, variances thereto.<br><br>*Bridge Financing Order, ¶ 13* |
| **Entities with Interests in Cash Collateral**<br>Bankruptcy Rule 4001(b)(l)(B)(i) | Prepetition Secured Parties<br><br>*Bridge Financing Order, ¶ B(iv)* |
| **Bridge DIP Facility**<br><br>4001(b)(l)(B)(i),<br>4001(c)(1)(B) | A senior secured super-priority debtor-in possession term loan facility in an aggregate principal amount of up to $350,000.00 from Metropolitan Partners Group Administration LLC.<br><br>*Bridge Financing Order, Introduction* |
| **Bridge DIP Facility Term**<br><br>Bankruptcy Rule 4001(b)(l)(B)(iii), | The Bridge DIP Facility shall mature on the earliest to occur of (i) March 4, 2019, (ii) the closing date of any sale of substantially all of the Debtors' assets, and (iii) the occurrence of an Event of Default (defined below) which remains uncured following the Remedies Notice Period (defined below) (such earlier date, the "Termination Date"). |

[4] The summaries contained in this Motion are qualified in their entirety by the provisions of the documents referenced. To the extent anything in this Motion is inconsistent with such documents, the terms of the applicable documents shall control. Capitalized terms used in this summary chart, but not otherwise defined, have the meanings ascribed to them in the DIP Documents or the Interim Order, as applicable.

| Bankruptcy Code/Local Rule | Summary of Material Terms |
|---|---|
| 4001(c)(1)(B)<br>LBR 4001- 2(a)(10) | *Bridge Financing Order, ¶ 3* |
| **DIP Collateral** | All assets and properties (whether tangible, intangible, real, personal, or mixed) of the Debtors, whether now owned by or owing to, or hereafter acquired by (including the Debtors' interest in property owned or consigned by or to, or leased from or to the Debtors), or arising in favor of, the Debtors (including under any trade names, styles, or derivations thereof), and whether hereafter acquired by, the Debtors, and regardless of where located, before or after the Petition Date including, without limitation: (i) all Prepetition Collateral; (ii) all cash and cash equivalents; (iii) all funds in any deposit account, securities account or other account of the Debtors and all cash and other property deposited therein or credited thereto from time to time; (iv) all accounts and other receivables (including those owed to the Debtors generated by intercompany transactions); (v) all contracts and contract rights; (vi) all instruments, documents and chattel paper; (vii) all securities (whether or not marketable); (viii) all goods, as-extracted collateral, equipment, inventory and fixtures; (ix) all real property interests; (x) all interests in leaseholds, (xi) all franchise rights; (xii) all patents, tradenames, trademarks (other than intent-to-use trademarks), copyrights and all other intellectual property; (xiii) all general intangibles; (xiv) all capital stock, limited liability company interests, partnership interests and financial assets; (xv) all investment property; (xvi) all supporting obligations; (xvii) all letters of credit issued to the Debtors and letter of credit rights; (xviii) all commercial tort claims (including that certain claim of Burkhalter Rigging, Inc., identified as Claim ID 100928 pursuant to the Deepwater Horizon Economic and Property Damages Settlement Program, for the loss of business economic benefit to Burkhalter Rigging, Inc.); (xix) all other claims and causes of action and the proceeds thereof; (xx) all books and records (including, without limitation, customers lists, credit files, computer programs, printouts and other computer materials and records); (xxi) to the extent not covered by the foregoing, all other goods, assets or properties of the Debtors, whether tangible, intangible, real, personal or mixed; and (xxii) all products, offspring, profits, and proceeds of each of the foregoing and all accessions to, substitutions and replacements for, and rents, profits and products of, each of the foregoing, and any and all proceeds of any insurance, indemnity, warranty or guaranty payable to such Debtor from time to time with respect to any of the foregoing.  For the avoidance of doubt, the Carve-Out shall be from the Prepetition Collateral and the DIP Collateral, and it shall be paid from proceeds thereof.<br><br>*Bridge Financing Order, ¶ 8(b)* |
| **Adequate Protection**<br>Bankruptcy Rules 4001(b)(l)(B)(iv), 4001(c)(1)(B)(ii)<br>LBR 4001-2(a)(4) | Adequate Protection.  The adequate-protection package includes:<br><br>• *Prepetition Adequate Protection Liens*. Pursuant to sections 361, 363(e) and 364(d) of the Bankruptcy Code, the Prepetition Senior Loan Agent and the Prepetition Senior Lenders, effective as of the entry of this Bridge Financing Order, are hereby granted continuing, valid, binding, enforceable and automatically perfected postpetition liens (the "Prepetition Adequate Protection Liens") on all DIP Collateral.<br><br>• *Prepetition Superpriority Claim*. Pursuant to section 507(b) of the Bankruptcy Code, the Prepetition Senior Loan Agent and the Prepetition Senior Lenders, effective as of the entry of this Bridge Financing Order, are hereby further granted an allowed superpriority administrative expense claim (the "Prepetition Superpriority Claim"), which claim shall be junior to the DIP Superiority Claim, which shall be junior to the Carve-Out, but shall be senior to and have priority over any other administrative expense claims, unsecured claims and all other claims against the Debtors or their estates in any of the Chapter 11 Cases or any Successor Cases, at any time existing or arising, of any kind or nature whatsoever, including, without limitation, administrative expenses or other claims of the kinds specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 365, 503(a), 503(b), 506(c) (subject to entry of the Final Order), 507(a), 507(b), 546(c), 546(d), 726, 1113 and 1114 of the Bankruptcy Code, and any other provision of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy, or attachment. |

| Bankruptcy Code/Local Rule | Summary of Material Terms |
|---|---|
| | The Prepetition Superpriority Claim shall, for purposes of section 1129(a)(9)(A) of the Bankruptcy Code, be considered administrative expenses allowed under section 503(b) of the Bankruptcy Code, shall be against each Debtor on a joint and several basis, and shall be payable from and have recourse to all DIP Collateral. Except for the Carve-Out and the DIP Superiority Claim, the Prepetition Superpriority Claim shall not be made subject to or pari passu with any claim heretofore or hereinafter granted or created in any of the Chapter 11 Cases or any Successor Cases and shall be valid and enforceable against the Debtors, their estates and any successors thereto, including, without limitation, any trustee appointed in any of the Chapter 11 Cases or any Successor Cases until such time as the Prepetition Secured Obligations owed under the Prepetition Documents are paid in full.<br><br>• *Adequate Protection Reservation*; Section 507(b) Reservation. The receipt by the Prepetition Secured Parties of the adequate protection provided pursuant to this Bridge Financing Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly, the rights of the Prepetition Secured Parties to seek additional forms of adequate<br><br>*Bridge Financing Order, ¶¶ 11 (a) and (b), 12* |
| **Waiver/Modification of the Automatic Stay** Bankruptcy Rule 4001(c)(1)(B)(iv) | The automatic stay imposed under section 362(a) of the Bankruptcy Code is hereby modified as necessary to effectuate all of the terms, rights, benefits, privileges, remedies and provisions of this Bridge Financing Order, including, without limitation, to permit: (a) the Debtors to grant the DIP Liens and the DIP Superpriority Claims, and to perform such acts as the DIP Agent may reasonably request, to assure the perfection and priority of the DIP Liens and any other liens granted hereunder; (b) the Debtors to take all appropriate actions necessary to (i) grant the Adequate Protection Liens, Adequate Protection Claims, or any other liens or claims set forth herein, and (ii) ensure that the Adequate Protection Liens or any other liens granted hereunder are perfected and maintain the priority set forth herein; (c) the Debtors to incur all liabilities and obligations (including all the Bridge DIP Obligations) to the DIP Parties and the Prepetition Secured Parties, as contemplated under this Bridge Financing Order; (d) the Debtors to pay all amounts referred to, required under, in accordance with, and subject to this Bridge Financing Order; (e) the DIP Parties and the Prepetition Secured Parties to retain and apply payments made in accordance with this Bridge Financing Order; (f) the DIP Parties to exercise, upon the occurrence and during the continuance of any Event of Default hereunder, all rights and remedies provided hereunder and take any or all actions provided therein, in each case without further notice, motion, application to, order of, or hearing before, this Court; and (g) the implementation of all of the terms, rights, benefits, privileges, remedies, and provisions of this Bridge Financing Order without further notice, motion, or application to, or order of or hearing before, this Court, subject to the terms of this Bridge Financing Order including as to the Remedies Notice Period.<br><br>The DIP Facilities provide that upon the occurrence of an Event of Default and certain other events, and after five (5) business days from the date of the Default Notice, the DIP Parties may proceed against and realize upon the DIP Collateral.<br><br>*Bridge Financing Order, ¶¶ 17, 18* |
| **Carve Out Bankruptcy** Rule 4001(c)(1)(B) LBR 4001- 2(a)(5) | The Interim Order provides a "Carve Out" for the following expenses:<br><br>• All fees required to be paid, both prior to and after delivery of a Carve-Out Trigger Notice, by the Debtors to the Clerk of the Bankruptcy Court and all statutory fees payable to the U.S. Trustee under 28 U.S.C. § 1930(a) (collectively, the "Statutory Fees");<br>• all reasonable fees and expenses incurred by a trustee under section 726(b) of the Bankruptcy Code in an aggregate amount not to exceed $25,000;<br>• to the extent allowed by the Bankruptcy Court at any time, all accrued and unpaid fees and expenses incurred by professionals or professional firms retained by the Debtors, their estates, or the Committee pursuant to sections 327, 328, 363 or 1103 of the |

| Bankruptcy Code/Local Rule | Summary of Material Terms |
|---|---|
| | Bankruptcy Code (other than ordinary course professionals) (collectively, the "Estate Professionals") at any time before the delivery by the DIP Agent of a Carve-Out Trigger Notice (as defined herein), whether such amounts are allowed by the Bankruptcy Court prior to or after delivery of such Carve-Out Trigger Notice (and including amounts incurred but not invoiced prior to the delivery of the Carve-Out Trigger Notice); provided, that, there shall be a dollar-for-dollar reduction of the Carve-Out for any unused retainers (if any) held by or on behalf of the Estate Professionals as of the delivery of the Carve-Out Trigger Notice; and <br><br> • to the extent allowed by the Bankruptcy Court at any time, all unpaid fees and expenses incurred by the Estate Professionals on or after the day following the date of the delivery by the DIP Agent of the Carve-Out Trigger Notice, in an aggregate amount not to exceed $75,000 for all such professionals (for the avoidance of doubt, not on a professional-by-professional basis); provided, that, without duplication of the above reduction for retainers, there shall be a dollar-for-dollar reduction of the Carve-Out for any unused retainers (if any) held by or on behalf of the Estate Professionals as of the delivery of the Carve-Out Trigger Notice; provided, further, that any payment or reimbursement made for fees and expenses incurred after the delivery of the Carve-Out Trigger Notice to an Estate Professional shall permanently reduce the Post-Carve-Out Trigger Notice Cap on a dollar-for-dollar basis, and to the extent any payment to an Estate Professional is subsequently disallowed and/or disgorged, the proceeds of any claim against the Estate Professional for amounts so disallowed or disgorged shall constitute DIP Collateral subject to the DIP Liens (such amount set forth in this clause (iv), the "Post-Carve-Out Trigger Notice Cap"). <br><br> Notwithstanding the foregoing, no portion of the Carve-Out shall be used for the payment of fees, disbursements, costs or expenses incurred by any Estate Professional to investigate, challenge, object to, contest, or raise any defense to, the validity, security, perfection, priority, extent or enforceability of any amount due under or the liens or claims granted under or in connection with the Prepetition Loan Documents. <br><br> *Interim Order, ¶ 24* |
| **Interest Rates** <br> Bankruptcy Rule 4001(c)(1)(B) <br> LBR 4001- 2(a)(3) | Interest on the Bridge DIP Facility shall accrue and be payable on the Termination Date at a rate per annum equal to 16%. <br><br> *Bridge Financing Order, ¶ 3(b)* |
| **Sale Process** <br> LBR 4001-2(a)(12) | The Bridge Order contemplates certain milestones in the sales process: <br><br> • An order granting interim approval of a subsequent senior post-petition loan facility with the DIP Agent and the DIP Lenders entered by this Court on or before March 1, 2019; <br> • An order granting authority for the Debtors to retain a Chief Restructuring Officer (the "CRO") reasonably acceptable to the DIP Agent and the DIP Lenders entered by this Court on or before March 1, 2019; <br> • A motion seeking approval of bidding procedures and the sale of all or substantially all of the Debtors' assets to a stalking horse bidder acceptable to the DIP Agent and the DIP Lenders is not filed on or before February 15, 2019; <br> *Bridge  Financing Order, ¶3* |
| **Use of Cash Collateral** <br> Bankruptcy Rule 4001(b)(l)(B)(ii) <br> LBR 4001- 2(a)(2) | Borrowers shall use the proceeds to provide working capital through a bankruptcy sale process and reorganization proceedings in accordance with the Approved Budget. <br><br> No proceeds of the DIP Facilities or Cash Collateral shall be used in: <br><br> • the investigation (including by way of examinations or discovery proceedings), initiation, assertion, joining, commencement, support or prosecution of any claims, counter-claims, causes of action, adversary proceedings, applications, motions, |

| Bankruptcy Code/Local Rule | Summary of Material Terms |
|---|---|
| **Limitation on Use of Proceeds** <br> LBR 4001-2(a)(9) | objections, defenses, or other contested matters against any of the DIP Parties or the Prepetition Secured Parties, and each of their respective successors, assigns, affiliates, parents, subsidiaries, partners, controlling persons, representatives, agents, attorneys, advisors, financial advisors, consultants, professionals, officers, directors, members, managers, shareholders, and employees, past, present and future, and their respective heirs, predecessors, successors and assigns, in each case in their respective capacities as such and with respect to any transaction, occurrence, omission, action or other matter related to any Debtor (including formal discovery proceedings in anticipation thereof) (each, a "Loan Party Claim"), including, without limitation, (a) investigating or challenging the amount, validity, extent, perfection, priority, or enforceability of, or asserting any defense, counterclaim, or offset to the Bridge DIP Obligations, DIP Superpriority Claims or security interests and liens of the DIP Parties in respect thereof, (b) investigating or challenging the amount, validity, extent, perfection, priority, or enforceability of, or asserting any defense, counterclaim, or offset to the Prepetition Secured Obligations or the Prepetition Liens, (c) investigating or asserting any claims or causes of action arising under chapter 5 of the Bankruptcy Code against the Prepetition Secured Parties, (d) investigating or asserting any so-called "lender liability" claims and causes of action against the Prepetition Secured Parties or the DIP Parties; and (e) investigating or asserting any action seeking to invalidate, set aside, avoid or subordinate, in whole or in part, the Prepetition Secured Obligations or the Bridge DIP Obligations; <br><br> • the assertion of any claims or causes of action against the Prepetition Secured Parties or the DIP Parties, including, without limitation, claims or actions to hinder or delay the assertions, enforcement or realization on the DIP Collateral or the liens securing the Prepetition Secured Obligations in accordance with this Bridge Financing Order (including attempting to stay the exercise of any right or remedy described in clause (e), clause (f), or clause (g) of paragraph [18] of this Bridge Financing Order); <br><br> • seeking to modify any of the rights, remedies, priorities, privileges, protections and benefits granted to the Prepetition Secured Parties or the DIP Parties hereunder or under the Prepetition Senior Loan Documents, in each of the foregoing cases without such applicable parties' prior written consent; <br><br> • the payment of any amount on account of any claims arising prior to the Petition Date unless such payments are approved by order of the Court; or <br><br> • any purpose that is prohibited under the Bankruptcy Code. <br><br> *Bridge Financing Order, ¶ 4, 14* |
| **Stipulations to Prepetition Loans and Claims** <br> Bankruptcy Rule 4001(c)(1)(B)(iii) <br> LBR 4001- 2(a)(4) | Subject to entry of the Final Order, the Debtors admit, acknowledge, agree, and stipulate as to certain stipulations regarding the validity and extent of the Prepetition Senior Loan Agreement, the collateral securing it, and that the Debtors are in default of their debts and obligations under the Prepetition Senior Loan Documents. <br><br> *Bridge Financing Order, ¶ B* |

| Bankruptcy Code/Local Rule | Summary of Material Terms |
|---|---|
| **Waiver/Modification of Applicability of Nonbankruptcy Law Relating to Perfection or Enforceability of Liens** Bankruptcy Rule 4001(c)(1)(B)(vii) | The DIP Liens and Adequate Protection Liens shall not be subject to a challenge and shall attach and become valid, perfected, binding, enforceable, non-avoidable and effective liens by operation of law as of the Petition Date without any further action by the Debtors, the DIP Parties or any of the applicable Prepetition Secured Parties, respectively, and without the necessity of executing, filing or recording any financing statements, security agreements, vehicle lien applications, mortgages, filings with a governmental unit (including, without limitation, the U.S. Patent and Trademark Office or the Library of Congress), or other documents or the taking of any other actions (including, for the avoidance of doubt, entering into any deposit account control agreement or taking possession of any collateral) to validate or perfect (in accordance with applicable law) such liens, or to entitle the DIP Liens or the Prepetition Secured Parties the priorities granted herein. Any property or assets or other items of collateral constituting DIP Collateral which are in the possession of the Prepetition Senior Loan Agent (or its agents or bailees) or under the control (as defined in the Uniform Commercial Code) of the Prepetition Senior Loan Agent as at the Petition Date shall at all times be held by the Prepetition Senior Loan Agent as gratuitous bailee for the benefit of the DIP Agent and the other DIP Parties. If the DIP Agent or the Prepetition Senior Loan Agent hereafter requests that the Debtors execute and deliver to the DIP Agent or the Prepetition Senior Loan Agent, as applicable, financing statements, security agreements, pledge agreements, control agreements, collateral assignments, mortgages, or other instruments and documents considered by the DIP Agent or the Prepetition Senior Loan Agent, as applicable, to be reasonably necessary or desirable to further evidence the perfection of the DIP Liens or Adequate Protection Liens, as applicable, the Debtors are hereby authorized to execute and deliver such financing statements, security agreements, pledge agreements, control agreements, mortgages, collateral assignments, instruments, and documents, and the DIP Agent or the Prepetition Senior Loan Agent, as applicable, is hereby authorized to file or record such documents in its discretion without seeking modification of the automatic stay under section 362 of the Bankruptcy Code, in which event all such documents shall be deemed to have been filed or recorded at the time and on the Petition Date; provided, however, no such filing or recordation shall be necessary or required in order to create or perfect the DIP Liens and the Adequate Protection Liens. The DIP Agent and the Prepetition Senior Loan Agent, as applicable, each in its sole discretion, may file a photocopy of this Bridge Financing Order as a financing statement with any filing or recording office or with any registry of deeds or similar office in addition to, or in lieu of, such financing statements, notices of liens or similar statements.<br><br>*Bridge Financing Order, ¶ 16* |
| **Repayment Features** LBR 4001- 2(a)(13) | The Debtors promise and agree, jointly and severally, to pay to the Bridge DIP Facility.<br><br>Upon an Event of Default, the DIP Lender Parties may demand repayment of DIP Facilities obligations then outstanding.<br><br>*Bridge Financing Order ¶ 1, 18* |
| **Fees** Bankruptcy Rule 4001(c)(1)(B) LBR 4001- 2(a)(3), (16) | The Debtors shall pay upon demand all reasonable out-of-pocket costs and expenses of the DIP Parties (including, without limitation, the reasonable prepetition and postpetition fees and out-of-pocket costs and expenses of counsel to the DIP Agent and DIP Lenders, and (B) any other necessary or appropriate counsel, advisors, professionals and/or consultants in connection with advising the DIP Parties), in each case subject to receiving a written invoice therefor.<br><br>*Bridge Financing Order, ¶ 6* |
| **Approved Budget** Bankruptcy Rule 4001 (c)(1)(B) LBR 4001- 2(a)(2) | The initial budget is attached as Exhibit A to the Bridge Financing Order.<br><br>*Bridge Financing Order, ¶ 13* |
| **Budget Covenant** Bankruptcy Rule | Not later than 4:00 p.m. Central time on the Wednesday of each calendar week commencing with the Wednesday following the first full week after the Petition Date (each such Wednesday, a "Variance Report Date"), the Debtors shall deliver to the DIP Agent and the DIP Lenders a line- |

| Bankruptcy Code/Local Rule | Summary of Material Terms |
|---|---|
| 4001(c)(l)(B)<br>LBR 4001- 2(a)(2) | by-line variance report (each, a "Variance Report") setting forth, in reasonable detail, any differences between actual receipts and disbursements for each such line item for the prior trailing one-week period versus projected receipts and disbursements set forth in the Approved Budget for each such line item for such trailing one-week period (such difference with respect each line item, a "Line-Item Variance") and on a cumulative basis for the period from the Petition Date to the report date, together with a statement certifying compliance with the Budget Covenants (defined below) (with supporting back-up in reasonable detail) and certifying that no disbursements inconsistent with the Budget Covenants have been made.  The Variance Report shall also provide a reasonably detailed explanation for any variance.  Notwithstanding the Approved Budget, without the express written consent of the DIP Lenders, the Borrowers shall not permit any Line-Item Variance (including, for the avoidance of doubt with respect to receipts or disbursements) that is unfavorable to the DIP Lenders, in the sole discretion of the DIP Lenders, to exceed ten (10%) (such permitted variance, the "Permitted Variance" and such limitation, the "Budget Covenant").<br><br>*Bridge Financing Order, ¶ 13* |
| **Priority of DIP Liens**<br>Bankruptcy Rule 4001(c)(l)(B)(i)<br>LBR 4001- 2(a)(4) | To secure the Bridge DIP Obligations, immediately upon, and effective as of entry of this Bridge Financing Order, the DIP Agent, for the benefit of itself and the DIP Lenders, is hereby granted continuing, valid, binding, enforceable, non-avoidable, and automatically and properly perfected DIP Liens in the DIP Collateral as follows:<br>• pursuant to section 364(c)(2) of the Bankruptcy Code, valid, enforceable, non-avoidable automatically and fully perfected first priority liens on and security interests in all DIP Collateral that is not otherwise subject to a valid, perfected and non-avoidable security interest or lien as of the Petition Date;<br>• pursuant to section 364(c)(3) of the Bankruptcy Code valid, enforceable, non-avoidable automatically and fully perfected junior liens on and security interests in all DIP Collateral (other than as set forth in clauses (i) and (iii) of this paragraph), subject to the Permitted Prior Liens[5]; and<br>• pursuant to section 364(d)(1) of the Bankruptcy Code, valid, enforceable, non-avoidable automatically and fully perfected first priority senior priming liens on and security interests in all DIP Collateral that also constitutes Prepetition Collateral, wherever located, subject to Permitted Prior Liens.<br>• Except as expressly set forth herein, the DIP Liens and the DIP Superpriority Claims: (i) shall not be made subject to or *pari passu* with (A) any lien, security interest or claim heretofore or hereinafter granted in any of the Chapter 11 Cases or any Successor Cases, and shall be valid and enforceable against the Debtors, their estates, any trustee or any other estate representative appointed or elected in the Chapter 11 Cases or any Successor Cases and/or upon the dismissal of any of the Chapter 11 Cases or any Successor Cases, (B) any lien that is avoided and preserved for the benefit of the Debtors and their estates under section 551 of the Bankruptcy Code or otherwise, and (C) any intercompany or affiliate lien or claim; and (ii) shall not be subject to sections 506(c), 510, 549, 550 or 551 of the Bankruptcy Code.<br><br>*Bridge Financing Order, ¶ 9* |
| **Event of Default**<br>Bankruptcy Rule | Each of the following shall constitute an Event of Default: |

---

[5] For purposes of this Bridge Financing Order, "Permitted Prior Liens" shall mean those legal, valid, properly-perfected, non-avoidable and senior in priority liens otherwise expressly permitted by the Prepetition Senior Loan Documents and certain valid perfected unavoidable security interests or liens in existence as of the Petition Date or that are perfected subsequent thereto as permitted by section 546(b) of the Bankruptcy Code that were senior to the Prepetition Liens, which, for the avoidance of doubt, shall not include the Prepetition Liens.

| Bankruptcy Code/Local Rule | Summary of Material Terms |
|---|---|
| 4001(c)(l)(B)<br>LBR 4001- 2(a)(10), (11) | <ul><li>any Debtor (i) shall fail to pay when due all or any part of the principal on the Bridge DIP Loans or (ii) shall fail to pay any interest or premium on any Bridge DIP Loans or any fee or other Obligations payable hereunder after the date on which such amount is due;</li><li>any of these chapter 11 cases shall be dismissed or converted to a case under chapter 7 of the Bankruptcy Code, or a trustee or examiner with expanded powers shall be appointed in any of the chapter 11 cases;</li><li>the failure to comply with the Budget Covenant;</li><li>venue for any of these chapter 11 cases is transferred from this Court;</li><li>an order granting interim approval of a subsequent senior post-petition loan facility with the DIP Agent and the DIP Lenders is not entered by this Court on or before March 1, 2019;</li><li>an order granting authority for the Debtors to retain a Chief Restructuring Officer (the "CRO") reasonably acceptable to the DIP Agent and the DIP Lenders is not entered by this Court on or before March 1, 2019;</li><li>a motion seeking approval of bidding procedures and the sale of all or substantially all of the Debtors' assets to a stalking horse bidder acceptable to the DIP Agent and the DIP Lenders is not filed on or before February 15, 2019;</li><li>the Court or any other court shall enter an order granting relief from the automatic stay applicable under Section 362 of the Bankruptcy Code to the holder or holders of any security interest (other than the security interests of the DIP Lenders to the extent granted in this Bridge Financing Order) in any assets of any Debtor allowing such holder or holders to foreclose or otherwise realize upon any such security interests which assets have an aggregate value in excess of $200,000;</li><li>an order of the Court or any other court shall be entered amending, supplementing, staying, vacating, reversing, revoking, rescinding or otherwise modifying this Bridge Financing Order; *provided* that no Event of Default shall occur under this clause (e) to the extent that any such amendment, supplement or other modification is not adverse, in the judgment of the DIP Lenders, to the rights and interests of the DIP Lenders under this Bridge Financing Order;</li><li>an order of the Court or any other court shall be entered granting any lien or security interest in any property of the Debtors in favor of any party other than the DIP Lenders pursuant to this Bridge Financing Order or granting a claim to any party other than the DIP Lenders that is *pari passu* with or senior to the superpriority claims granted to the DIP Lenders pursuant to this Bridge Financing Order;</li><li>this Bridge Financing Order shall cease to be in full force and effect, or the Debtors' authority to borrow funds hereunder shall have otherwise terminated;</li><li>any Debtor shall make any payment (including "adequate protection" payments) on or in respect of any pre-Petition Date indebtedness or obligations other than (i) the obligations owed to the Prepetition Senior Loan Agent and the Prepetition Senior Lenders, or (ii) as permitted under this Bridge Financing Order or by another order of the Court as agreed to by the DIP Lenders in their sole discretion;</li><li>any Debtor shall fail to comply with the terms of this Bridge Financing Order;</li></ul> |

| Bankruptcy Code/Local Rule | Summary of Material Terms |
|---|---|
| | • this Court shall abstain from hearing any chapter 11 case, or any Debtor shall so move or support any motion brought by any third party seeking such relief; <br><br> • any Debtor shall seek to, or shall support any other person's motion to, disallow or subordinate in whole or in part any DIP Lender's or Prepetition Secured Parties' claims in respect of the Bridge DIP Obligations or the Prepetition Secured Obligations or to challenge the validity, enforceability, perfection or priority of the liens in favor of any DIP Lender (including, without limitation, the DIP Liens) or any Prepetition Secured Party (including, without limitation, the Prepetition Liens or Prepetition Adequate Protection Liens); or <br><br> • except to the extent specifically provided for herein, the filing of any motion to obtain credit from any party other than the DIP Lenders unless the terms of any such facility, or any motion and/or order to approve such facility, are acceptable to the DIP Lenders in all respects, or, in connection therewith, all the obligations owed to the DIP Lenders shall first be paid indefeasibly in full in cash. <br><br> *Bridge Financing Order, ¶ 3(c)* |
| **Indemnification** <br> Bankruptcy Rule 4001(c)(1)(B)(ix) | Subject to entry of the Final Order, the Debtors are hereby authorized to and hereby agree to indemnify and hold harmless the DIP Parties and, in their capacities as such, each of their respective successors, assigns, affiliates, parents, subsidiaries, partners, controlling persons, representatives, agents, attorneys, advisors, financial advisors, consultants, professionals, officers, directors, members, managers, shareholders, and employees, past, present and future, and their respective heirs, predecessors, successors and assigns (each, an "Indemnified Party") from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses (including, without limitation, reasonable attorney's fees) or disbursements of any nature whatsoever which may be imposed on, incurred by or asserted against an Indemnified Party in any way relating to or arising out of the Bridge DIP Facility or the transactions contemplated by this Bridge Financing Order or any action taken or omitted by the DIP Agent or the DIP Lenders under this Bridge Financing Order or any document contemplated hereby; provided that the Debtors shall not have any obligation to indemnify and hold harmless any Indemnified Party under this paragraph with respect to any matter solely resulting from (a) the gross negligence or willful misconduct of such Indemnified Party or (b) violations by such Indemnified Party of this Bridge Financing Order, as determined by a court of competent jurisdiction in a final non-appealable judgment or order.  No Indemnified Party shall have any liability (whether direct or indirect, in contract, tort or otherwise) to any Debtor or any of its subsidiaries or any shareholders or creditors of the foregoing for or in connection with the transactions contemplated hereby, except to the extent such liability is determined by a court of competent jurisdiction in a final non-appealable judgment or order to have resulted solely from such Indemnified Party's (a) gross negligence or willful misconduct or (b) violations of this Bridge Financing Order.  All indemnities made or owed by any Debtor to the Indemnified Parties shall be secured by the DIP Collateral and afforded all of the priorities and protections afforded to the DIP Obligations under this Bridge Financing Order. <br><br> *Bridge Financing Order, ¶ 10.* |
| **Releases** <br><br> Bankruptcy Rule 4001(c)(1)(B) <br> LBR 4001-2(a)(9) | As a condition of any termination or release of liens securing the Bridge DIP Obligations upon such obligations being paid in full, the Debtors shall provide a general release (other than with respect to matters arising from any of the DIP Parties' bad faith, gross negligence or willful misconduct) in favor of the DIP Parties (in their capacities as such) and, in their capacities as such, their respective affiliates, parents, subsidiaries, partners, controlling persons, agents, attorneys, advisors, professionals, officers, directors and employees, whether arising under applicable state or federal law. |

| Bankruptcy Code/Local Rule | Summary of Material Terms |
|---|---|
| | *Bridge Financing Order, ¶ 25* |

## Prepetition Capital Structure[6]

10.     The Debtors' primary prepetition obligor was at least $19.5 million in outstanding principal amount pursuant to that certain Loan and Security Agreement, dated as of January 8, 2018, (as amended, supplemented, amended and restated, or otherwise modified from time to time in accordance with the terms thereof, the "Prepetition Credit Agreement"), by and among the Debtors, as Borrower, Metro, as administrative agent and collateral agent thereunder (the "Prepetition Agent"), and the financial institutions and other entities party thereto as "Lenders" thereunder (collectively, the "Prepetition Secured Lenders") and together with the Prepetition Agent, the "Prepetition Secured Obligations").  The Prepetition Agent, for its benefit and the benefit of the Prepetition Lenders, was granted a security interest in and lien on substantially all assets of the Debtors, as set forth in the Prepetition Credit Agreement.

### The Debtors' Liquidity Needs and Efforts to Acquire Alternative Financing

I.     **The Debtors Cannot Prudently Operate their Businesses by Operating Only on a Cash Collateral Basis**.

11.     In connection with their liquidity struggles, the Debtors, with the assistance of their advisors, analyzed their cash needs and determined that use of the Cash Collateral, alone, was insufficient to operate their business, and that additional funding was necessary, for a number of

---

[6] The following summary is qualified in its entirety by reference to the operative documents, agreements, schedules, and exhibits. In the event of inconsistency between this summary (including the defined terms therein), the source documents shall control and govern.

factors.  For example, additional financing is necessary to: (a) fund working-capital requirements and other operational expenses in connection with the ordinary course operation of the Debtors' business; (b) provide an appropriate liquidity cushion for anticipated vendor contraction and tightening of trade terms; (c) address the potential negative impact on customer collections arising from the commencement of these chapter 11 cases; (d) send a strong market signal that these chapter 11 cases are well-funded; (e) provide a stable platform for their businesses; (f) fund the Debtors' pursuit of a value-maximizing transaction for the benefit of their stakeholders; and (g) satisfy the administrative expenses to be incurred.

12.    The Debtors enter chapter 11 with limited available liquidity, which is significantly below the optimal level required to preserve and maximize value. The Debtors further anticipate that vendors and service providers may contract or eliminate trade terms, further exacerbating the Debtors' strained liquidity position. Further, customers may seek other alternative products and services, and vendors and suppliers may refuse to do business with the Debtors if there exists a market perception that these chapter 11 cases are not well-funded and the Debtors cannot effectuate their value-maximizing transaction.

13.    The Debtors therefore require immediate access to liquidity to stave off what would be substantial damage to their operations. The Debtors may not have sufficient liquidity to continue their business operations in the ordinary course to the material detriment of customers, creditors, employees, and other parties in interest, jeopardizing these chapter 11 cases before they have even begun. Therefore, the Debtors have an immediate need to incrementally access the Bridge DIP Facilities on an as-needed and interim basis (the "DIP Facility").

14.    Absent the immediate relief requested by this Motion, the Debtors face a material risk of substantial, irreparable, and ongoing harm. Access to Cash Collateral and new capital under

the Bridge DIP Facilities will ensure that the Debtors have sufficient funds to preserve and maximize the value of its estates, responsibly administer these Chapter 11 Cases, and consummate a value-maximizing transaction.

## II.    Alternative Sources of Financing Are Not Available On Better Terms.

15.    Recognizing a financing need, the Debtors, with the assistance of Mr. O'Neill and other advisors, undertook a marketing process that involved discussions with a variety of financial institutions, lenders, and the Debtors' incumbent secured lenders. In this process, the Debtors solicited eight nationally known asset-based and specialty lenders

16.    Mr. O'Neill, together with the Debtors' other advisors, sought potential lenders based on a number of factors, including, among other things, their ability to complete diligence quickly, experience providing debtor-in-possession financing, and their knowledge of the Debtors' complex business operations.   Ultimately, the Debtors determined that debtor-in-possession financing was only viable from their Prepetition Secured Lenders.

17.    The Debtors have engaged in extensive, arms'-length negotiations with the DIP Agent, and continue to do so in the anticipation of entering into a more fulsome DIP facility.  The Bridge DIP Facility will allow the Debtors to continue to operate in the early days of these Chapter 11 Cases while finalizing the terms of such facility. The proposed Bridge DIP Facility represents a negotiated resolution with the Prepetition Secured Lenders that will allow the Debtors to continue to use Cash Collateral to operate in the early days of these Chapter 11 Cases. Thus, the Debtors determined that their proposed Bridge DIP Financing provides the best path forward for the Debtors under the circumstances to both fund the early days of these Chapter 11 Cases while providing the flexibility necessary for the Debtors to maximize value for all stakeholders.

**Basis for Relief**

**I.     Entering into the DIP Documents Is an Exercise of the Debtors' Sound Business Judgment.**

18.     The Court should authorize the Debtors, as an exercise of their sound business judgment, to enter into the DIP Documents, obtain access to the DIP Facilities, and continue using the Cash Collateral. Courts grant considerable deference to a debtor's business judgment in obtaining postpetition secured credit, so long as the agreement to obtain such credit does not run afoul of the provisions of, and policies underlying, the Bankruptcy Code. *See, e.g., In re N. Bay Gen. Hosp., Inc.*, No. 08-20368 (Bankr. S.D. Tex. July 11, 2008) (order approving postpetition financing on an interim basis as exercise of debtors' business judgment); *In re L.A. Dodgers LLC*, 457 B.R. 308, 313 (Bankr. D. Del. 2011) ("[C]ourts will almost always defer to the business judgment of a debtor in the selection of the lender."); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("[C]ases consistently reflect that the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest.").

19.     Courts grant debtors considerable deference in acting in accordance with their sound business judgment in obtaining such credit. *See In re Barbara K. Enters., Inc.*, No. 08-11474, 2008 WL 2439649, at *14 (Bankr. S.D.N.Y. June 16, 2008) (explaining that courts defer to a debtor's business judgment "so long as a request for financing does not 'leverage the bankruptcy process' and unfairly cede control of the reorganization to one party in interest"). Specifically, to determine whether a debtor has met this business judgment standard, a court need only "examine whether a reasonable business person would make a similar decision under similar circumstances." *In re Exide Techs.*, 340 B.R. 222, 239 (Bankr. D. Del. 2006); *see also In re Curlew*

*Valley Assocs.*, 14 B.R. 506, 513–14 (Bankr. D. Utah 1981) (noting that courts should not second guess a debtor's business decision when that decision involves "a business judgment made in good faith, upon a reasonable basis, and within the scope of [the debtor's] authority under the [Bankruptcy] Code").

20.     Further, in considering whether the terms of postpetition financing are fair and reasonable, courts consider the terms in light of the relative circumstances of both the debtor and the potential lender. *In re Farmland Indus., Inc.*, 294 B.R. 855, 886 (Bankr. W.D. Mo. 2003); *see also Unsecured Creditors' Comm. Mobil Oil Corp. v. First Nat'l Bank & Trust Co.* (*In re Elingsen McLean Oil Co., Inc.*), 65 B.R. 358, 365 n.7 (W.D. Mich. 1986) (recognizing a debtor may have to enter into "hard bargains" to acquire funds for its reorganization).

21.     The Debtors' determination to move forward with the DIP Facilities is an exercise of its sound business judgment following an arm's-length process and careful evaluation of available alternatives. Specifically, the Debtors and their advisors determined that postpetition financing will create certainty with respect to cash flows necessary for the administration of these chapter 11 cases.  The Debtors are continuing to negotiate the terms of a DIP facility, which is facilitated through the availability of the DIP Bridge Facility.  The Debtors believe that they have obtained the best financing available for the purposes of the Bridge DIP Facility because: (a) the Bridge DIP Facility permits the Debtors to avoid value-destructive priming issues while continuing to negotiate the final terms of a DIP Facility; (b) third-party lenders were unwilling to provide viable debtor-in-possession financing junior to the Prepetition Secured Lenders due to the Debtors' high level of existing secured debt obligations; and (c) the Bridge DIP Facility presents the best financing reasonably available to the Debtors.  Finally, entry into the Bridge DIP Facility with the Debtors' Prepetition Secured Lenders will likely avoid a costly priming and adequate-protection

fight at the outset of these Chapter 11 Cases that would cause significant uncertainty among the Debtors' vendors, employees, customers, and others.  Accordingly, the Court should authorize the Debtors' entry into the Bridge DIP Facility, as it is a reasonable exercise of the Debtors' business judgment

## II.     The Debtors Should Be Authorized to Grant Liens and Superpriority Claims

22.     The Debtors propose to obtain financing under the Bridge DIP Facility by providing security interests and liens as set forth in the Bridge Financing Order pursuant to section 364(c) of the Bankruptcy Code.  Specifically, the Debtors propose to provide to the DIP Lenders continuing, valid, binding, enforceable, non-avoidable, and automatically and properly perfected postpetition security interests in and liens on the DIP Collateral, subject to the Carve-Out, which includes substantially all of the Debtors' assets.

23.     The statutory requirement for obtaining postpetition credit under section 364(c) is a finding, made after notice and hearing, that a debtor is "unable to obtain unsecured credit allowable under Section 503(b)(1) of [the Bankruptcy Code]."  11 U.S.C. § 364(c); *see In re Crouse Grp., Inc.*, 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987) (secured credit under section 364(c) of the Bankruptcy Code is authorized, after notice and hearing, upon showing that unsecured credit cannot be obtained).  Courts have articulated a three-part test to determine whether a debtor is entitled to financing under section 364(c) of the Bankruptcy Code. Specifically, courts look to whether:

> a.     the debtor is unable to obtain unsecured credit under section 364(b) of the Bankruptcy Code, i.e., by allowing a lender only an administrative claim;
>
> b.     the credit transaction is necessary to preserve the assets of the estate; and
>
> c.     the terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor-borrower and proposed lenders.

*See In re Ames Dep't Stores*, 115 B.R. at 37–40; *see also In re St. Mary Hosp.,* 86 B.R. 393, 401-02 (Bankr. E.D. Pa. 1988); *Crouse Grp.*, 71 B.R. at 549.

24.     The Debtors meet each part of this test.  Due to the Debtors' high level of existing secured debt obligations, no third-party lenders have been willing to provide postpetition financing junior to the Prepetition Secured Lenders.  Therefore, the Debtors, in consultation with their advisors, concluded that any workable financing likely would require the support of, or be provided by, the Debtors' Prepetition Secured Lenders.  Absent the Bridge DIP Facility, which is a necessary step to finalize a DIP Facility, the value of the Debtors' estates would be significantly impaired to the detriment of all stakeholders.  Given the Debtors' circumstances, the Debtors believe that the terms of the DIP Facility, as set forth in the Bridge Financing Order, are fair, reasonable, and adequate, all as more fully set forth below.  For all these reasons, the Debtors submit that it has met the standard for obtaining postpetition financing.

25.     In the event that a debtor is unable to obtain unsecured credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code, section 364(c) provides that a court "may authorize the obtaining of credit or the incurring of debt (1) with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of [the Bankruptcy Code]; (2) secured by a lien on property of the estate that is not otherwise subject to a lien; or (3) secured by a junior lien on property of the estate that is subject to a lien."  11 U.S.C. § 364(c).  As described above, the Debtors are unable to obtain unsecured credit. Therefore, approving superpriority claims in favor of the DIP Lenders is reasonable and appropriate.

26.     Further, section 364(d) of the Bankruptcy Code provides that a debtor may obtain credit secured by a senior or equal lien on property of the estate already subject to a lien, after notice and a hearing, where the debtor is "unable to obtain such credit otherwise" and "there is

adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted." 11 U.S.C. § 364(d)(1).  Accordingly, the Debtors may incur "priming" liens under the DIP Facilities if either (a) the Prepetition Secured Lenders have consented or (b) the Prepetition Secured Lenders' interests in collateral are adequately protected.  What constitutes adequate protection is decided on a case-by-case basis, and adequate protection may be provided in various forms, including payment of adequate protection fees, payment of interest, or granting of replacement liens or administrative claims. *In re Mosello*, 195 B.R. 277, 289 (Bankr. S.D.N.Y. 1996) ("[T]he determination of adequate protection is a fact-specific inquiry . . . left to the vagaries of each case."); *In re Realty Sw. Assocs.*, 140 B.R. 360, 366 (Bankr. S.D.N.Y. 1992) ("'Adequate protection' is a question of fact because it has as its linchpin the concept of value, and therefore is determined on a case-by-case basis.") (citation omitted); *In re Beker Indus. Corp.*, 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986) (the application of adequate protection "is left to the vagaries of each case, but its focus is protection of the secured creditor from diminution in the value of its collateral during the reorganization process") (citation omitted).

27.     The Debtors respectfully submit that their proposal more than satisfies the requirements of "adequate" protection.  As described more fully in the Bridge Financing Order, the Debtors propose to provide a variety of adequate protection to protect the interests in the Debtors' property of the Prepetition Secured Lenders from any diminution in value of the Cash Collateral (as well as the Prepetition Collateral) resulting from the use of the Cash Collateral by

the Debtors and the imposition of the automatic stay, subject, in each case, to the Carve-Out

(collectively, the "Adequate Protection Obligations"):[7]

   a.   Valid and automatically perfected liens and security interests
        in and upon the DIP Collateral;

   b.   superpriority administrative claims under section 507(b) of
        the Bankruptcy Code;

   c.   payment of the fees and expenses of certain of the
        Prepetition Secured Lenders; and

   d.   payment of fees and expenses.

28.     The Debtors respectfully submit that this package is more than sufficient to

constitute adequate protection here as "[a]dequate protection, not absolute protection, is the

statutory standard." *In re Beker Indus. Corp.*, 58 B.R. at 741 (citation omitted).

29.     Also, the Debtors believe the likely alternative available to these Chapter 11 Cases

would be an expedited liquidation of the Debtors' assets rather than the Debtors' continued

operation as a going concern.  Such an outcome would, in turn, decrease the value available for all

stakeholders.  Thus, the Bridge DIP Facility provides these parties with adequate protection by

enhancing the value of these parties' collateral.  The Bankruptcy Court has recognized that a

debtor's ability to maintain business value by operating in the ordinary course is itself a significant

source of adequate protection.  *See In re Salem Plaza Assocs.*, 135 B.R. 753, 758 (Bankr. S.D.N.Y.

1992) (holding that a debtor's use of cash collateral to pay operating expenses, thereby

"preserv[ing] the base that generates the income stream," provided adequate protection to the

secured creditor); *In re Constable Plaza Assocs., L.P.*, 125 B.R. 98, 104-05 (Bankr. S.D.N.Y.

1991) (finding equity cushion alone was adequate protection when cash collateral was used to

_____

[7] The following summary is qualified in its entirety by reference to the DIP Bridge Order. In the event of inconsistency
between this summary (including the defined terms therein), the DIP Bridge Order shall control and govern.

preserve value of a building pledged as collateral and noting such use would "preserve or enhance the value of the building which, in turn, will protect the collateral covered by [the] mortgage").

### III.    No Comparable Alternatives to the DIP Facility Is Reasonably Available.

30.    A debtor need only demonstrate "by a good faith effort that credit was not available without" the protections afforded to potential lenders by sections 364(c) of the Bankruptcy Code. *In re Snowshoe Co., Inc.*, 789 F.2d 1085, 1088 (4th Cir. 1986); *see also In re Plabell Rubber Prods., Inc.*, 137 B.R. 897, 900 (Bankr. N.D. Ohio 1992). Moreover, in circumstances where only a few lenders likely can or will extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing." *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd sub nom. Anchor Sav. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 120 n.4 (N.D. Ga. 1989); *see also In re Ames Dep't Stores*, 115 B.R. at 37–39 (debtor must show that it made reasonable efforts to seek other sources of financing under section 364(a) and (b)) (citing *Snowshoe Co.*, 789 F.2d at 1088 (demonstrating that credit was unavailable absent the senior lien by establishment of unsuccessful contact with other financial institutions in the geographic area)); *In re Stanley Hotel, Inc.*, 15 B.R. 660, 663 (D. Colo. 1981) (bankruptcy court's finding that two national banks refused to grant unsecured loans was sufficient to support conclusion that section 364 requirement was met).

31.    As noted above, the Debtors do not believe that comparable alternative sources of financing are reasonably available given the realities imposed by the Debtors' existing capital structure and the Debtors' unsuccessful solicitation of alternative financing proposals. Substantially all of the Debtors' existing assets, including Cash Collateral, are encumbered by the DIP Lenders. The Debtors conducted arm's-length negotiations with the DIP Lender Parties regarding the terms of the Bridge DIP Facility, which are anticipated to culminate in a DIP Facility.

32.     Thus, the Debtors determined that the Bridge DIP Facility provides the best opportunity available to the Debtors under the circumstances to fund the crucial early phase of these Chapter 11 Cases.  In addition to evidence to be introduced at the hearing on the Bridge Financing Order if necessary, the Debtors submit that the requirement of section 364 of the Bankruptcy Code that alternative credit on more favorable terms be unavailable to the Debtors is satisfied.

## IV.     The Debtors Should Be Authorized to Use Postpetition Collateral, Including Cash Collateral.

33.     Section 363 of the Bankruptcy Code generally governs the use of estate property. Section 363(c)(2)(A) permits a debtor in possession to use cash collateral with the consent of the secured party. Section 363(e) provides for adequate protection of interests in property when a debtor uses cash collateral. Further, section 362(d)(1) of the Bankruptcy Code provides for adequate protection of interests in property due to the imposition of the automatic stay. *See In re Cont'l Airlines*, 91 F.3d 553, 556 (3d Cir. 1996) (en banc). While section 361 of the Bankruptcy Code provides examples of forms of adequate protection, such as granting replacement liens and administrative claims, courts decide what constitutes sufficient adequate protection on a case-by-case basis. *In re Mosello*, 195 B.R. at 289 ("[T]he determination of adequate protection is a fact-specific inquiry . . . left to the vagaries of each case."); *In re Realty Sw. Assocs.*, 140 B.R. at 366 ("'Adequate protection' is a question of fact because it has as its linchpin the concept of value, and therefore is determined on a case-by-case basis.") (citation omitted); *In re Beker Indus. Corp.*, 58 B.R. at 736 (the application of adequate protection "is left to the vagaries of each case, but its focus is protection of the secured creditor from diminution in the value of its collateral during the reorganization process") (citation omitted).

34.     The Debtors submit that the proposed Adequate Protection Obligations are sufficient to protect the Prepetition Secured Lenders from any diminution in value to the Cash Collateral and Prepetition Collateral and satisfies the requirements of "adequate" protection: "[a]dequate protection, not absolute protection, is the statutory standard." *In re Beker Indus. Corp.*, 58 B.R. at 741 (citation omitted).

35.     In addition to the proposed Adequate Protection Obligations, the critical liquidity provided by the proposed Bridge DIP Facility permits the Debtors to continue as a going concern to consummate a value-maximizing transaction.  The Debtors submit that continuing as a going concern provides additional adequate protection to the Prepetition Secured Lenders. *Cf. In re Salem Plaza Assocs.*, 135 B.R. at 758 (holding that debtor's use of cash collateral from shopping center to pay operating expenses, thereby "preserv[ing] the base that generates the income stream," provided adequate protection to the secured creditor); *In re Constable Plaza Assocs., L.P.*, 125 B.R. at 104–05 (finding equity cushion alone was adequate protection when cash collateral was used to preserve value of a building pledged as collateral and noting such use would "preserve or enhance the value of the building which, in turn, will protect the collateral covered by [the] mortgage"). Further, the incremental value generated by use of the proceeds of the proposed Bridge DIP Facility will inure to the ultimate benefit of the Debtors' estates and their stakeholders. Courts have held enhancement of collateral is a critical component of adequate protection and have considered "whether the value of the debtor's property will increase as a result of the" use of the collateral. *In re 495 Cent. Park Ave. Corp.*, 136 B.R. 626 (Bankr. S.D.N.Y. 1992) (finding that improvements to collateral financed by postpetition financing proceeds would improve collateral value in excess of loans and, therefore, provided adequate protection); *see In re Hubbard Power & Light*, 202 B.R. 680 (Bankr. E.D.N.Y. 1996) (approving postpetition financing to be used, in

part, to fund cleanup costs of encumbered property anticipated to improve the value of the collateral, thereby serving the goal of adequate protection).

36.     In light of the foregoing, the Debtors further submit, and the Prepetition Secured Lenders agree, that the proposed Adequate Protection Obligations to be provided for the benefit of the Prepetition Secured Lenders are appropriate.  Thus, the Debtors' provision of the Adequate Protection Obligations is not only necessary to protect against any diminution in value but is fair and appropriate under the circumstances of these chapter 11 cases to ensure the Debtors are able to continue using the Cash Collateral, subject to the terms and limitations set forth in the Interim Order, for the benefit of all parties in interest and their estates

**V.     The DIP Financing Fees are Reasonable and Should Be Approved**

37.     Under the DIP Financing Documents, the Debtors agreed, subject to Bankruptcy Court approval, to pay certain fees and expenses to the DIP Agent and the DIP Lenders.  The Debtors and the DIP Lender Parties agree that these fees are an integral component of the overall terms of the Bridge DIP Facility, and required by the applicable DIP Lender Parties as consideration for the extension of postpetition financing and ultimately concluding a DIP Facility. Accordingly, the Bankruptcy Court should authorize the Debtors to pay the fees provided under the Bridge Financing Order in connection with entering into those agreements.

**VI.     Modification of the Automatic Stay Is Warranted**

38.     The proposed Bridge Financing Order further provides that the automatic stay is modified as necessary to permit the Debtors to grant the DIP Liens to the DIP Lenders and to incur all liabilities and obligations set forth in the Interim Order. Finally, the proposed Bridge Financing Order provides that, following the occurrence of an Event of Default, the automatic stay shall be vacated and modified to the extent necessary to permit the DIP Lenders to exercise all rights and remedies in accordance with the DIP Financing Documents, or applicable law.

27

39.     Stay modifications of this kind are ordinary and standard features of debtor-in-possession financing arrangements, and, in the Debtors' business judgment, are reasonable and fair under the circumstances of these chapter 11 cases. *See, e.g.*, *In re BCBG Max Azria Global Holdings, LLC*, Case No. 17-10466 (SCC) (Bankr. S.D.N.Y. Mar. 28, 2017); I*n re Avaya, Inc.*, Case No. 17-10089 (SMB) (Bankr. S.D.N.Y. Mar. 10, 2017); *In re Dacco Transmission Parts (NY), Inc.*, Case No. 16-13245 (MKV) (Bankr. S.D.N.Y. December 23, 2016); *In re Breitburn Energy Partners LP*, Case No. 16-11390 (SMB) (Bankr. S.D.N.Y. August 19, 2016); *In re Aéropostale, Inc.*, Case No. 16-11275 (SHL) (Bankr. S.D.N.Y. June 13, 2016).

## VII.   The DIP Lender Parties Should Be Deemed Good-Faith Lenders under Section 364(e).

40.     Section 364(e) of the Bankruptcy Code protects a good faith lender's right to collect on loans extended to a debtor, and its right in any lien securing those loans, even if the authority of the debtor to obtain such loans or grant such liens is later reversed or modified on appeal. Specifically, section 364(e) provides that:

> The reversal or modification on appeal of an authorization under this section [364 of the Bankruptcy Code] to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.

11 U.S.C. § 364(e). Because "good faith" is not defined in the Bankruptcy Code, courts often look to case law under section 363(m). 7 *Collier on Bankruptcy*, 16th ed. ¶ 364.08, p. 37 ("Section 364(e) is consistent with section 363(m), which provides similar protection to a buyer or lessee of property of the estate in a section 363 transaction."). As one court in this district explained, "the misconduct that would destroy a purchaser's good faith status at a judicial sale involves fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly

unfair advantage of other bidders.*" In re Pan Am Corp.*, No. 91 CIV. 8319 (LMM), 1992 WL

154200, at *4 (S.D.N.Y. June 18, 1992) (citing *In re Rock Indus. Mach. Corp.*, 572 F.2d 1195,

1198 (7th Cir. 1978)); *accord In re General Growth Properties, Inc.*, 423 B.R. 716, 722 (S.D.N.Y.

2010).

41.     As explained in detail herein, the Bridge DIP Facility is the result of the Debtors'

reasonable and informed determination that the DIP Lenders offered the most favorable terms on

which to obtain necessary postpetition financing as a bridge to allow for the successful conclusion

of negotiations of a DIP Facility for these Chapter 11 Cases.

42.     The Debtors submit that the terms and conditions of the Bridge DIP Facility are

reasonable and appropriate under the circumstances, and the proceeds of the Bridge DIP Loan will

be used only for purposes that are permissible under the Bankruptcy Code. Further, no

consideration is being provided to any party to the Bridge DIP Facility other than as described

herein.  Accordingly, the Bankruptcy Court should find that the DIP Lenders are "good faith"

lenders within the meaning of section 364(e) of the Bankruptcy Code and are entitled to all of the

protections afforded by that section.

## Immediate Relief Is Required to Avoid Immediate and Irreparable Harm

43.     The Court may grant interim relief in respect of a motion filed pursuant to section

363(c) or 364 of the Bankruptcy Code and to repay obligations arising prior to the Petition Date

where, as here, interim relief is "necessary to avoid immediate and irreparable harm to the estate

pending a final hearing." Fed. R. Bankr. P. 4001(b)(2), (c)(2); 6003(b).  As discussed in the First

Day Declaration and the O'Neill Proffer, the Debtors and their estates will suffer immediate and

irreparable harm if the interim relief requested herein, including authorizing the Debtors to use the

Cash Collateral and to borrow up to $350,000.00 under the Bridge DIP Facility, is not granted

promptly after the Petition Date. The Debtors anticipate that the commencement of these Chapter

11 Cases will significantly and immediately increase the demands on their liquidity as a result of, among other things, the costs of administering these Chapter 11 Cases, implementing critical restructuring initiatives, and addressing key constituents' concerns regarding the Debtors' financial health and ability to continue operations in light of these Chapter 11 Cases. Accordingly, the Debtors have an immediate need for access to liquidity to, among other things, continue the operation of their business, maintain important relationships with customers, meet payroll, procure goods and services from vendors and suppliers and otherwise satisfy their working capital and operational needs, all of which are required to preserve and maintain the Debtors' going concern value for the benefit of all parties in interest.

44.     The Debtors believe that the current Budget and its projections provide an accurate reflection of the Debtors' funding requirements over the identified period, will allow the Debtors to meet their obligations–including the administrative expenses of these Chapter 11 Cases–and are reasonable and appropriate under the circumstances.

45.     The importance of a debtor's ability to secure postpetition financing to prevent immediate and irreparable harm to its estate has been repeatedly recognized in other bankruptcy courts in similar circumstances. *See, e.g., In re SunEdison, Inc*., Case No. 16-10992 (SMB) (Bankr. S.D.N.Y. June 9, 2016) (relief necessary to avoid immediate and irreparable harm to the Debtors); *In re MPM Silicones, LLC*, Case No. 14-22503 (RDD) (Bankr. S.D.N.Y. May 23, 2014) (same); *In re United Retail Grp., Inc*., No. 12-10405 (SMB) (Bankr. S.D.N.Y. Feb. 2, 2012) (same); *In re Sbarro, Inc*., No. 11-11527 (SCC) (Bankr. S.D.N.Y. Apr. 5, 2011) (same); *In re MSR Resort Golf Course LLC*, No. 11-10372 (SHL) (Bankr. S.D.N.Y. Mar. 16, 2011) (same); *In re Insight Health Servs. Holdings Corp*., No. 10-16564 (AJG) (Bankr. S.D.N.Y. Jan. 4, 2011).  Accordingly, for all of the reasons set forth above, prompt entry of the Bridge Financing Order is necessary to avert

immediate and irreparable harm to the Debtors' estates and is consistent with, and warranted under, Bankruptcy Rules 4001(b)(2) and (c)(2).

### Request for a Final Hearing

46.      Pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2), the Debtors request that the Court set a date that is as soon as practicable, and in no event later than 25 days after the Petition Date, to hold a hearing to consider entry of the Final Order and the permanent approval of the relief requested in this Motion and fix the time and date prior to the Final Hearing for parties to file objections to this Motion.

### Waiver of Bankruptcy Rule 6004(a) and 6004(h)

47.      To successfully implement the foregoing, the Debtors request that the Bankruptcy Court enter an order providing that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a) and that the Debtors have established cause to exclude such relief from the 14-day stay period under Bankruptcy Rule 6004(h).

### Notice

48.      The Debtors will provide notice of this Motion to: (a) the Office of the United States Trustee for the Southern District of Texas; (b) the holders of the 20 largest unsecured claims against the Debtors (on a consolidated basis); (c) the United States Attorney's Office for the Southern District of Texas (the "U.S. Trustee"); (d) the Internal Revenue Service; (e) counsel for Metropolitan Partners Group Administration LLC, the administrative agent under the Debtors' senior loan and security agreement; (f) the state attorneys general for states in which the Debtors conduct business; (g) the DIP Lenders; and (h) any party that has requested notice pursuant to Bankruptcy Rule 2002.   The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

## **No Prior Request**

49.     No prior request for the relief sought in this Motion has been made to this or any other court.

[*Remainder of page intentionally left blank.*]

WHEREFORE, for the reasons set forth herein and in the First Day Declaration and the

O'Neill Proffer, the Debtors respectfully request that this Court (a) enter the Interim Order and the

Final Order granting the relief requested herein on an interim and permanent basis, respectively,

and (b) grant such other and further relief as the Court deems appropriate.

Dated: February 5, 2019

Respectfully Submitted,

*/s/ Marcus A. Helt*
Marcus A. Helt (TX 24052187)
**FOLEY GARDERE**
Foley & Lardner LLP
2021 McKinney Avenue
Suite 1600
Dallas, TX 75201
Telephone: (214) 999-3000
Facsimile: (214) 999-4667
Email: mhelt@foley.com

-and-

Jack G. Haake (*pro hac pending*)
**FOLEY & LARDNER LLP**
Washington Harbour
3000 K Street, N.W., Suite 600
Washington, D.C.  20007-5109
Telephone: (202) 295-4085
Facsimile: (202) 672-5399
Email: jhaake@foley.com

***Proposed Counsel for the Debtors and Debtors in Possession***