# EXHIBIT A

EXECUTION VERSION

# AMENDED ASSET PURCHASE AGREEMENT

**THIS AMENDED ASSET PURCHASE AGREEMENT** ("Agreement") is made as of the 28th day of May 2019 (the "Effective Date"), by and among Burkhalter Rigging, Inc., Burkhalter Transport, Inc., and Burkhalter Specialized Transport, LLC (each, a "Debtor Burkhalter Party" and collectively, the "Debtor Burkhalter Parties") and Barnhart Crane and Rigging Co., a Delaware corporation with its principal place of business at 2163 Airways Boulevard, Memphis, Tennessee, 38114 ("Purchaser").  The Debtor Burkhalter Parties are sometimes referred to in this Agreement individually as a "Seller" and collectively as the "Sellers."  The Sellers and Purchaser are sometimes referred to in this Agreement individually as a "Party" and collectively, as the "Parties."

## RECITALS:

**A.**　**Nature of Assets and Ownership.**  The Sellers are, collectively, the owner of all right, title, and interest in and to the Assets (as defined herein), which are currently used by Sellers in the building and construction industry, whereby they provide services for heavy lift, rigging, and super heavy transport on various projects (collectively, the "Business").

**B.**　**Nature of Transaction.**  Sellers desire to sell all of their right, title and interest in and to the Assets to Purchaser and Purchaser desires to acquire the Assets from Sellers, all pursuant to this Agreement (and subject to the approval of the Bankruptcy Code) as hereinafter provided (the "Transaction").

**C.**　**Bankruptcy Case.**  On January 31, 2019 ("Petition Date"), Sellers, each filed a voluntary petition for relief commencing a case under chapter 11 of title 11 of the United States Code, 11 U.S.C. 101 *et seq.* (the "Bankruptcy Code"), commencing Case Numbers 19-30495, 19-30496, and 19-30497, (collectively, the "Chapter 11 Case") in the United States Bankruptcy Court for the Southern District of Texas (the "Bankruptcy Court").  The Chapter 11 Case is jointly administered in Case Number 19-30495.  With respect to the Assets, the Parties must effectuate the Transaction through a sale of such Assets pursuant to Sections 363 and 365 of the Bankruptcy Code.  The execution and delivery of this Agreement and the Seller's ability to consummate the Transaction are subject to, among other things, the entry of an order of the Bankruptcy Court under, *inter alia*, sections 363 and 365 of the Bankruptcy Code.

**D.**　**Content of Agreement.**  The Parties desire to set forth certain representations, warranties, and covenants made by each to the other as an inducement to the execution and delivery of this Agreement and to set forth certain conditions to their respective obligations to consummate the Transaction.

**NOW, THEREFORE**, for and in consideration of the foregoing premises, the representations, warranties, and covenants contained herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

4836-4404-7752.20

1.    **PURCHASE AND SALE OF ASSETS; CLOSING DATE**

1.1.    <u>ASSETS TO BE SOLD</u>. Subject to the entry of the Sale Order by the Bankruptcy Court, Seller shall sell, convey, assign, transfer and deliver to Purchaser, and Purchaser shall purchase and acquire from Seller, free and clear of all liens, claims, encumbrances, and interests (collectively, the "<u>Encumbrances</u>"), all of Seller's right, title and interest of all of the assets, whether held individually or collectively, as they exist as of 12:01 a.m., prevailing Central Time, at the closing (the "<u>Closing</u>") on the closing date of May 31, 2019 (the "<u>Closing Date</u>"), listed on <u>Exhibit A</u>, (collectively, the "<u>Assets</u>").  The Assets shall not include the Excluded Assets.

Notwithstanding the foregoing, the transfer of the Assets pursuant to this Agreement shall not include the assumption of any liability related to the Assets unless Purchaser expressly assumes that liability pursuant to Section 1.4(a).

1.2.    <u>EXCLUDED ASSETS</u>. Notwithstanding anything to the contrary contained in Section 1.1 or elsewhere in this Agreement, only the Assets shall be sold by the Sellers to the Purchaser.  None of the Sellers' right, title, and interest in and to the assets not listed on <u>Exhibit A</u> and to the assets described in <u>Exhibit B</u> (collectively, the "<u>Excluded Assets</u>") shall be sold by Sellers to Purchaser, and all such right, title and interest shall be retained by the Seller having such right, title, or interest thereto immediately prior to the Closing Date. Notwithstanding any other provision in this Agreement, the Excluded Assets shall include all communications between Sellers and counsel or any attorney-client, work-product, or similar right, privilege, or confidence of Sellers, and the expectation of such privileges and confidences belongs to and shall remain with the Sellers and shall not pass to Purchaser.

1.3.    <u>PURCHASE PRICE</u>.

(a)    <u>Purchase Price Deposit</u>.  On the Effective Date, Purchaser and Seller shall enter into an escrow agreement in substantially the form attached as <u>Exhibit C</u> (the "<u>Escrow Agreement</u>"), and Purchaser shall deliver to Escrow Agent (as defined in the Escrow Agreement) concurrently with the delivery of its executed copy of this Agreement an earnest money deposit to be applied to the "Purchase Price" as defined below, in accordance with paragraph 1.3(b) below in the amount of $1,230,000 (the "<u>Deposit</u>").  The Deposit shall be made by means of a wire transfer of immediately available funds to the non-interest bearing IOLTA trust account maintained by Escrow Agent (the "<u>Trust Account</u>").  The Deposit shall be maintained in the Trust Account pursuant to the terms and conditions of this Agreement and the Escrow Agreement.  If the Closing occurs, the Deposit shall be applied as part of the payment of the Purchase Price.  At Closing, Purchaser and the Seller shall promptly deliver joint written instructions directing Escrow Agent to deliver the Deposit to Sellers.  If this Agreement is terminated without Closing having occurred for any reason, Purchaser and the Seller shall promptly deliver joint written instructions directing the Escrow Agent to deliver the Deposit (A) to Sellers if such termination is pursuant to Section 9(d)(ii) and (B) to Purchaser if such termination is for any other reason.  Under no circumstances shall the Deposit be deemed to be property of the estate within the meaning of section 541 of the Bankruptcy Code.

(b)    <u>Price and Payment</u>.  The aggregate consideration to be paid by Purchaser for the Assets (the "<u>Purchase Price</u>") shall be the sum of:  (i) $13,800,000.00 (the "<u>Cash</u>

Purchase Price"); *plus* (ii) the assumption of the Assumed Liabilities; *plus* (iii) the Cure Costs (as hereinafter defined) related to the Assumed Contracts (as hereinafter defined), which shall be paid by Purchaser directly to the applicable counterparties pursuant to Section 1.3(h); *less* (iv) the cost of the transportation and display of the BSET as set forth in Section 1.3(d) below.  An amount equal to the Purchase Price (excluding clauses (ii) and (iii) from the definition thereof) less only the Deposit ("Closing Cash Payment") shall be paid by Purchaser to Seller at the Closing by wire transfer of immediately available funds.  At Closing, the Escrow Agent shall deliver the Deposit to Seller to be applied to the Closing Cash Payment.  As used herein, "Cure Costs" means, with respect to any Assumed Contract (as defined below), the monetary amounts that must be paid and obligations that otherwise must be satisfied under Sections 365(b)(1)(A) and 365(b)(1)(B) of the Bankruptcy Code in connection with the assumption and/or assignment of such Assumed Contract, in each case as determined by order of the Bankruptcy Court or by agreement among Purchaser, the Sellers and the applicable counterparty thereto.

(c)     (omitted)

(d)     Transportation and Display of BSET.  Purchaser shall, at the cost of $77,000 to the Seller, which amount shall be credited against the Purchase Price, transport all parts and components of the Burkhalter Self-Erecting Tower (the "BSET") to the yard in Columbus Mississippi and assemble the BSET for demonstration and auction.  The assembly will include a short tower and the basic girders.  The strandjacks will be displayed, but not installed or stranded.  The Sellers and Metropolitan Partners Group Administration, LLC (the "Prepetition Lenders"), together with each of their respective successors and/or assigns, representatives, agents, employees and invitees, shall have access to the BSET pursuant to Section 6.5 below.  The Prepetition Lenders and their successors and assigns shall be express third-party beneficiaries to the provisions of this Section 1.3(d).

(e)     Sales and Use Tax.  Purchaser shall be responsible for payment to the appropriate Governmental Body (defined below) of all transfer, documentary, sales, use or other similar taxes and the preparation and filing of all associated tax returns for such taxes, in connection with the consummation of the Transaction, if any.

(f)     Allocation of Purchase Price.  The Purchase Price (and all other amounts treated as consideration for applicable tax purposes) shall be allocated in accordance with Exhibit A. After the Closing, the Parties shall make consistent use of the allocation, fair market value and useful lives specified in Exhibit A for all tax purposes and in all filings, declarations and reports with the IRS in respect thereof, including the reports required to be filed under Section 1060 of the Internal Revenue Code (the "Code").  Purchaser shall prepare and deliver IRS Form 8594 (consistent with the allocation set forth on Exhibit A) to Sellers within forty-five (45) days after the Closing Date to be filed with the IRS. In any Proceeding related to the determination of any tax, neither Purchaser nor Seller shall contend or represent that such allocation is not a correct allocation.

(g)     Withholding.  Purchaser, its Affiliates and the Escrow Agent each shall be entitled to deduct and withhold from all payments made pursuant to this Agreement such amounts as required to deduct and withhold under the Code or any provision of state, local or foreign law.  To the extent that amounts are so withheld and paid over to the appropriate

Governmental Body, such withheld amounts shall be treated for all purposes of this Agreement as having been paid to the Person in respect of which such deduction and withholding was made. If Purchaser becomes aware of a requirement to deduct and withhold taxes from the amounts payable pursuant to this Agreement then, prior to withholding, Purchaser shall notify Sellers and provide Sellers a reasonable opportunity to submit such documents and forms as may be required or necessary to reduce or eliminate the obligation to withhold taxes.

(h)     Assumed Contracts; Cure Costs.

(i)     From the Effective Date through Closing, except in the ordinary course of business and in a manner consistent with the exercise of reasonable business judgment, the Sellers shall maintain and perform all liabilities and obligations required to be performed under each Seller Contract (as defined below) (other than any Contract that is an Excluded Asset or that is rejected by Sellers pursuant to this paragraph) and the Sellers shall not reject any such Seller Contract unless otherwise agreed to in writing by Purchaser or as otherwise provided in this paragraph. Notwithstanding the foregoing, the Sellers shall not be required to maintain any Seller Contract that expires by its own terms. Upon written notification by the Sellers to Purchaser that the Sellers desire to reject any Seller Contract that is not an Excluded Asset, Purchaser may make an Assignment Election (as defined below) with respect to such Seller Contract, provided that Purchaser shall be obligated to notify the Sellers of such Assignment Election, in writing, within ten (10) business days of Purchaser's receipt of such written notice, and if Purchaser fails to make an Assignment Election within such ten (10) business day period, such Seller Contract shall constitute an Excluded Asset and the Sellers shall be free to reject such Seller Contract at any time thereafter.

(ii)    Within thirty (30) days following the receipt by Purchaser from Sellers of the list of Seller Contracts (other than any Seller Contract that is an Excluded Asset or has been rejected by Sellers pursuant to this Section 1.3(h)) together with the estimated Cure Cost for each such Seller Contract, Purchaser shall irrevocably designate by written notice to the Sellers (such notice to be signed and dated by Purchaser) (each, an "Assignment Election") each such Seller Contract, if any, that Purchaser elects to have assumed and assigned to it as an Assumed Contract at the Closing (each, an "Assumed Contract"). Subject to Bankruptcy Court approval and payment of the applicable Cure Costs pursuant to Section 1.3(h)), Purchaser and the Sellers shall cause each Assumed Contract to be assumed and assigned to Purchaser at the Closing or, for any Assumed Contract for which the Cure Cost is finally established on or after the Closing Date, as promptly as practicable following such determination) pursuant to one or more contract assignment and assumption agreements duly executed by the applicable Seller and Purchaser. Each Seller Contract for which Purchaser has not delivered an Assignment Election prior to the Bid Deadline shall constitute an Excluded Asset, shall not be assigned to or assumed by Purchaser, and Purchaser and Sellers shall have no further obligation or liability under this Agreement with respect thereto, as of the Bid Deadline.

(iii)   The Sellers shall use reasonable efforts to establish the proper Cure Cost, if any, for each such Assumed Contract as soon as practicable, including taking all reasonable actions with respect to the filing and prosecution of any pleadings and proceedings in the Bankruptcy Court and the service and delivery of any related notices or pleadings. However, "all reasonable actions," for purposes of this Section 1.3(i), shall not include any action that

4

would require, be interpreted to mean or imply that the automatic stay provided by Section 362 of the Bankruptcy Code for the benefit of the Sellers is, has been, will be or should be modified or lifted in order to accomplish such action.

(iv)     At the Closing, Purchaser shall pay the Cure Costs of the Assumed Contracts for which the Cure Cost has been finally established prior to the Closing Date (whether by order of the Bankruptcy Court or agreement among Purchaser, the Sellers and the applicable counterparty thereto) to the applicable counterparties to the Assumed Contracts.  From and after the Closing, Purchaser shall, if applicable, pay the Cure Costs of each Assumed Contract, if any, for which the Cure Cost is finally established on or after the Closing Date (whether by order of the Bankruptcy Court or agreement among Purchaser, the Sellers and the applicable counterparty thereto), in each case to the applicable counterparty promptly following such determination.

1.4.     <u>LIABILITIES</u>.

(a)     <u>Assumed Liabilities</u>.  On the Closing Date, but effective as of the effective date (the "<u>Effective Time</u>"), Purchaser shall assume and agrees to pay, perform and discharge the following liabilities of Seller ("<u>Assumed Liabilities</u>"), and from and after the Effective Time such liabilities shall be the sole responsibility of Purchaser;

(i)     All claims, liabilities, responsibilities, obligations, costs, and expenses arising from Purchaser's ownership or operation of the Assets after the Effective Time, including, without limitation, any and all warranty obligations or claims relating to warranties provided to customer of the various projects in which the Assets are being used on or prior to the Closing Date, but solely to the extent such warranties or claims are covered by the original manufacturer's warranty;

(ii)     All of the Sellers' obligations under the Assumed Contracts to the extent such obligations arise after the Effective Time or relate to periods from and after the Effective Time;

(iii)     All Cure Costs for the Assumed Contracts;

(iv)     All liabilities in respect of taxes allocated to Purchaser under this Agreement;

(v)     All liabilities relating to the Assets to the extent arising on or after the Closing Date;

(vi)     All liabilities associated with the Hired Employees arising from Purchaser's employment of such Hired Employees on and after the Effective Time;

(vii)     Any liability described in Schedule 1.4(a)(ii) as being expressly assumed by Purchaser; and

(viii)     Any liability of the Purchaser under this Agreement or any document executed in connection with the transactions contemplated by this Agreement (the "<u>Transaction</u>");

(ix)     Any liability described in this Section 1.4 and Section 6.3 as being expressly assumed by Purchaser;

(x)     All other liabilities, responsibilities, and obligations relating to the Assets arising on or after the Closing Date; and

(xi)     All vacation pay, sick pay, or other paid time off earned by Hired Employees (defined below) from the Petition Date through the close of business on the Closing Date.

(b)     <u>Retained Liabilities</u>.   The Retained Liabilities shall remain the sole responsibility of and shall be retained, paid, performed and discharged solely by Seller. "<u>Retained Liabilities</u>" shall mean every liability of Seller other than the Assumed Liabilities including without limitation (in each case except to the extent included in the Assumed Liabilities):

(i)     any liability arising out of or relating to services provided by Seller, the Assets, or the Business, arising prior to the Effective Time;

(ii)     omitted;

(iii)     any liability under any Seller Contract not assumed by Purchaser under Section 1.4(a);

(iv)     any liability for taxes, including (A) any taxes arising as a result of Seller's operation of its business or ownership of the Assets prior to the Effective Time, (B) except as provided in Section 6.4, any tax liability of Seller that will arise as a result of the sale of the Assets pursuant to this Agreement and (C) any deferred taxes of any nature;

(v)     except to the extent included in the Assumed Liabilities, any liability under the employee plans or relating to payroll, vacation, sick leave, workers' compensation, unemployment benefits, pension plans, welfare plans, health care plans or benefits or any other employee plans or benefits of any kind for Seller's employees (collectively, "<u>Employee Plans</u>");

(vi)     except to the extent included in the Assumed Liabilities, any liability under any employment, severance, retention or termination agreement with (a) any employee of Seller or (b) any of its "insiders" or "affiliates" (as those terms as defined in the Bankruptcy Code) of the Seller (collectively, "<u>Related Persons</u>");

(vii)     any liability arising out of or relating to any employee grievance that occurred prior to the Effective Time;

(viii)     any claims, causes of action or litigation or proceedings with respect to the operation of the Business or the Assets (collectively, a "<u>Proceeding</u>") prior to the Effective Time;

4836-4404-7752.20

(ix)    any liability arising out of any Proceeding commenced after the Effective Time and arising out of or relating to any occurrence or event happening prior to the Effective Time;

(x)    any liability of Seller to a Related Person;

(xi)    any liability to indemnify, reimburse or advance amounts to any officer, director, employee or agent of Seller;

(xii)    any liability to distribute to any of Seller's shareholders or otherwise apply all or any part of the consideration received hereunder;

(xiii)    any liability arising out of or resulting from Seller's compliance or noncompliance with any legal requirement, regulation, statute, law, rule or order of any commission, board, agency, authority, unit or other regulatory body of the United States or any state or political subdivision thereof (a "Governmental Body"), each and any of which shall be referred to as a "Legal Requirement" or "Legal Requirements;"

(xiv)    any liability of Seller under this Agreement or any other document executed in connection with the Transaction;

(xv)    any liability of Seller based on Seller's acts or omissions occurring after the Effective Time;

(xvi)    any environmental, health and safety liabilities arising out of or relating to the operation of the Business, Seller's use of the Assets, or Seller's leasing, ownership or operation of any real property, but limited to liabilities which arose prior to the Closing Date (the "Environmental, Health and Safety Liabilities"); and

(xvii)    any liability arising out of or resulting from any loan, financing or security agreements to which the Seller is a party.

1.5.    CLOSING. In the event that Purchaser is the Prevailing Bidder and this Agreement is approved by order of the Bankruptcy Court at the Sale Hearing, then subject to the terms and conditions of this Agreement, as may be amended at the Auction and the Sale Hearing, the consummation of the Transaction (the "Closing") shall occur at 10:00 a.m. (prevailing Central time) on the third (3rd) business day following the entry of the Sale Order (as defined below) and the satisfaction (or waiver as provided therein) of each of the conditions precedent set forth in Section 4 and Section 5 of this Agreement (other than any such conditions that by their nature are to be satisfied at the Closing, but subject to satisfaction or waiver of all such conditions at or prior to the Closing), at the offices of Foley Gardere, 1000 Louisiana Street, Suite 2000, Houston, Texas 77002, or at such other location, time and date as shall be mutually agreed upon by the Parties ("Closing Date"), but in no event shall the Closing occur after the date that is thirty (30) days after entry of the Sale Order (defined below) ("Outside Date").  The time of the Closing shall be deemed to be effective as of 11:59 p.m. (prevailing Central time) on the date of the Closing ("Effective Time").

1.6.    (omitted)

1.7.    CLOSING OBLIGATIONS. At the Closing, the Sellers shall take all steps reasonably necessary to put Purchaser (or its designated Affiliate(s)) in possession of the Assets and for Purchaser to be vested with good and valid title to the Assets, pursuant to Section 363(f) and the Sale Order, and shall deliver to Purchaser (or its designated Affiliate(s)) (a) a duly executed Bill of Sale, Assignment and Assumption Agreement covering the Assets other than Assumed Contracts, in substantially the form attached as Exhibit D (the "Bill of Sale, Assignment and Assumption Agreement"), (b) duly executed title and transfer documents covering any Assets for which a certificate of title was ever issued and (c) such other duly executed transfer and release documents as Purchaser shall reasonably request to evidence the transfer of the Assets to Purchaser (or its designated Affiliate(s)) pursuant to Section 363(f) and the Sale Order.  At the Closing, Purchaser shall deliver to Seller the Closing Cash Payment as provided in Section 1.3(b), a duly executed Bill of Sale, Assignment and Assumption Agreement, and such other duly executed documents as Seller shall reasonably request to evidence and give effect to the Transaction.  At the Closing, Purchaser and the applicable Seller shall deliver to each other a duly executed counterpart of each contract assignment and assumption agreement that, pursuant to Section 1.3(h)(ii), is used to assume and assign the Assumed Contracts to Purchaser at Closing.

1.8.    PRORATIONS. The Purchase Price shall be subject to the following credits and adjustments, which shall be determined within two (2) business days before the Closing:

(a)    Any rents, prepaid items, and other applicable items with respect to the Assumed Liabilities shall be prorated as of the Effective Time.  Seller shall assign to Purchaser all unused deposits with respect to the Assumed Liabilities.

(b)    All revenue/amounts due or to be due and owed on projects/contracts for worked performed by the Sellers shall be prorated as of the Closing Date.

(c)    All taxes, utilities, rents and other items customarily prorated between a purchaser and a seller in transactions of this type shall be prorated on a per diem basis between Purchaser and Seller as of the Closing.  Seller shall not deduct federal and state taxes and other standard withholdings from employee wages more than the amount necessary to cover the per diem amounts through the Closing.  Ad valorem real, tangible personal property taxes with respect to the Assets for the calendar year in which the Closing occurs shall be prorated between Seller and Purchaser as of the Effective Time on the basis of no applicable discount.

## 2.    REPRESENTATIONS AND WARRANTIES OF SELLER

"Seller's Knowledge" shall mean the actual knowledge of the Burkhalters without investigation.  To the best of Seller's Knowledge, Seller represents and warrants to Purchaser as follows:

2.1.    ORGANIZATION AND GOOD STANDING. Burkhalter Specialized Transport, LLC is a limited liability company that is duly organized, validity existing, and in good standing under the laws of Delaware, with full corporate power and authority to conduct its business as it is now being conducted, to own or use the properties and assets that it purports to own or use, and to perform all its obligations under the Seller Contracts sold herein.  Burkhalter Rigging, Inc.

and Burkhalter Transport, Inc. are each a corporation that is duly organized, validly existing, and in good standing under the laws of Mississippi, with full corporate power and authority to conduct its business as it is now being conducted, to own or use the properties and assets that each purports to own or use, and to perform all its obligations under the Seller Contracts sold herein.  Sellers are duly qualified to do business as a foreign corporation and is in good standing under the laws of each state or other jurisdiction in which either the ownership or use of the properties owned or used by it, or the nature of the activities conducted by it, requires such qualifications, except where the failure to be so qualified will not have a "Material Adverse Effect" (as defined herein) on Seller.

"Material Adverse Effect" means any event, change, circumstance, effect, or other matter that has a material adverse effect on (a) the Assets, taken as a whole, or (b) the ability of the Sellers to consummate timely the Transaction; provided, however, that none of the following, either alone or in combination, will constitute, or be considered in determining whether there has been, a Material Adverse Effect:  any event, change, circumstance, effect or other matter resulting from or related to (i) any outbreak or escalation of war or major hostilities or any act of terrorism, (ii) changes in Laws, GAAP, or enforcement or interpretation thereof, (iii) changes that generally affect the industries and markets in which the Sellers operate, (iv) changes in financial markets, general economic conditions (including prevailing interest rates, exchange rates, commodity prices and fuel costs), or political conditions, (v) any failure, in and of itself, of any Seller to meet any published or internally prepared projections, budgets, plans, or forecasts of revenues, earnings, or other financial performance measures or operating statistics (it being understood that the facts and circumstances underlying any such failure that are not otherwise excluded from the definition of a "Material Adverse Effect" may be considered in determining whether there has been a Material Adverse Effect), (vi) any action taken or failed to be taken pursuant to or in accordance with this Agreement or at the request of, or consented to by, the Purchaser, (vii) the filing or pending of the Chapter 11 Case, any order of the Bankruptcy Court, and any actions or omissions of Seller in compliance with such orders or the Bankruptcy Code, or (viii) the execution or delivery of this Agreement, the consummation of the Transaction or the public announcement or other publicity with respect to any of the foregoing.

2.2.    ENFORCEABILITY; AUTHORITY; NO CONFLICT.

(a)    Subject to Bankruptcy Court approval, this Agreement constitutes the legal, valid and binding obligation of Seller, enforceable against it in accordance with its terms. Upon the execution and delivery by Seller of each agreement to be executed or delivered by Seller at the Closing (collectively, the "Seller's Closing Documents"), each of Seller's Closing Documents will constitute the legal, valid and binding obligation of Seller, enforceable against it in accordance with its terms, subject to Bankruptcy Court approval.  Seller, subject only to Bankruptcy Court approval, has the absolute and unrestricted right, power and authority to execute and deliver this Agreement and the Seller's Closing Documents to which it is a party and to perform its obligations under this Agreement and the Seller's Closing Documents, and such action has been duly authorized by all necessary action by Seller's Board of Directors.

2.3.    FINANCIAL STATEMENTS. Seller has delivered to Purchaser: (a) verified internal balance sheets of Seller as of December 31 in each of the fiscal years 2017 through 2018, and the related verified internal statements of income for each of the fiscal years then

ended; and (b) an internal balance sheet of Seller as of January 31, 2019 (the "Interim Balance Sheet"), and the related internal statement of income for the four (4) months then ended. Such financial statements fairly present, in all material respects, the financial condition and the results of operations of Seller as of the respective dates of and for the periods referred to in such financial statements.

2.4.    SUFFICIENCY OF ASSETS. Other than the Excluded Assets, the Assets (a) constitute substantially all of the assets, tangible and intangible, of any nature whatsoever, used by the Seller in its Business, and (b) include substantially all of the operating assets of Seller.

2.5.    TITLE TO ASSETS. Seller owns good and transferable title to all of the Assets and, subject to entry of the Sale Order by the Bankruptcy Court, such Assets will be free and clear of any Encumbrances at the Closing.

2.6.    (omitted)

2.7.    (omitted)

2.8.    (omitted)

2.9.    (omitted)

2.10.    (omitted)

2.11.    (omitted)

2.12.    (omitted)

2.13.    (omitted)

2.14.    CONTRACTS; NO DEFAULTS. Seller has delivered to Purchaser or Purchaser has had the ability and access to review accurate and complete copies, of all material contracts to which Seller is a party as of the date of this Agreement (collectively, the "Seller Contracts").

2.15.    (omitted)

2.16.    (omitted)

2.17.    INTELLECTUAL PROPERTY ASSETS. Exhibit E lists all patents trademarks, trade names, domain names, service marks or copyrights, both registered and unregistered, in or to which Seller has a right, title or interest ("Intellectual Property Assets"). Seller is not infringing, violating or misappropriating any Intellectual Property of any other Person. No Person is infringing, violating or misappropriating any Intellectual Property Assets.

2.18.    (omitted)

2.19.    (omitted)

10

**3.**     **REPRESENTATION AND WARRANTIES OF PURCHASER**

Purchaser represents and warrants to Seller as follows:

3.1.    ORGANIZATION AND GOOD STANDING. Purchaser is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware, with full corporate power and authority to conduct its business as it is now conducted.

3.2.    AUTHORITY; NO CONFLICT.

(a)    This Agreement constitutes the legal, valid and binding obligation of Purchaser, enforceable against Purchaser in accordance with its terms.  Upon the execution and delivery by Purchaser of each agreement to be executed or delivered by Purchaser at Closing (collectively, the "Purchaser's Closing Documents"), each of the Purchaser's Closing Documents will constitute the legal, valid and binding obligation of Purchaser, enforceable against Purchaser in accordance with its respective terms, except as limited by applicable bankruptcy, moratorium, insolvency or other laws affecting generally the rights of creditors or by principles of equity. Purchaser has the absolute and unrestricted right, power and authority to execute and deliver this Agreement and the Purchaser's Closing Documents and to perform its obligations under this Agreement and the Purchaser's Closing Documents, and such action has been duly authorized by all necessary corporate action.

(b)    Neither the execution and delivery of this Agreement by Purchaser nor the consummation or performance of any of the Transaction by Purchaser will give any Person the right to prevent, delay or otherwise interfere with any of the Transaction pursuant to:  (i) any provision of Purchaser's Governing Documents; (ii) any resolution adopted by the Board of Directors or shareholders of Purchaser; (iii) any Legal Requirement or Order to which Purchaser may be subject; or (iv) any contract to which Purchaser is a party or by which Purchaser may be bound.

(c)    Purchaser is not and will not be required to obtain any Consent from any Person in connection with the execution and delivery of this Agreement or the consummation or performance of any of the Transaction.

3.3.    CERTAIN PROCEEDINGS. There is no pending Proceeding that has been commenced against Purchaser and that challenges, or may have the effect of preventing, delaying, making illegal or otherwise interfering with, any of the Transaction.  To Purchaser's knowledge, no such Proceeding has been threatened.

3.4.    BROKERS OR FINDERS. Neither Purchaser nor any of its representatives have incurred any obligation or liability, contingent or otherwise, for brokerage or finders' fees or agents' commissions or other similar payment in connection with this Agreement, the sale of the Assets or the Transaction.

3.5.    FINANCIAL ABILITY. Purchaser has sufficient capital or access to sufficient capital to fund the total consideration to be paid by Purchaser under this Agreement and, as of the Closing, will have immediately available cash funds to pay the total consideration contemplated to be paid by Purchaser under this Agreement and to make all other necessary

11

payments of fees and expenses in connection with the Transaction.  Purchaser's obligations under this Agreement are not in any way contingent upon or otherwise subject to (a) Purchaser's consummation of any financial arrangements or Purchaser's obtaining of any financing; or (b) the availability, grant, provision or extension of any credit, loan or financing to Purchaser.

      3.6.   <u>EFFECT OF AGREEMENT</u>. The execution and delivery of this Agreement and the consummation of the Transaction will not (a) result in any breach of any of the terms or conditions of, or constitute a default under, the Certificate of Formation or other charter documents or operating agreement of Purchaser, or any commitment, mortgage, note, bond, debenture, deed of trust, contract, agreement, license or other instrument or obligation to which Purchaser is now a party or by which Purchaser or any of its properties or assets may be bound or affected; or (b) result in any violation of any Governmental Requirement applicable to Purchaser, except where it would not be reasonably expected to have a Material Adverse Effect on the ability of Purchaser to timely consummate the Transaction in accordance with the terms of this Agreement and perform its obligations hereunder and under any related Transaction documents.

      3.7.   <u>PURCHASER'S INVESTIGATION</u>. Purchaser represents that it is a sophisticated entity that was advised by knowledgeable counsel and hereby acknowledges that at Closing it will have conducted an investigation of the Assets.  Notwithstanding anything in this Agreement to the contrary, Purchaser acknowledges that, if the Closing occurs, it will accept the Assets sold, assigned and transferred at the Closing in their present condition and locations and with their present operating capabilities.  Purchaser acknowledges that Sellers make no warranty, express or implied, as to the condition of the Assets.  Purchaser has not relied on, and Sellers shall not be liable for or bound in any manner by, any express or implied verbal or written information, warranties, guarantees, promises, statements, inducements, representations or opinions pertaining to the Equipment, the Business or the Assets, except as may be contained in this Agreement.  Purchaser is relying solely on its own inspection of the Assets and the Sellers' operations.  Except as otherwise expressly set forth in this Agreement, no Seller makes any representation or extends any warranty of any kind, express or implied, with respect to the subject matter of this Agreement, including, without limitation, warranties of merchantability, fitness for a particular purpose, and any warranty arising out of prior course of dealing and usage of trade.  Purchaser shall accept all of the same in their "AS IS, WHERE IS" condition. Purchaser acknowledges that the representations and warranties of Sellers contained in this Agreement constitute the sole and exclusive representations and warranties of Sellers to Purchaser in connection with this Agreement and the Transaction, and Purchaser acknowledges that all other representations and warranties are specifically disclaimed and may not be relied upon or serve as a basis for a claim against Sellers.

**4.**    **<u>CONDITIONS PRECEDENT TO PURCHASER'S OBLIGATION TO CLOSE</u>**

      Purchaser's obligation to purchase the Assets and to take the other actions required to be taken by Purchaser at the Closing is subject to the satisfaction, at or prior to the Closing, of each of the following conditions (any of which may be waived by Purchaser, in whole or in part, in an executed writing prior to the Closing):

4.1.   <u>ACCURACY OF REPRESENTATIONS</u>. All of Seller's representations and warranties in this Agreement (considered collectively), and each of these representations and warranties (considered individually), shall have been accurate in all material respects as of the date of this Agreement, and shall be accurate in all material respects as of the Closing Date as if them made.

4.2.   <u>SELLER'S PERFORMANCE</u>. All of the covenants and obligations that Seller is required to perform or to comply with pursuant to this Agreement at or prior to the Closing (considered collectively), and each of these covenants and obligations (considered individually), shall have been duly performed and complied with in all material respects.

4.3.   <u>CONSENTS</u>. The Bankruptcy Court shall have entered an order approving this Agreement (as may have been amended with the consent of the Parties or order of the Bankruptcy Court), which order shall be substantially in the form of the order agreed by the Parties and attached as <u>Appendix 4.3</u>, which will be filed with the Bankruptcy Court at a later date (the "<u>Sale Order</u>"), and shall be entered by the Bankruptcy Court no later than May 24, 2019 (the "<u>Sale Order Deadline</u>").

The Sale Order shall include the following provisions substantially in the form as provided in Appendix 4.3:  (i) approving the sale, transfer and assignment of the Assets to Purchaser upon the terms and conditions set forth in this Agreement (or as may have been amended with the consent of the Parties hereto at the Auction and/or the Sale Hearing), free and clear of any Encumbrances; (ii) providing that any and all valid Encumbrances, if any, shall attach to the proceeds of the Purchase Price received by the Sellers at Closing; (iii) finding that the notice of the proposed sale of the Assets sent by Seller pursuant to the Bidding Procedures Order, and the service thereof, were sufficient under the circumstances; (iv) containing a finding that all requirements imposed by section 363(f) of the Bankruptcy Code for the sale of the Assets free and clear of all Encumbrances, whether known or unknown, have been satisfied; (v) containing a finding that Purchaser is a good faith purchaser pursuant to section 363(m) of the Bankruptcy Code; (vi) containing a finding that Purchaser and Seller did not engage in any conduct that would allow this Agreement to be set aside pursuant to section 363(n) of the Bankruptcy Code; (vii) containing a finding that the terms and provisions of this Agreement are fair and reasonable; (viii) authorizing the assumption and assignment of the Assumed Contracts to Purchaser; and (ix) containing such other findings and granting such other relief as is necessary, reasonable and customary in connection therewith.

4.4.   <u>ADDITIONAL DOCUMENTS</u>. Seller shall have caused the documents and instruments required by Article 6 to be delivered as required in Article 6 and/or tendered at Closing to Purchaser.

4.5.   <u>NO PROCEEDINGS</u>. There shall not have been commenced or threatened in writing against Purchaser, or against any Related Person of Purchaser, any Proceeding that remains pending as of the Closing (a) involving any challenge to, or seeking damages or other relief in connection with, any of the Transaction, or (b) that will have the effect of preventing, delaying, making illegal, imposing limitations or conditions on or otherwise interfering with any of the Transaction.

4836-4404-7752.20

4.6.    NO CONFLICT. Neither the consummation nor the performance of any of the Transaction will, directly or indirectly (with or without notice or lapse of time), contravene or conflict with or result in a violation of or cause Purchaser to suffer any material adverse consequence under any Legal Requirement or Order that has been published, introduced or otherwise proposed by or before any Governmental Body.

4.7.    NO MATERIAL ADVERSE EFFECT. There shall have been no Material Adverse Effect from the date hereof until the Closing except as disclosed, and reasonably acceptable to, Purchaser.

4.8.    NON COMPETITION AGREEMENTS.  Seller shall have obtained the execution of the Non-Competition Agreement(s) by the Burkhalters, which condition has been satisfied.

**5.      CONDITIONS PRECEDENT TO SELLER'S OBLIGATION TO CLOSE**

Seller's obligation to sell the Assets and to take the other actions required to be taken by Seller at the Closing is subject to the satisfaction, at or prior to the Closing, of each of the following conditions (any of which may be waived by Purchaser in whole or in part):

5.1.    ACCURACY OF REPRESENTATIONS. All of Purchaser's representations and warranties in this Agreement (considered collectively), and each of these representations and warranties (considered individually), shall have been accurate in all material respects as of the date of this Agreement and shall be accurate in all material respects as of the time of the Closing Date as if then made.

5.2.    PURCHASER'S PERFORMANCE. All of the covenants and obligations that Purchaser is required to perform or to comply with pursuant to this Agreement at or prior to the Closing (considered collectively), and each of these covenants and obligations (considered individually), shall have been performed and complied with in all material respects.

5.3.    BANKRUPTCY COURT APPROVAL. This Agreement is subject to the Bankruptcy Court's entry of the Sale Order.

5.4.    ADDITIONAL DOCUMENTS. Purchaser shall have caused the documents and instruments required by this Agreement to be delivered (or tendered subject only to Closing) to Seller.

**6.      ADDITIONAL COVENANTS.**

6.1.    CONDUCT OF THE BUSINESS. From the date hereof to the Closing Date (or the date on which this Agreement is terminated pursuant to Article 9 hereof), Seller shall, except (i) as required in connection with the Transaction; (ii) as required by any court or applicable Legal Requirement; or (iii) as otherwise set forth in, or permitted or contemplated by, this Agreement, or consented to in writing by Purchaser:

(a)      use commercially reasonable efforts to carry on the business of Seller in the ordinary course, consistent with Seller's past practice and in substantially the same manner

previously conducted except taking into account the existence of the bankruptcy and the changes on account thereof.;

(b)      not sell, or grant options, warrants or rights to purchase, or otherwise dispose of any of the Assets other than in the ordinary course of business;

(c)      not amend, modify, or terminate, or enter into any agreement to amend, modify, or terminate, any of the Seller Contracts other than in the ordinary course of business unless notice has been provided to Purchaser of such amendment, modification, or termination;

(d)      maintain the Seller's records in accordance with past practice; and

(e)      not take any action or enter into any transaction that would result in an Encumbrance being imposed on any Asset other than a Permitted Encumbrance.

6.2.      <u>ACCESS TO INFORMATION</u>. From the date hereof until the Auction, Seller shall (a) afford Purchaser and its representatives reasonable access to the Assets, including Equipment, Tangible Personal Property, Seller Contracts, books and records, contracts and other documents and data related to the Business; (b) furnish Purchaser and its representatives with such financial, operating and other data and information related to the business as Purchaser or any of its representatives may reasonably request; and (c) instruct the representatives of Seller to reasonably cooperate with Purchaser in its investigation of the business.  Any access, furnishing of information or investigation pursuant to this Section 7.2 shall be conducted at Purchaser's expense and the results thereof shared with Seller (and Seller may share such results with any other party submitting a Qualified Offer), during normal business hours, under the supervision of Seller's personnel and in such manner as not to interfere with the conduct of the business of Seller, the bankruptcy, or the sale process.  No investigation by Purchaser or other information received by Purchaser shall operate as a waiver or otherwise affect any representation, warranty, or agreement given or made by Seller in this Agreement.

6.3.      <u>EMPLOYEES AND EMPLOYEE BENEFITS</u>.

(a)      <u>Information on Active Employees</u>.  For purpose of this Agreement, the term "<u>Active Employees</u>" shall mean all employees employed on the Closing Date by Seller for its business who are employed by Seller for its business as currently conducted, including employees on vacation, temporary leave of absence, family and medical leave, military leave, temporary disability or sick leave.  In addition, any employee who is on long-term disability leave shall be treated as an Active Employee if and when such employee returns to active service.

(b)      <u>Employment of Active Employees by Purchaser</u>.

(i)      On or before the Closing Date, Purchaser shall make a Qualifying Employment Offer, as defined below, to 80% of the Active Employees (the "<u>Hired Employees</u>").  Nothing contained in this Agreement shall confer on any Hired Employee any employment agreement or any right to any term or condition of employment, or to the continuance of employment by Purchaser, nor shall anything herein interfere with the right of Purchaser to terminate the employment of any employee, including any Hired Employee, at any

time, with or without notice and for any or no reason, or restrict Purchaser in modifying any of the terms or conditions of employment of any employee, including any Hired Employee, after the Closing.  Termination by Sellers of the employment of the Hired Employee shall occur on or prior to the Closing Date. "Qualifying Employment Offer" means, with respect to a given employee of a Seller, an offer of employment on terms that, considering salary and all benefits, are substantially similar to such items set forth on a schedule to be provided to Purchaser for such Hired Employee; provided, however, that health and medical benefits shall be substantially similar to such benefits provided on a general basis to Purchaser's other employees.

As a condition to hiring any Active Employee, such employee shall waive any and all claims, causes of actions or rights he or she may have against the Sellers in respect of the payment of any termination or severance payments.  Each Active Employee who accepts Purchaser's offer of employment shall become an employee of Purchaser immediately following the Effective Time on the Closing Date.

(ii)     Seller shall not solicit the continued employment of any Active Employee (unless and until Purchaser has informed Seller in writing that the particular Active Employee will not receive any employment offer from Purchaser) or the employment of any Hired Employee after the Closing for a period of two (2) years.

(c)     Salaries and Benefits.

(i)     Unless waived or required to be waived pursuant to this Agreement, Seller shall be responsible for any and all remuneration due (if any) to Active Employees with respect to their services or employment through the close of business on the Closing Date, including *pro rata* bonus payments (if any), all vacation pay, sick pay or other paid time off earned prior to the Closing Date; and (B) the payment of any termination or severance payments.

(ii)     Purchaser shall not be liable for any claims made or incurred by Active Employees and their beneficiaries up to the Effective Time under the Employee Plans. For purposes of the immediately preceding sentence, a charge will be deemed incurred, in the case of hospital, medical or dental benefits, when the services that are the subject of the charge are performed and, in the case of other benefits (such as disability or life insurance), when an event has occurred or when a condition has been diagnosed that entitles the employee to the benefit.

(d)     Seller's Retirement and Savings Plans.  All Hired Employees who are participants in Seller's retirement plans shall retain their accrued benefits under Seller's retirement plans as of the Closing Date, and Purchaser (or Purchaser's retirement plans) shall not have liability for the payment of such benefits as and when such Hired Employees become eligible therefor under such plans.

(e)     No Transfer of Assets.  Seller will not make any transfer of pension or other Employee Plan assets or any liability with respect thereto to Purchaser.

(f)     (omitted)

16

(g)     General Employee Provisions.

(i)     Seller and Purchaser shall give any notices required by Legal Requirements and take whatever other actions with respect to the plans, programs and polices described in this Section 6.3 as may be necessary to carry out the arrangements described in this Section 7.3.

(ii)     Seller and Purchaser shall provide each other with such plan documents and summary plan descriptions, employee data or other information as may be reasonably required to carry out the arrangements described in this Section 6.3.

(iii)     If any of the arrangements described in this Section 6.3 are determined by the IRS or other Governmental Body to be prohibited by law, Seller and Purchaser shall modify such arrangements to as closely as possible reflect their expressed intent and retain the allocation of economic benefits and burdens to the parties contemplated herein in a manner that is not prohibited by law.

(iv)     Seller shall provide Purchaser with completed I-9 forms and attachments with respect to all Hired Employees, except for such employees as Seller certifies in writing to Purchaser are exempt from such requirement.

6.4.    PAYMENT OF SALES TAXES RESULTING FROM SALE OF ASSETS BY SELLER. Seller shall pay 100% of any and all sales and use tax, and bulk-sales tax resulting from the sale of the Assets pursuant to this Agreement and in accordance with the Bankruptcy Code.  Purchaser acknowledges that Sellers will not comply with the provisions of any bulk-sale or bulk-transfer laws of any jurisdiction in connection with the Transaction, and hereby waives all claims related to the non-compliance therewith.  The Parties intend that, pursuant to Section 363(f) of the Bankruptcy Code, the transfer of the Assets to Purchaser hereunder shall be free and clear of any Encumbrances, including any Encumbrances arising out of any bulk-sale or bulk-transfer laws.

6.5.    REMOVING EXCLUDED ASSETS AND UNWANTED ITEMS.

(a)     Sellers use certain real property (collectively, the "Real Property") in the Business.  Purchaser intends to enter into a lease (the "Lease") with Burkhalter Properties, Inc., a Mississippi corporation (the "Landlord") the owner of the Real Property, for Purchaser's use.  If Purchaser enters into a Lease, within five (5) business days after the later of (a) the Closing Date and (b) the date the effective date of the Lease, and unless authorized to lease Excluded Assets and Unwanted Items by the owner of the Real Property, Seller shall remove all Excluded Assets (except as provided in Section 1.3(d) and this Section 6.5 with respect to the BSET and pursuant to any agreement with the owner of the Real Property), and Unwanted Items from the Real Property to be occupied by the Purchaser.  It is understood and agreed that Excluded Assets may remain or be stored on the Real Property pursuant to any agreement between the Seller and the owner of the Real Property, so long as such Excluded Assets do not interfere with Purchaser's reasonable use and enjoyment of the Real Property in a material way.  Purchaser and Seller will meet to designate personal property identified by Purchaser as Unwanted Items (as defined in Exhibit B) as a part of the Excluded Assets. For the avoidance of doubt, the Sellers and their

agents shall have access to the Excluded Assets and Unwanted Items, including the BSET.  Such storage and removal, as applicable, of the Excluded Assets and Unwanted Items shall be done in such manner as to not unreasonably interfere with business operations to be conducted by Purchaser after the Closing.  Any damage to the Assets or to the Real Property resulting from such removal shall be paid by Sellers.  Upon Purchaser vacating the Real Property, Purchaser shall have no obligation to remove the Excluded Assets or Unwanted Items (subject to requirements contained in the property lease) on the Real Property at such time.

(b)     Notwithstanding anything to the contrary in this Agreement, Sellers shall not be required to remove the BSET from the Real Property (and shall be entitled to continue storing it at such location without any additional compensation to the Purchaser or the owner of the Real Property) until the date that is the earlier of (a) twelve (12) months after the closing of the sale of the BSET by the Sellers and (b) fifteen (15) months after the Closing Date, Sellers, in their sole and absolute discretion, at any time may assign all or any portion of their rights under this Section to any person or entity that purchases the BSET from the Sellers.

(c)     The Prepetition Lenders and their successors and assigns shall be express third-party beneficiaries to the provisions of this Section 6.5.

6.6.     (omitted)

6.7.     <u>REPORTS AND RETURNS</u>. Seller shall promptly after the Closing prepare and file all reports and returns required by Legal Requirements relating to the Business as conducted using the Assets, to and including the Effective Time.

6.8.     <u>ASSISTANCE IN PROCEEDINGS</u>. Each party will cooperate with the other party and its counsel in the contest or defense of, and make available its personnel and provide any testimony and access to its books and records in connection with, any Proceeding involving or relating to (a) the Transaction or (b) any action, activity, circumstance, condition, conduct, event, fact, failure to act, incident, occurrence, plan, practice, situation, status or transaction involving Seller or its business.

6.9.     <u>CUSTOMER AND OTHER BUSINESS RELATIONSHIPS</u>. After the Closing, Seller will provide reasonable cooperation to Purchaser in its efforts to continue and maintain for the benefit of Purchaser those business relationships of Seller existing prior to the Closing and relating to the business to be operated by Purchaser after the Closing, including relationships with lessors, employees, regulatory authorities, licensors, customers, suppliers and others; provided, however, Seller shall not be required to incur any expenses in connection with such cooperation.  Any such expenses and costs incurred by Seller shall be immediately reimbursed to Seller by Purchaser.  Seller will refer to Purchaser all inquiries relating to such business.  Neither Seller nor any of its shareholders shall take any action that is intended to damage the value of the Assets after the Closing, including disparaging the name or business of Purchaser.

6.10.     <u>NONCOMPETITION, NONSOLICITATION AND NONDISPARAGEMENT</u>.

(a)     <u>Noncompetition</u>.  After the Closing Date, Seller shall not, anywhere in the United States, directly or indirectly invest in, own, manage, operate, finance, control, advise,

render services to or guarantee the obligations of any Person engaged in or planning to become engaged in the crane, rigging or heavy transport business.

(b)     Nonsolicitation.   After the Closing Date, Seller shall not, directly or indirectly:

(i)     solicit the business of any Person who is a customer of Purchaser;

(ii)     cause, induce or attempt to cause or induce any customer, supplier, licensee, licensor, franchisee, employee, consultant or other business relation of Purchaser to cease doing business with Purchaser, to deal with any competitor of Purchaser or in any way interfere with its relationship with Purchaser;

(iii)     cause, induce or attempt to cause or induce any customer or supplier, licensee, licensor, franchisee, employee, consultant or other business relations of Seller on the Closing date or within the year preceding the Closing Date to cease doing business with Purchaser, to deal with any competitor of Purchaser or in any way interfere with its relationship with Purchaser; or

(iv)     hire, retain or attempt to hire or retain any employee or independent contractor of Purchaser or in any way interfere with the relationship between Purchaser and any of its employees or independent contractors.

(c)     Nondisparagement.   After the Closing Date, neither party will disparage the others or any of the other's shareholders, directors, officers, employees or agents.

(d)     Modification of Covenant.   If a final judgment of a court or tribunal of competent jurisdiction determines that any term or provision contained in Section 6.9(a) through (c) is invalid or unenforceable, then the Parties agree that the court or tribunal will have the power to reduce the scope, duration or geographic area of the term or provision, to delete specific words or phrases or to replace any invalid or unenforceable term or provisions with a term or provisions that is valid and enforceable and that comes closest to expressing the intention of the invalid or unenforceable terms or provision.   This Section 6.9 will be enforceable as so modified after the expiration of the time within which the judgment may be appealed.   This Section 6.9 is reasonable and necessary to protect and preserve Purchaser's legitimate business interests and the value of the Assets and to prevent any unfair advantage conferred on Seller.

6.11.   RETENTION OF AND ACCESS TO RECORDS. For a period of thirty-six (36) months after the Closing Date, upon reasonable advance notice, Purchaser shall provide Seller and its representatives reasonable access to all books, records, employees, auditors, and counsel to the extent necessary for financial reporting and accounting matters, employee-benefits matters, the preparation and filing of any tax returns, reports or forms, the defense of any Tax audit, claim or assessment, the reconciliation of claims in the Chapter 11 Case or otherwise to enable Sellers to address issues arising in connection with or relating to the Chapter 11 Case or to permit Sellers to determine any matter relating to their rights and obligations hereunder or any other reasonable business purpose related to the Excluded Assets or Excluded Liabilities; provided, however, that any such access by Sellers shall not unreasonably interfere with the conduct of the business of Sellers.  Sellers will hold, and will use their commercially reasonable

efforts to cause their representatives, accountants, counsel, consultants, advisors, and agents to hold, in confidence, unless compelled to disclose by judicial or administrative process or by other requirements of Law, all confidential documents and information concerning Sellers or the Assets.

6.12.   <u>FURTHER ASSURANCES</u>. The Parties shall cooperate reasonably with each other and with their respective representatives in connection with any steps required to be taken as part of their respective obligations under this Agreement, and shall (a) furnish upon request to each other such further information; (b) execute and deliver to each other such other documents; and (c) do such other acts and things, all as the other party may reasonably request for the purpose of carrying out the intent of this Agreement and the Transaction.

# 7.   <u>SURVIVAL; REMEDIES</u>

7.1.   <u>NO SURVIVAL OF REPRESENTATIONS AND WARRANTIES OR PRE-CLOSING COVENANTS</u>. All representations and warranties in this Agreement, and the covenants, agreements and obligations in this Agreement that are to be performed at or before the Closing, shall not survive the Closing and the consummation of the Transaction and, other than in the case of fraud, none of the Parties shall have any Liability to each other after the Closing for any breach thereof.  Notwithstanding the foregoing, the Parties agree that the covenants, agreements and obligations contained in this Agreement to be performed after the Closing shall survive the Closing in accordance with the terms hereunder, and, subject to the terms of this Agreement, each Party shall be liable to the other after the Closing for any breach thereof.

7.2.   <u>INJUNCTIVE RELIEF</u>. Each Party agrees that any breach of this Agreement may constitute irreparable harm and damages at law are an inadequate remedy for the breach of any of the covenants, promises and agreements contained in this Agreement, and, accordingly, either Party is entitled to seek injunctive relief with respect to any such breach, including specific performance of such covenants or obligations or an order enjoining a Party from any threatened, or from the continuation of any actual, breach of the covenants or obligations contained in this Agreement.  Each Party hereby waives any requirement for the securing or posting of any bond in connection with any such injunctive relief.

# 8.   <u>CONFIDENTIALITY</u>

From and after the Closing, Seller shall hold, in confidence any and all information, whether written or oral, concerning the business of Seller, except to the extent that Seller can show that such information is generally available to and known by the public through no fault of Seller.  If Seller is compelled to disclose any information by judicial or administrative process or by other Legal Requirements, Seller shall promptly notify Purchaser in writing and shall disclose only that portion of such information which Seller is advised by its counsel in writing is legally required to be disclosed, provided that Seller shall use reasonable best efforts to obtain, at the sole cost and expense of Purchaser, an appropriate protective order or other reasonable assurance that confidential treatment will be accorded such information.

4836-4404-7752.20

9.    **TERMINATION**

This Agreement and the Transaction may be terminated prior to Closing pursuant to any of the following:

(a)    By Purchaser if the "Bidding Procedures Order" (as defined below) has not been entered within twenty-eight (28) calendar days from the Effective Date; in which case, this Agreement shall be null and void and of no legal effect whatsoever upon the return to Purchaser of the Deposit which shall occur within two (2) business days of such event, and each of the parties shall otherwise suffer their own losses, costs, expenses or damages arising out of, under or related to this Agreement;

(b)    By the mutual written consent of Seller and Purchaser; in which case, this Agreement shall be null and void and of no legal effect whatsoever upon the return to Purchaser of the Deposit which shall occur within two (2) business days after the date of the execution of such mutual written consent, and each of the parties shall otherwise suffer their own losses, costs, expenses or damages arising out of, under or related to this Agreement;

(c)    If Seller determines at the Auction that Purchaser has submitted neither the Prevailing Bid nor the Runner-Up Bid at the Auction, and provided that Purchaser is not in material default hereunder, then this Agreement shall be null and void and of no legal effect whatsoever upon the return of the Deposit which shall occur within two (2) business days after the date of the Auction, and if applicable, payment of the Break-Up Fee, and each of the parties shall otherwise suffer their own losses, costs, expenses or damages arising out of, under or related to this Agreement;

(d)    By either of the parties if the other party materially defaults under this Agreement or the Closing of this Agreement, if approved by the Bankruptcy Court pursuant to the terms of the Sale Order, shall not have occurred at or before the Outside Date; provided, however, that the right to terminate this Agreement under this subparagraph shall not be available to any party whose failure to fulfill any of its obligations under this Agreement has been the cause of or resulted in the failure of the Closing to occur on or prior to the aforesaid date, and provided further, that:

(i)    If Purchaser is not in material default hereunder, if the Sale Order has not been stayed, and Seller fails to make the required deliveries at the Closing or materially defaults under this Agreement with no fault of Purchaser, then Purchaser, as its sole and exclusive remedy, shall have the right to:  (A) terminate this Agreement and thereupon this Agreement shall be null and void and of no legal effect whatsoever upon the return of the Deposit to Purchaser which shall occur within two (2) business days after the date of Seller's material default, and each of the parties shall otherwise suffer their own losses, costs, expenses or damages arising out of, under or related to this Agreement; (B) pursue the remedy of specific performance of this Agreement in the Bankruptcy Court; in which case, whichever party is the prevailing party in such action shall be entitled to all of its reasonable costs and expenses incurred in connection therewith (including, without limitation, reasonable attorneys' fees); or (C) waive or agree to modify, in Purchaser's sole and absolute discretion, the occurrences

21

causing Seller's inability to consummate the Transaction, after which Purchaser shall be required to consummate the Transaction; and

(ii)    If Seller is not in material default hereunder, and Purchaser fails to make the required deliveries (including payment of the Closing Date Payment) at the Closing as set forth above, or refuses to close for any reason, then Seller, as its sole and exclusive remedy, shall have the right to:   (A) terminate this Agreement and retain 100% of the Deposit as liquidated damages for such default, in which event Seller's retention of the Deposit shall be conclusively deemed to be the sole and exclusive remedy available to Seller in connection with such breach by the Purchaser, and the Seller is conclusively deemed to have waived all other claims rights and remedies against the Purchaser relating to the Transaction and this Agreement or (B) pursue the remedy of specific performance of this Agreement in the Bankruptcy Court; in which case, whichever party is the prevailing party in such action shall be entitled to all of its reasonable costs and expenses incurred in connection therewith (including, without limitation, reasonable attorneys' fees).

(e)    by Buyer or Seller, if any court of competent jurisdiction or other competent Governmental Body shall have issued a law or order permanently restraining, enjoining or otherwise prohibiting the Transaction and such law or order or other action shall have become final and non-appealable.

## 10.    METHOD OF SALE; BANKRUPTCY COURT APPROVAL

(a)    <u>Sale Motion</u>.  Within four (4) business days of the Effective Date, Seller shall file a motion in the Chapter 11 Case seeking the entry of orders:  (i) approving the sale process for the sale of the Assets and the bidding process; (ii) approving the form of this Agreement, including, the "Initial Overbid" and "Break-Up Fee" in favor of Purchaser, as defined in, and pursuant to, Sections 12 and 13 below; (iii) scheduling the "Bid Deadline," "Auction," and "Sale Hearing," as those terms are defined below; (iv) approving the form, and recipients, of the notice of the above, including without limitation, notice of the assignment of the Seller Contracts ("<u>Notice of Sale</u>"); (v) authorizing the sale of the Assets free and clear of liens, claims, encumbrances and interests, and assigning the Seller Contracts; and (vi) for such other relief as is necessary, reasonable and customary in connection therewith ("<u>Sale Motion</u>");

(b)    <u>Bidding Procedures Order</u>.  Seller shall obtain the entry in the Chapter 11 Case of an order, in form and substance reasonably acceptable to Seller and Purchaser, granting the relief sought by Seller in the Sale Motion in all material respects concerning the bidding process, applicable dates and times and the Notice of Sale ("<u>Bidding Procedures Order</u>");

(c)    <u>Auction and Sale Hearing</u>.  Purchaser acknowledges that in connection with the sale of the Assets and continuing until the Bid Deadline, Seller shall have advertised to the public in such manner as Seller, in its sole discretion, deems appropriate, that the Assets are for sale and will be sold to the highest and best "Qualifying Offer(s)", as defined below, submitted at an auction to be conducted by Seller at the offices of the Seller's counsel, Foley Gardere, 1000 Louisiana Street, Suite 2000, Houston, Texas 77002, at 9:00 a.m. prevailing Central Standard Time May 7, 2019 ("<u>Auction</u>"), and approved by the Bankruptcy Court at a hearing to be held in the Chapter 11 Case thereafter ("<u>Sale Hearing</u>").  Purchaser's bid for the

Assets as set forth in this Agreement shall be the opening bid for such Assets at the Auction. Subject to the provisions concerning bid protection, Seller shall be authorized to receive and consider Qualifying Offer(s) from third parties at the Auction to purchase the Assets.  In the event that a Qualifying Offer(s) is received, subject to the bid protections, Seller will continue at the Auction to seek higher bids in an open-cry auction format, until no further bids are made.  In the event that there is no Qualifying Offer, Purchaser's bid as set forth in this Agreement shall be deemed accepted by Seller.

(d)      For purposes hereof, a "Qualifying Offer" shall mean a bona fide, binding, and duly executed written offer(s) to purchase the Assets, received on or before midnight on April 29, 2019, (which Seller, in its sole discretion, may extend for up to three calendar days), (the "Bid Deadline"), which:  (i) is accompanied by redline that shows the differences between the proposed asset purchase agreement proposed by such offer and this Agreement ; (ii) is irrevocable until the conclusion of the Sale Hearing; (iii) is accompanied by a deposit in the form of a cashiers' check or wire transfer in the amount equal to ten percent (10%) of the initial bid amount of $12,300,000 (the "Initial Bid Amount"), to be held pursuant to Section 1.3 above; (iv) is accompanied by such evidence reasonably acceptable to Seller, demonstrating the proposed bidder's ability to close the proposed transaction and receipt of, before the start of the Auction, such further evidence establishing the existence of available unrestricted liquid funds in an amount sufficient for the proposed bidder to close the proposed transaction ("Available Funds"); (v) total consideration in an amount greater than the total consideration provided by this Agreement, plus the bid protection inclusive of the Break-Up Fee; and (vi) may propose to purchase the Assets on either a "going concern," or piecemeal, or liquidating basis.  All Qualifying Offers must disclose the material terms and conditions of any contemplated employment or consulting agreement with any Related Person.

(e)      In the event that a Qualifying Offer(s) for the Assets or a combination of the Assets and Excluded Assets is/are received by the Seller that is higher and better than the Qualifying Offer reflected in this Agreement for the Assets, Purchaser shall be entitled to submit further bids at the Auction.  In the event that the highest and best Qualifying Offer(s) is/are submitted at the Auction by a purchaser(s) other than Purchaser, then Seller shall (i) be entitled to accept such other Qualifying Offer(s) ("Prevailing Bid(s)" or "Prevailing Bidder(s)"), and (ii) announce the next highest or otherwise best bid(s) to constitute a runner-up bid(s) ("Runner-Up Bid(s)" or "Runner-Up Bidder(s)"), and submit each for approval at the Sale Hearing (an "Alternative Transaction").

(f)      Seller shall have the right to provide any third party with any information which that third party reasonably requests concerning the Business and/or the Assets so as to allow that third party to have the information on which to base a bid for the Assets; provided, however, that Seller must first obtain the execution and delivery of a non-disclosure agreement from said third party(s) in the same form and substance as that certain Mutual Non-Disclosure Agreement by and between Seller and Purchaser ("NDA").

(g)      In the event that the Prevailing Bid(s) is/are submitted by a party other than the Purchaser, and the Purchaser's bid herein (or as amended by the Purchaser at the Auction in response to competitive bidding) is declared to be the Runner-Up Bid by Seller, then subject to the provisions of subparagraph (i) below, Purchaser hereby agrees to keep its offer to

23

purchase the Assets (as may be amended at the Auction) open for a period not to exceed 21 calendar days from the conclusion of the Sale Hearing, during which time, Escrow Agent shall continue to hold the Deposit as aforesaid.  All parties submitting Qualifying Offers shall also be so required to keep their bids open if any of their bids are declared to be the Runner-Up Bid.  In the event that such Prevailing Bid closes within said 21 days, then effective upon such closing, the Runner-Up Bid(s), including this Agreement, if applicable, shall be considered null and void and of no legal effect whatsoever, effective only upon Seller's (i) return of the Deposit to the Purchaser, which shall occur within three (3) business days after such closing, and (ii) payment of the "Break-Up Fee" (as defined herein), and each party hereto shall otherwise suffer its own losses, costs, expenses or damages arising out of, under or related to this Agreement.

(h)     In the event that the Prevailing Bid fails to close within said 7 days from the conclusion of the Sale Hearing because of a breach or failure to perform on the part of such bidder, then Seller, may accept the Runner-Up Bid without need for further approval from the bankruptcy court in writing within three (3) business days thereafter; in which case, the Runner-Up Bid shall be deemed to be the Prevailing Bid and the party submitting the Runner-Up Bid, including Purchaser if applicable, shall be required to consummate the transactions contemplated in the Runner-Up Bid within the following seven (7) calendar days after such acceptance without further order of the bankruptcy court.  If Seller fails to timely notify the party holding the Runner-Up Bid within said three business days, then such offer, including this Agreement, if applicable, shall be considered null and void and of no legal effect whatsoever upon Seller's (i) return of the Deposit to such party, which shall occur within 3 business days after the conclusion of such 3-day notice period, and (ii) if applicable, payment of the Break-Up Fee, and each party hereto shall otherwise suffer its own losses, costs, expenses or damages arising out of, under or related to this Agreement.

(i)     If this Agreement is not the Prevailing Bid or the Runner-Up Bid, then upon the entry of the Sale Order, this Agreement shall be considered null and void and of no legal effect whatsoever, effective only upon Seller's return of the Deposit to Purchaser, which shall occur within three (3) business days after the entry of the Sale Order, and upon the payment of the Break-Up Fee to Purchaser which shall occur at the Closing, and each party hereto shall otherwise suffer its own losses, costs, expenses or damages arising out of, under or related to this Agreement.

(j)     The Sale Motion, Bidding Procedures Order, Bidding Procedures, and Sale Order shall be reasonably acceptable to the Prepetition Lenders.

## 11.     ASSUMPTION OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

(a)     Seller agrees to seek authority from the Bankruptcy Court to assume and assign to Purchaser, should this Agreement be the Prevailing Bid or the Runner-Up Bid, any and all Assumed Contracts that are executory contracts and/or unexpired leases.

(b)     If Purchaser, in its sole discretion, elects to waive the condition precedent regarding Seller's assumption of any Assumed Contracts, Purchaser shall have confirmed such waiver(s) in writing at least two business days prior to the Sale Hearing.

(c)      Purchaser shall pay, at Closing pursuant to Section 1.3(b), all Cure Costs (as provided under section 365 of the Bankruptcy Code) with respect to all Assumed Contracts being assigned to Purchaser pursuant to the Sale Order at the Closing, unless otherwise ordered by the Bankruptcy Court.

## 12.      **BID PROTECTION**

Purchaser is hereby granted the following bid protections: (I) solely in the circumstances expressly provided for in Section 13, Purchaser shall be entitled to be paid the Break-Up Fee; (II) an Initial Overbid must equal or exceed the sum of: (i) the Purchase Price (including any adjustments under Section 1.3(b)(ii) above) *plus* (ii) the Break-Up Fee; *plus* (iii) $100,000; and (III) all bids after the Initial Overbid must exceed the prior bid by at least $50,000.

## 13.      **BREAK-UP FEE**

(a)      In the event of one of the following occurrences as set forth below, in consideration for Purchaser having expended considerable time and expense in connection with this Agreement and the negotiation thereof and the identification and quantification of assets of Seller and the benefit to Seller's estate, if no material breach of this Agreement has occurred, Seller shall pay Purchaser an amount equal to: (i) a break-up fee (the "Break-Up Fee") of three percent (3%) of the Initial Bid Amount or (ii) the Expense Reimbursement (as defined below):

(i)      Purchaser is declared to be the Runner-Up Bidder, but the Prevailing Bidder closes; in which case, the Break-Up Fee shall be paid to Purchaser at the Closing of the Alternative Transaction from the cash proceeds of the Alternative Transaction;

(ii)      a third party other than Purchaser is declared the Prevailing Bidder and/or Runner-Up Bidder, and either of such Alternative Transactions close, the Break-Up Fee shall be paid to Purchaser at the Closing from the cash proceeds of the Alternative Transaction; or

(iii)      the secured creditor is allowed to credit bid its debt (in multiple bids) for the Assets and is declared the Prevailing Bidder; in such case, the Purchaser is entitled to payment by the secured creditor at Closing of the Break-Up Fee; or

(iv)      prior to any Closing, in the event there is an order of the Bankruptcy Court appointing either (a) a Chapter 11 trustee or (b) converting the Chapter 11 Cases to cases under Chapter 7 of the Bankruptcy Code, then, in such event, Purchaser is hereby granted an allowed administrative claim in accordance with section 503(b)(1) of the Bankruptcy Code without further act, notice, deed or court order (X) equal to the reasonable and documented out-of-pocket amounts actually expended or incurred by the Purchaser for third party costs and fees in preparing, negotiating, executing, and delivering this Agreement (the "Expense Reimbursement"); provided, however, in no event shall the Expense Reimbursement exceed $150,000; and (Y) payable upon consummation of an Alternative Transaction resulting in the sale of the Assets by the Chapter 11 or Chapter 7 trustee and from cash proceeds of such Alternative Transaction. The Expense Reimbursement shall not be due if either the Chapter 11 trustee or Chapter 7 trustee agrees to promptly assume and honor the terms of this Agreement and proceeds to Closing on such Agreement within 14 days of his/her appointment.

(b)     Seller acknowledges and agrees that the entry into this Agreement provides value to the Seller's chapter 11 estate by, among other things, inducing other parties to submit higher or better offers for the Assets.  Seller and Purchaser agree that the Break-Up Fee is a material and necessary inducement to the Purchaser to enter into this Agreement and to consummate the Transaction.

(c)     Notwithstanding anything to the contrary in this Agreement, Purchaser acknowledges and agrees that, if the Break-Up Fee or Expense Reimbursement is paid to Purchaser, such payment shall constitute liquidated damages and be the sole and exclusive remedy of Purchaser, whether at law or in equity, and Purchaser shall thereupon be deemed to have fully released and discharged each Seller from any liabilities resulting from the termination of this Agreement or any breach hereof.

## 14.   GENERAL PROVISIONS

14.1.   EXPENSES. Except as otherwise provided in this Agreement, each party to this Agreement will bear its respective fees and expenses incurred in connection with the preparation, negotiation, execution and performance of this Agreement and the Transaction, including all fees and expense of its representatives and agents.

14.2.   PUBLIC ANNOUNCEMENTS. Except as made in connection with the sale process, the marketing of the Assets consistent with the terms of this Agreement, or the Sale Motion, no party to this Agreement shall make any public announcements in respect of this Agreement or the Transaction or otherwise communicate with any news media without the prior written consent of the other party (which consent shall not be unreasonably withheld or delayed), and the parties shall cooperate as to the timing and contents of any such announcement.

14.3.   NOTICES. All notices, consents, waivers and other communications required or permitted by this Agreement shall be in writing and shall be deemed given to a party when (a) delivered to the appropriate address by hand or by nationally recognized overnight courier service (costs prepaid); or (b) received or rejected by the addressee, if sent by certified mail, return receipt requested, in each case to the following addresses, and marked to the attention of the person (by name or title) designated below (or to such other address or person as a party may designate by notice to the other parties):

| | |
|---|---|
| Seller: | Burkhalter Rigging, Inc.<br>Attention:  Delynn Burkhalter<br>P.O. Box 9360<br>Columbus, Mississippi 39701 |
| Without copy to counsel: | Foley Gardere<br>Attention:  Marcus Helt<br>2021 McKinney, Suite 1600<br>Dallas, Texas 75201 |
| | Foley Gardere<br>Attention:  Jack Haake |

Washington Harbour
3000 K Street, N.W., Suite 600
Washington, D.C. 20007-5109

Purchaser:                 Barnhart Crane and Rigging Company
Attention:  Matt Brennan
2163 Airways Boulevard
Memphis, Tennessee 38114

Without copy to counsel:    Baker Donelson Bearman Caldwell & Berkowitz, PC
Attention:  E. Franklin Childress, Jr.
165 Madison Ave., Suite 2000
Memphis, Tennessee 38103

14.4.   <u>WAIVER; REMEDIES CUMULATIVE</u>. The rights and remedies of the parties to this Agreement are cumulative and not alternative.  Neither any failure nor any delay by any party in exercising any right, power or privilege under this Agreement or any of the documents referred to in this Agreement will operate as a waiver of such right, power or privilege, and no single or partial exercise of any such right, power or privilege will preclude any other or further exercise of such right, power or privilege or the exercise of any other right, power or privilege. To the maximum extent permitted by applicable law, (a) no claim or right arising out this Agreement or any of the documents referred to in this Agreement can be discharged by one party, in whole or in part, by a waiver or renunciation of the claim or right unless in writing signed by the other party; (b) no waiver that may be given by a party will be applicable except in the specific instance for which it is given; and (c) no notice to or demand on one party will be deemed to be a waiver of any obligation of that party or of the right of the party giving such notice or demand to take further action without notice or demand as provided in this Agreement or the documents referred to in this Agreement.

14.5.   <u>ENTIRE AGREEMENT AND MODIFICATION</u>. This Agreement supersedes all prior agreements, whether written or oral, between the parties with respect to its subject matter (including any letter of intent and any confidentiality agreement between Purchaser and Seller) and constitutes (along with the Exhibits and other documents delivered pursuant to this Agreement) a complete and exclusive statement of the terms of the agreement between the parties with respect to its subject matter.  This Agreement may not be amended, supplemented, or otherwise modified except by a written agreement executed by the party to be charged with the amendment.

14.6.   <u>ASSIGNMENTS, SUCCESSORS AND NO THIRD-PARTY RIGHTS</u>.  No party may assign any of its rights or delegate any of its obligations under this Agreement without the prior written consent of the other parties; provided, however, that the Sellers may assign their rights under this Agreement to a liquidation trust established by the Bankruptcy Court in the Bankruptcy Cases for the estates of the Sellers and the Purchaser shall be deemed to have consented to such assignment. Subject to the preceding sentence, this Agreement will apply to, be binding in all respects upon and inure to the benefit of the successors and permitted assigns of the parties.  Nothing expressed or referred to in this Agreement will be construed to give any Person other than the parties to this Agreement any legal or equitable right, remedy or claim

27

under or with respect to this Agreement or any provision of this Agreement, except such rights as shall inure to a successor or permitted assignee pursuant to this Section 14.7.

14.7.    SEVERABILITY.  If any provision of this Agreement is held invalid or unenforceable by any court of competent jurisdiction, the other provisions of this Agreement will remain in full force and effect.  Any provision of this Agreement held invalid or unenforceable only in part or degree will remain in full force and effect to the extent not held invalid or unenforceable.

14.8.    CONSTRUCTION. The headings of Articles and Sections in this Agreement are provided for convenience only and will not affect its construction or interpretation.    All references to "Articles," "Sections," and "Parts" refer to the corresponding Articles, Sections, and Parts of this Agreement.

14.9.    GOVERNING LAW. This Agreement will be governed by and construed under the laws of the State of Texas without regard to conflicts-of-laws principles that would require the application of any other law.  All jurisdiction and venue shall lie in the State of Texas including the U.S. Federal courts therein.

14.10.  EXECUTION OF AGREEMENT. This Agreement may be executed in one or more counterparts, each of which will be deemed to be an original copy of this Agreement and all of which, when taken together, will be deemed to constitute one and the same agreement. The exchange of copies of this Agreement and of signature pages by facsimile or email transmission shall constitute effective execution and delivery of this Agreement as to the parties and may be used in lieu of the original Agreement for all purposes.  Signatures of the parties transmitted by facsimile or email shall be deemed to be their original signatures for all purposes.

**[Execution Page Follows]**

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first written above.

**SELLER:**                                              **PURCHASER:**

Delynn Burkhalter on behalf of each Seller              BARNHART CRANE AND RIGGING CO.

By: _____                           By: _____

Name: _____                           Name: _____ALAN BARNHART_____

Title: _____                          Title: _____PRESIDENT_____

29

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first written above.

**SELLER:**                                                  **PURCHASER:**

Delynn Burkhalter on behalf of each Seller          BARNHART CRANE AND RIGGING CO.

By: _____                    By: _____

Name: ___Delynn Burkhalter_____               Name: _____

Title: ___Chief Executive Officer_____              Title: _____

29

4836-4404-7752.20

**Schedule 1.3(h) – Assumed Contracts**

| Counterparty | Debtor | Title of Contract | Type of Lease/Contract | Description/Contract ID Number | Beginning Date | Ending Date | Cure Amount |
|---|---|---|---|---|---|---|---|
| AIA Software* | Burkhalter Rigging Inc. | | Software License | | Undetermined | Undetermined | $         - |
| Avetta LLC* | Burkhalter Rigging Inc. | | Software License | | Undetermined | Undetermined | $         - |
| Applied Software Tech* | Burkhalter Rigging Inc. | | Software License | | Undetermined | Undetermined | $         - |
| Bigge | Burkhalter Rigging Inc. | Bare Rental Crane Agreement | Equipment Rental | Rental Agreement | Undetermined | Undetermined | $         - |
| BP Husky Refining | Burkhalter Rigging Inc. | Purchase Order | In-Process Job | TR603677 | 11/9/2018 | 3/31/2019 | $         - |
| Browz Group* | Burkhalter Rigging Inc. | | Software License | | Undetermined | Undetermined | $         - |
| Central Oceans | Burkhalter Rigging Inc. | Burkhalter Proposal No. 5163 | In-Process Job | 5163 | 1/24/2019 | Undetermined | $         - |
| Fagioli | Burkhalter Rigging Inc. | Jack Stand Rental | Equipment Rental | Proposal | 10/2/2018 | 3 months minimum | $         - |
| Fagioli | Burkhalter Rigging Inc. | Jack Stand Rental | Equipment Rental | Proposal | 1/2/2019 | 3 months minimum | $         - |
| Foundation Software* | Burkhalter Rigging Inc. | | Software License | | Undetermined | Undetermined | $         - |
| Kerr-McGee Chemical LLC | Burkhalter Rigging Inc. | Master-Work Agreement for Construction or Field Services | Crane Rental | Work Agreement | 9/1/2004 | Undetermined | $         - |
| Materialink Inc* | Burkhalter Rigging Inc. | | Software License | | Undetermined | Undetermined | $         - |
| Mammoet USA South, Inc. | Burkhalter Rigging Inc. | Equipment Lease Agreement | Equipment Rental | Lease Agreement | 3/15/2019 | 8/15/2019 (minimum) | $         - |
| Nucor Steel | Burkhalter Rigging Inc. | Invoice | Crane Rental | 2523 | 9/6/2018 | 11/5/2018 | $         - |
| Nucor Steel | Burkhalter Rigging Inc. | Invoice | Crane Rental | 2521 | 9/1/2018 | 11/3/2018 | $         - |
| Siemens | Burkhalter Rigging Inc. | Purchase Order | In-Process Job | 4400018904 | 3/7/2019 | Undetermined | $         - |
| Siemens | Burkhalter Rigging Inc. | Service Sub-Contract | In-Process Job | SORL-19600 | 2/20/2019 | 2/19/2020 | $         - |
| Tronox LLC | Burkhalter Rigging Inc. | Master Agreement for Periodic Lease of Equipment | Crane Rental | | Undetermined | Undetermined | $         - |
| Tronox LLC | Burkhalter Rigging Inc. | Memorandum of Agreement- Crane Rental Pricing | Crane Rental | Master Work Agreement dated November 10, 2004 | 12/31/2004 | 12/31/2007 | $         - |
| UTC Overseas, Inc. | Burkhalter Rigging Inc. | Burkhalter Proposal No. 4838 | In-Process Job | 4838 | Undetermined | Undetermined | $         - |
| Valmont Coatings | Burkhalter Rigging Inc. | Burkhalter Job Number Request Form | In-Process Job | 411 | 6/14/2019 | 6/21/2019 | $         - |

\* The contracts identified with an asterisk will be   subject to a subsequent motion to assume and assign.

## Schedule 1.4(a)(ii) – Assumed Liabilities

1. All liabilities required to assume the contracts identified on Schedule 1.3(h),

2. All liabilities related to any in-process jobs.

**Exhibit A:  Assets to be Sold & Allocation of Purchase Price**

| Assets To Be Sold | | Allocation of Purchase Price |
|---|---|---|
| 1. | all cranes, heavy lifting systems, and equipment, and all accessories thereto and parts thereof, included, but not limited to, those listed on <u>Exhibit A-1</u> hereto (the "<u>Equipment</u>"); | $13.8 million net to the Debtors' estates. |
| 2. | all tangible personal property and all inventory listed on <u>Exhibit A-1</u> hereto ("<u>Tangible Personal Property</u>"); | |
| 3. | all "Seller Contracts" (as defined herein), all "NDAs" (as defined herein) and all outstanding offers or solicitations made by or to Seller to enter into any contract, and to the extent any such Seller Contracts constitute executory contracts under section 365 of the Bankruptcy Code, subject to the terms and conditions concerning "Assumed Contracts" as defined, and as set forth, in this Agreement; | |
| 4. | all "Governmental Authorizations" (as defined herein) and all pending applications therefor or renewals thereof, in each case to the extent transferable to Purchaser; | |
| 5. | all data and records related to the operations of Seller, including client and customer lists, referral sources, research and development reports, production reports, service and warranty reports, equipment logs, operating guides and manuals, financial and accounting reports, creative materials, advertising materials, promotional materials, studies, reports, correspondence and other similar documents and reports; | |
| 6. | all intangible rights and property of Seller, including "Intellectual Property Assets" (as defined herein), licenses thereof or therefor, going concern value, goodwill, telephone, facsimile and email addresses and listings, as well as cell phone numbers for employees of Seller used in connection with the Business; | |
| 7. | all rights of Seller relating to deposits and prepaid expenses, claims for refunds and rights to offset in respect thereof; and | |
| 8. | all personnel records of employees of Seller, which Purchaser elects to hire after the Closing, in its sole discretion, if any. | |

**Exhibit A-1:  Equipment**

| final report order 2018 | Equip. No. | Year Prov | CONF YR | Manufacturer | Model | Product Type | Serial Number / PIN / Vehicle Identification Number | 5-19-18 Estimated Liquidation Value | Purchase Price Allocation | % of Estimated Liquidation Value |
|---|---|---|---|---|---|---|---|---|---|---|
| **001** | *Air Compressors* | | | | | | | | | |
| 002 | 80AC3 | - | 1992 | LeRoi | 185 CFM | Air Compressor (Portable) | 3119X2371 | $ 1,000 | $ 1,000 | 100.0% |
| 003 | 80AC4 | - | 1989 | Ingersoll-Rand | P185, 185 CFM | Air Compressor (Portable) | 179792-U89-329 | $ 1,250 | $ 1,000 | 80.0% |
| 004 | 80AC5 | - | 1999 | Sullair | AC750 | Air Compressor | 004-128898 | $ 3,000 | $ 1,000 | 33.3% |
| 005 | 80AC6 | - | 2005 | Atlas Copco | XAS97, 123 CFM | Air Compressor | 4500A10195R015164 | $ 2,500 | $ 1,000 | 40.0% |
| 006 | | | | | | | | **$ 7,750** | **$8,000** | **51.6%** |
| **007** | *Barge Ramps* | | | | | | | | | |
| 008 | 95188 | - | - | Unknown | 20'x6' | Jumper Bridge/Barge Ramp | Not Available | $ 5,000 | $ 3,000 | 60.0% |
| 009 | 95189 | - | - | Unknown | 20'x6' | Jumper Bridge/Barge Ramp | Not Available | $ 5,000 | $ 3,000 | 60.0% |
| 010 | 95190 | - | - | Unknown | 40' | Jumper Bridge/Barge Ramp | Not Available | $ 10,000 | $ 5,000 | 50.0% |
| 011 | 95191 | - | - | Unknown | 40' | Jumper Bridge/Barge Ramp | Not Available | $ 10,000 | $ 5,000 | 50.0% |
| 012 | 95192 | - | - | Shopmade | 40'x6' | Jumper Bridge/Barge Ramp | Not Available | $ 10,000 | $ 5,000 | 50.0% |
| 013 | 95193 | - | - | Shopmade | 40'x6' | Jumper Bridge/Barge Ramp | Not Available | $ 10,000 | $ 5,000 | 50.0% |
| 014 | 95200 | - | 2001 | Greenfield Eng. Inc. | 56'x6' | Jumper Bridge/Barge Ramp | JB1003620101 | $ 25,000 | $ 11,000 | 44.0% |
| 015 | 95210 | - | 2001 | Greenfield Eng. Inc. | 56'x6' | Jumper Bridge/Barge Ramp | JB1013620102 | $ 25,000 | $ 11,000 | 44.0% |
| 016 | 95211 | - | - | Shopmade | 56'x6' | Jumper Bridge/Barge Ramp | Not Available | $ 25,000 | $ 11,000 | 44.0% |
| 017 | 95212 | - | - | Unknown | 56' | Jumper Bridge/Barge Ramp | Not Available | $ 25,000 | $ 11,000 | 44.0% |
| 018 | 95213 | - | - | Shopmade | 70'x10'6" | Jumper Bridge/Barge Ramp | Not Available | $ 100,000 | $ 35,000 | 35.0% |
| 019 | 95214 | - | - | Shopmade | 56'x6' | Jumper Bridge/Barge Ramp | Not Available | $ 25,000 | $ 11,000 | 44.0% |
| 020 | | | | | | | | **$ 275,000** | **$ 116,000** | **42.2%** |
| **021** | *BSET* | | | | | | | | | |
| 022 | 20950 / 209 | - | 2009 | Burkhalter | BSET - 2,000 Ton | Self-Erecting Tower Gantry | 20080654 | $2,275,000 | $ - | |
| 023 | | | | | | | | **$ 2,275,000** | **$ -** | |
| **024** | *Cranes* | | | | | | | | | |
| 025 | 10110 | 2008 | 2008 | Tadano | ATF90G-4, 110 Ton | All Terrain Crane | WFN4RULFX82045176 | $ 400,000 | $ 250,000 | 62.5% |
| 026 | 10220 | 2001 | 2001 | Liebherr | LTM 1160/2, 200 Ton | All Terrain Crane | 68114 | $ 350,000 | $ 265,000 | 75.7% |
| 027 | 10221 | 2007 | 2007 | Liebherr | LTM 1200/5.1, 220 Ton | All Terrain Crane | 69588 | $ 725,000 | $ 450,000 | 62.1% |
| 029 | 10365 | 2001 | 2001 | Liebherr | LTM 1300/1, 365 Ton | All Terrain Crane | 071095 / W096760001EL05092 (Odometer Inoperable) | $ 675,000 | $ 500,000 | 74.1% |
| 031 | 1012A | 1988 | 988 / 198 | National / Ford | 556B, 12.5 Ton / F-800 | Boom Truck - S/A | 19382 / 1FDPK84A8JVA16683 | $ 12,500 | $ 10,000 | 80.0% |
| 034 | 1CC02 | 2000 | 2000 | Link-Belt | LS-238H, 150 Ton | Crawler Crane | F5J0-2327 | $ 295,000 | $ 200,000 | 67.8% |
| 036 | 1CC11 | 2008 | 2008 | Kobelco | CK2500, 250 Ton | Crawler Crane | JD0402232 | $ 900,000 | $ 600,000 | 66.7% |
| 037 | 1CD008 | 2007 | 2007 | Grove | YB4409-2, 9 Ton | Carry Deck Crane | 320540 (Hour Meter Inoperable) | $ 22,500 | $ 20,000 | 88.9% |
| 039 | 1RT01 | 2007 | 2007 | Tadano | GR800XL-1, 80 Ton | Rough Terrain Crane | 546126 | $ 210,000 | $ 210,000 | 100.0% |
| 042 | 1RT04 | 2007 | 2007 | Tadano | GR600XL-1, 60 Ton | Rough Terrain Crane | 546268 | $ 160,000 | $ 125,000 | 78.1% |
| 043 | 1RT05 | 2014 | 2014 | Tadano | GR1000XL-2, 100 Ton | Rough Terrain Crane | 548496 | $ 450,000 | $ 400,000 | 88.9% |
| 044 | 1RT06 | 2015 | 2015 | Terex | RT-780, 80 Ton | Rough Terrain Crane | 1T9RT704VF161993 | $ 290,000 | $ 280,000 | 96.6% |
| 045 | 1RT07 | 2015 | 2015 | Terex | RT-780, 80 Ton | Rough Terrain Crane | 1T9RT704AFW162059 | $ 275,000 | $ 270,000 | 98.2% |
| 046 | 1RT08 | 2015 | 2015 | Terex | RT-780, 80 Ton | Rough Terrain Crane | 161981 | $ 300,000 | $ 290,000 | 96.7% |
| 048 | | | | | | | | **$ 5,065,000** | **$ 3,870,000** | **76.4%** |
| **049** | *Forklifts* | | | | | | | | | |

| final report order 2018 | Equip. No. | Year Prov | CONF YR | Manufacturer | Model | Product Type | Serial Number / PIN / Vehicle Identification Number | 5-19-18 Estimated Liquidation Value | Purchase Price Allocation | % of Estimated Liquidation Value |
|---|---|---|---|---|---|---|---|---|---|---|
| 051 | 3005K | 1991 | 1991 | Hyster | H50XL, 5,000# | Forklift (Pneumatic Tired) | C177807075M (Hour Meter Inoperable) | $ 500 | $ 500 | 100.0% |
| 056 | 3016K | - | 1994 | Caterpillar | T150D, 15,000# | Forklift (Solid Tired) | 5MB02393 (Hour Meter Inoperable) | $ 12,000 | $ 8,000 | 66.7% |
| 057 | 3022K | 1980 | 1967 | Taylor | Y-22WO, 22,000# | Forklift (Pneumatic Tired) | 1-67-3713 | $ 8,000 | $ 5,000 | 62.5% |
| 058 | 3030K | 1981 | 1972 | Taylor | WPY300, 30,000# | Forklift (Pneumatic Tired) | S40P10075 | $ 15,000 | $ 11,000 | 73.3% |
| 059 | 3080K | 1990 | 1990 | Bristol | Riggers Special RS80, 80,000# | Forklift (Solid Tired) | 221-9006112 | $ 92,500 | $ 75,000 | 81.1% |
| 060 | 3090K | 1992 | 1990 | Taylor | TE-40-30 Rigger Special, 90,000# | Forklift (Pneumatic Tired) | S-P2-20328 | $ 82,500 | $ 70,000 | 84.8% |
| 062 | 3RT17 | 2006 | 2006 | Genie | GTH1048, 10,000# | Forklift (Telescopic) | GTH1006A-9917 | $ 25,000 | $ 18,000 | 72.0% |
| 063 | 3RT18 | 2006 | 2006 | Genie | GTH1048, 10,000# | Forklift (Telescopic) | GTH1006A-9929 | $ 25,000 | $ 18,000 | 72.0% |
| 064 | 3RT20 | - | 2004 | Caterpillar | TH560B, 11,000# | Forklift (Telescopic) | SLG00489 | $ 22,500 | $ 16,000 | 71.1% |
| 065 | | | | | | | | $ 283,000 | $ 221,500 | 78.3% |
| 066 | *Gantry Systems* | | | | | | | | | |
| 067 | 20900 | 1990 | - | J&R Engineering | L900-2-34, 225 Ton | 2-Point Hydraulic Gantry System | Not Available | $ 55,000 | $ 45,000 | 81.8% |
| 068 | 20901 | 1989 | - | J&R Engineering | L900-2-34, 225 Ton | 2-Point Hydraulic Gantry System | Not Available | $ 62,500 | $ 45,000 | 72.0% |
| 069 | 20903 | | - | J&R Engineering | 2-Valve | Gantry System Hydraulic Power Unit | Not Available | $ 7,500 | $ 5,000 | 66.7% |
| 070 | 20906 | 1997 | 1997 | J&R Engineering | L903-4-34, 450 Ton | 4-Point Hydraulic Gantry System | L904-7477 | $ 142,500 | $ 110,000 | 77.2% |
| 071 | 20907 | 2001 | 2000 | J&R Engineering | Lift-N-Lock 1000 Series, L1001-4-34, 500 Ton | 4-Point Hydraulic Gantry System | L1004-0012131-1 L1004-0012131-2 L1004-0012131-3 L1004-0012131-4 L1004-0012131-5 | $ 165,000 | $ 130,000 | 78.8% |
| 072 | 20909 | 2001 | 2001 | J&R Engineering | Lift-N-Lock 1000 Series, L1001-4-34, 500 Ton | 4-Point Hydraulic Gantry System | L1004-0111145 | $ 165,000 | $ 130,000 | 78.8% |
| 073 | 20910 | 2002 | 2002 | J&R Engineering | Lift-N-Lock 1000 Series, L1001-4-34, 500 Ton | 4-Point Hydraulic Gantry System | L1004-0205155-1 L1004-0205155-2 L1004-0205155-3 L1004-0205155-4 L1004-0205155-5 | $ 165,000 | $ 130,000 | 78.8% |
| 074 | | | | | | | | $ 762,500 | $ 595,000 | 78.0% |
| 075 | *Goldhofer Trailers* | | | | | | | | | |
| 076 | 1GBB1 | 2016 | - | Burkhalter | Goldhofer 23' | Transport Module Connection Beam & (2) Plates | Not Available | $ 22,500 | $ 15,000 | 66.7% |
| 077 | 7GBB1 | 2016 | - | Burkhalter | Goldhofer 23' | Transport Module Connection Beam & (2) Plates | Not Available | $ 22,500 | $ 15,000 | 66.7% |
| 078 | 7G1R1 | - | - | Goldhofer / Spohn & Burkhardt | - | Umbilical Joystick Remote Control | Not Available (For Use & Appraised With Equip. No. 7GSP1) | $ - | $ - | |
| 079 | 7G1R2 | - | - | Goldhofer / Spohn & Burkhardt | - | Umbilical Joystick Remote Control | Not Available (For Use & Appraised With Equip. No. 7GSP1) | $ - | $ - | |
| 080 | 7G201 | - | 1999 | Goldhofer | THP/SL2, 2-Line | Heavy Duty Transport Module | WGOTHPS24X0023161 | $ 35,000 | $ 30,000 | 85.7% |
| 081 | 7G202 | - | 2000 | Goldhofer | THP/SL2, 2-Line | Heavy Duty Transport Module | WGOTHPS24Y0026000 | $ 35,000 | $ 30,000 | 85.7% |
| 082 | 7G203 | - | 2000 | Goldhofer | THP/SL2, 2-Line | Heavy Duty Transport Module | WGOTHPS24Y0026001 | $ 35,000 | $ 30,000 | 85.7% |
| 083 | 7G204 | - | 2001 | Goldhofer | THP/SL2, 2-Line | Heavy Duty Transport Module | WGOTHPS2410026044 | $ 35,000 | $ 30,000 | 85.7% |
| 084 | 7G205 | - | 2001 | Goldhofer | THP/SL2, 2-Line | Heavy Duty Transport Module | WGOTHPS2410026078 | $ 35,000 | $ 30,000 | 85.7% |
| 085 | 7G206 | - | 2001 | Goldhofer | THP/SL2, 2-Line | Heavy Duty Transport Module | WGOTHPS2410026079 | $ 35,000 | $ 30,000 | 85.7% |
| 088 | 7G209 | 2015 | 2015 | Goldhofer | THP/CA2, 2-Line | Hydraulic Transport Module | WGOTHPCAF0037900 | $ 70,000 | $ 70,000 | 100.0% |
| 089 | 7G210 | 2015 | 2015 | Goldhofer | THP/CA2, 2-Line | Hydraulic Transport Module | WGOTHPC26F0037901 | $ 70,000 | $ 70,000 | 100.0% |
| 090 | 7G2R1 | - | - | Goldhofer / Spohn & Burkhardt | - | Umbilical Joystick Remote Control | Not Available (For Use & Appraised With Equip. No. 7GSP2) | $ - | $ - | |
| 091 | 7G2R2 | - | - | Unknown | - | Remote | Not Available (For Use & Appraised With Equip. No. 7GSP2) | $ - | $ - | |

| final report order 2018 | Equip. No. | Year Prov | CONF YR | Manufacturer | Model | Product Type | Serial Number / PIN / Vehicle Identification Number | 5-19-18 Estimated Liquidation Value | Purchase Price Allocation | % of Estimated Liquidation Value |
|---|---|---|---|---|---|---|---|---|---|---|
| 092 | 7G301 | - | 1998 | Goldhofer | THP/SL3, 3-Line | Hydraulic Transport Module | WG0THPS36W0023134 | $ 52,500 | $ 45,000 | 85.7% |
| 093 | 7G302 | - | 1999 | Goldhofer | THP/SL3, 3-Line | Hydraulic Transport Module | WG0THPS36X0023158 | $ 52,500 | $ 45,000 | 85.7% |
| 094 | 7G303 | - | 2001 | Goldhofer | THP/SL3, 3-Line | Hydraulic Transport Module | WG0THPS3610026105 | $ 52,500 | $ 45,000 | 85.7% |
| 095 | 7G304 | - | 2001 | Goldhofer | THP/SL3, 3-Line | Hydraulic Transport Module | WG0THPS3610026106 | $ 52,500 | $ 45,000 | 85.7% |
| 096 | 7G3R1 | | | Goldhofer / Spohn & Burkhardt | - | Umbilical Joystick Remote Control | Not Available (In Use & Appraised With Equip. No. 7GSP3) | $ - | $ - | |
| 097 | 7G3R2 | - | - | Cavotec | MC-LINK-CAN | Wireless Remote Control | 6081-6084 / RX-A, Goldhofer No. 517366-67812 (For Use & Appraised With Equip. No. 7GSP3) | $ - | $ - | |
| 098 | 7G401 | - | 1999 | Goldhofer | THP/SL4, 4-Line | Heavy Duty Transport Module | WG0THPS49X0023165 | $ 70,000 | $ 60,000 | 85.7% |
| 099 | 7G404 | 2015 | 2015 | Goldhofer | THP/CA-R4, 4-Line (Reinforced) | Hydraulic Transport Module | WG0THPC46F0037902 | $ 240,000 | $ 160,000 | 66.7% |
| 100 | 7G405 | 2015 | 2015 | Goldhofer | THP/CA-R4, 4-Line (Reinforced) | Hydraulic Transport Module | WG0THPC48F0037903 | $ 240,000 | $ 160,000 | 66.7% |
| 101 | 7G4R1 | | | Goldhofer / Spohn & Burkhardt | - | Umbilical Joystick Remote Control | Not Available (For Use & Appraised With Equip. No. 7GSP4) | $ - | $ - | |
| 102 | 7G4R2 | - | - | Cavotec | MC-3-6 | Wireless Remote Control | 6082 / TX-2, Goldhofer No. 517366-67821 (For Use & Appraised With Equip. No. 7GSP2) | $ - | $ - | |
| 103 | 7G601 | - | 1999 | Goldhofer | THP/SL6, 6-Line | Heavy Duty Transport Module | WG0THPS6CX0023175 | $ 105,000 | $ 90,000 | 85.7% |
| 104 | 7G602 | - | 1999 | Goldhofer | THP/SL6, 6-Line | Heavy Duty Transport Module | WG0THPS6CX0023144 | $ 105,000 | $ 90,000 | 85.7% |
| 105 | 7G603 | - | 2000 | Goldhofer | THP/SL6, 6-Line | Heavy Duty Transport Module | WG0THPS6CY0026014 | $ 105,000 | $ 90,000 | 85.7% |
| 106 | 7GDD2 | 1999 | - | Goldhofer | 230 Ton | Drop Deck Insert | 23134-40 | $ 75,000 | $ 60,000 | 80.0% |
| 107 | 7GE01 | - | - | Deutz | F2L1011F | Power Pack | 0057187 | $ 8,500 | $ 5,000 | 58.8% |
| 108 | 7GE02 | - | - | Deutz | F2L1011F | Power Pack | 00625782 | $ 8,500 | $ 5,000 | 58.8% |
| 109 | 7GE03 | - | 2013 | Deutz | F2L1011F | Power Pack | 0054288 | $ 8,500 | $ 5,000 | 58.8% |
| 110 | 7GE04 | - | - | Hatz | - | Power Pack | 371699044174 | $ 8,500 | $ 5,000 | 58.8% |
| 111 | 7GE05 | - | - | Hatz | - | Power Pack | 371699044173 | $ 8,500 | $ 5,000 | 58.8% |
| 112 | 7GE06 | - | - | Hatz | - | Power Pack | 731999030339 | $ 8,500 | $ 5,000 | 58.8% |
| 113 | 7GE07 | - | - | Deutz | - | Power Pack | 659475 | $ 8,500 | $ 5,000 | 58.8% |
| 114 | 7GE08 | - | - | Hatz | - | Power Pack | 371699044107 | $ 8,500 | $ 5,000 | 58.8% |
| 115 | 7GE09 | - | 2015 | Deutz | D2011L021 | Power Pack | 11456416 (For Use With Goldhofer Transport Modules) | $ 8,500 | $ 5,000 | 58.8% |
| 116 | 7GE10 | - | 2015 | Deutz | D2011L021 | Power Pack | 11446679 | $ 8,500 | $ 5,000 | 58.8% |
| 117 | 7GE11 | - | - | Deutz | - | Power Pack | 11446681 (For Use With Goldhofer Transport Modules) | $ 8,500 | $ 5,000 | 58.8% |
| 118 | 7GHD1 | - | - | Unknown | - | Hydronic Unit (Qty 2) | Not Available | $ 18,000 | $ 10,000 | 55.6% |
| 119 | 7GHD2 | - | - | Unknown | - | Hydronic Unit (Qty 2) | Not Available | $ 18,000 | $ 10,000 | 55.6% |
| 120 | 7GS14 | 2002 | 2002 | Goldhofer | THP/SL4, 4-Line | Heavy Duty Transport Module | WG0THPS4920026152 | $ 70,000 | $ 60,000 | 85.7% |
| 121 | 7GS16 | 2002 | 2002 | Goldhofer | THP/SL6, 6-Line | Hydraulic Transport Module | WG0THPS6C20026153 | $ 105,000 | $ 90,000 | 85.7% |
| 122 | 7GSB1 | - | - | Goldhofer | 2-Piece | Swivel Bolster Set | Not Available | $ 42,500 | $ 30,000 | 70.6% |
| 123 | 7GSD1 | 2000 | - | Goldhofer | 9'9"x15' | Intermediate Platform Insert | 26000-20 | $ 30,000 | $ 20,000 | 66.7% |
| 124 | 7GSD2 | 2000 | - | Goldhofer | 9'9"x14' 7.5" | Intermediate Platform Insert | 26000-30 | $ 30,000 | $ 20,000 | 66.7% |
| 125 | 7GSD3 | - | - | Industrial Fabricators | Goldhofer | Intermediate Platform Insert (Half) | Not Available | $ 15,000 | $ 8,000 | 53.3% |
| 126 | 7GSE1 | 2013 | 2013 | Goldhofer | PST/SL-E6-12X04, 6-Line | Hydraulic Transport Module | WG0PST063D0060925 | $ 400,000 | $ 300,000 | 75.0% |
| 127 | 7GSE2 | 2013 | 2013 | Goldhofer | PST/SL-E6-12X04, 6-Line | Hydraulic Transport Module | WG0PST065D0060926 | $ 400,000 | $ 300,000 | 75.0% |
| 128 | 7GSE3 | 2014 | 2014 | Goldhofer | PST/SL-E6-12X04, 6-Line | Hydraulic Transport Module | WG0PST061E0061167 | $ 400,000 | $ 300,000 | 75.0% |
| 129 | 7GSE5 | 2014 | 2014 | Goldhofer | PST/SL-E6-12X04, 6-Line | Hydraulic Transport Module | WG0PST063E0061169 | $ 400,000 | $ 300,000 | 75.0% |
| 130 | 7GSEP1 | - | 2015 | Goldhofer | PFV-490/60-31 | Power Pack | 61171 | $ 50,000 | $ 100,000 | 200.0% |
| 131 | 7GSEP3 | - | - | Goldhofer | PFV-490/60-31 | Power Pack | 60881 | $ 50,000 | $ 100,000 | 200.0% |

| final report order 2018 | Equip. No. | Year Prov | CONF YR | Manufacturer | Model | Product Type | Serial Number / PIN / Vehicle Identification Number | 5-19-18 Estimated Liquidation Value | Purchase Price Allocation | % of Estimated Liquidation Value |
|---|---|---|---|---|---|---|---|---|---|---|
| 132 | 7GSP1 | - | 2000 | Goldhofer | PST/SL6-12X12, 6-Line | Heavy Duty Self-Propelled Transport Module | WGOPST06MY0060060 | $ 375,000 | $ 300,000 | 80.0% |
| 133 | 7GSP2 | - | 2001 | Goldhofer | PST/SL6-12X12, 6-Line | Heavy Duty Self-Propelled Transport Module | WGOPST06M10060087 | $ 375,000 | $ 300,000 | 80.0% |
| 134 | 7GSP3 | 2009 | 2009 | Goldhofer | PST/SL6-12X08, 6-Line | Heavy Duty Self-Propelled Transport Module | WGOPST06990060371 | $ 475,000 | $ 400,000 | 84.2% |
| 135 | 7GSP4 | 2009 | 2009 | Goldhofer | PST/SL6-12X08, 6-Line | Heavy Duty Self-Propelled Transport Module | WG0PST06090060677 | $ 475,000 | $ 400,000 | 84.2% |
| 136 | | | | | | | | $ 5,367,000 | $ 4,343,000 | 80.9% |
| 137 | *Jack & Slide* | | | | | | | | | |
| 138 | 95170 | 1998 | - | Burkhalter | 800 Ton | Jack & Slide System | Not Available | $ 150,000 | $ 120,000 | 80.0% |
| 139 | 9H101 | - | - | SPX Power Team | - | Hydraulic Jack Power Unit | 317161 | $ 3,000 | $ 1,000 | 33.3% |
| 140 | 9H102 | - | - | SPX Power Team | PG1200M-4D | Hydraulic Jack Power Unit | 310562 | $ 3,000 | $ 1,000 | 33.3% |
| 141 | 9H103 | - | - | SPX Power Team | - | Hydraulic Jack Power Unit | 311584 | $ 3,000 | $ 1,000 | 33.3% |
| 142 | 9H104 | - | - | SPX Power Team | - | Hydraulic Jack Power Unit | Not Available | $ 3,000 | $ 1,000 | 33.3% |
| 143 | 9H105 | - | - | SPX Power Team | - | Hydraulic Jack Power Unit | 364928 | $ 3,000 | $ 1,000 | 33.3% |
| 144 | 9H106 | - | - | Unknown | - | Hydraulic Jack Power Unit | 6310 | $ 3,000 | $ 1,000 | 33.3% |
| 145 | | | | | | | | $ 168,000 | $ 126,000 | 75.0% |
| 146 | *Jacking System* | | | | | | | | | |
| 147 | 20970 / 20971 | - | 2015 | Enerpac | EP5000 - 2,000 Metric Ton | Push-Up System | 2014000886 | $ 2,200,000 | $ 1,460,000 | 66.4% |
| 148 | | | | Associated with braces and 5' deep 84' girders from misc below | | | | $ 2,200,000 | $ 1,460,000 | 66.4% |
| 149 | *Jacks* | | | | | | | | | |
| 150 | 9J001 | - | - | SPX Power Team | - | Motion Control System (Jacking System) | Not Available | $ 25,000 | $ 10,000 | 40.0% |
| 151 | 9J002 | - | - | Unknown | 10 Ton | Jack (Qty 2) | Not Available | $ 100 | $ - | 0.0% |
| 152 | | | | | | | | $ 25,100 | $ 10,000 | 39.8% |
| 159 | *Manlifts & Scissor Lifts* | | | | | | | | | |
| 160 | 95230 | - | 1996 | JLG | 40RTS, 40' | Scissor Lift - 4x4 | 200030022 | $ 2,750 | $ 2,000 | 72.7% |
| 161 | 95240 | - | 1996 | JLG | 40RTS, 40' | Scissor Lift - 4x4 | 200030021 | $ 2,750 | $ 2,000 | 72.7% |
| 162 | 95241 | 2000 | 2000 | JLG | 40RTS, 40' | Scissor Lift - 4x4 | 200073848 | $ 3,250 | $ 2,000 | 61.5% |
| 163 | 95278 | 1999 | 1999 | JLG | 40RTS, 40' | Scissor Lift - 4x4 | 200058993 | $ 3,250 | $ 2,000 | 61.5% |
| 164 | 1ML012 | 2007 | 2007 | JLG | 1250AJP, 125' | Manlift - 4x4 | 300115926 | $ 32,500 | $ 30,000 | 92.3% |
| 165 | 1SL003 | 2015 | 2015 | JLG | 1930ES, 19' | Scissor Lift | 200245820 | $ 5,500 | $ 3,000 | 54.5% |
| 166 | 1SL004 | 2015 | 2015 | JLG | 1930ES, 19' | Scissor Lift | 200245844 | $ 6,000 | $ 4,000 | 66.7% |
| 169 | | | | | | | | $ 56,000 | $ 45,000 | 80.4% |
| 170 | *Overhead Cranes* | | | | | | | | | |
| 171 | OHC01 | - | - | Lo-Hed | 10 Ton | Bridge Crane | Not Available | $ 7,500 | $ 5,000 | 66.7% |
| 172 | OHC02 | - | - | Harrington | 5 Ton | Overhead Bridge Crane | Not Available | $ 5,000 | $ 3,000 | 60.0% |
| 173 | OHC03 | - | - | Harrington | 5 Ton | Overhead Bridge Crane | Not Available | $ 5,000 | $ 3,000 | 60.0% |
| 174 | OHC04 | - | - | Unknown | 300' (Two 150' Lengths) | Overhead Crane Runway | Not Available | $ 10,000 | $ 5,000 | 50.0% |
| 175 | | | | | | | | $ 27,500 | $ 16,000 | 58.2% |
| 176 | *Pickup, Medium Duty, & Service Trucks* | | | | | | | | | |
| 178 | 60S21 | 1998 | 1998 | Chevrolet | 1500 Extended Cab | Pickup Truck | 1GCEC19MXWE186358 | $ 500 | $ 500 | 100.0% |
| 179 | 60S26 | 1999 | 1999 | Ford | F-350XL Crew Cab | Flatbed Dump Truck - 4x4 | 1FDWW36F2XEE84557 | $ 2,750 | $ 2,000 | 72.7% |
| 180 | 60S37 | 2001 | 2001 | Chevrolet | Silverado 2500HD Crew Cab | Pickup Truck | 1GCHC23U61F123367 | $ 1,500 | $ 500 | 33.3% |
| 181 | 60S38 | 2001 | 2001 | Chevrolet | Silverado 2500HD Crew Cab | Pickup Truck | 1GCHC23U81F118445 | $ 500 | $ 500 | 100.0% |
| 182 | 60S39 | 2001 | 2001 | Chevrolet | Silverado 2500HD Crew Cab | Pickup Truck | 1GCHC23UX1F150846 | $ 500 | $ 500 | 100.0% |
| 183 | 60S40 | 2002 | 2002 | Chevrolet | Silverado 1500LS Extended Cab | Pickup Truck | 2GCEC19V821244679 | $ 1,000 | $ 1,000 | 100.0% |
| 184 | 60S43 | 2002 | 2002 | Chevrolet | Silverado 2500HD LS Crew Cab | Pickup Truck | 1GCHC23U52F105637 | $ 1,500 | $ 1,500 | 100.0% |
| 185 | 60S45 | 2002 | 2002 | Chevrolet | Silverado 1500 Extended Cab | Pickup Truck | 2GCEC19V921255156 | $ 750 | $ 750 | 100.0% |
| 186 | 60S46 | 2002 | 2002 | Chevrolet | Silverado 1500LS Extended Cab | Pickup Truck | 2GCEC19V921186274 | $ 1,000 | $ 1,000 | 100.0% |
| 187 | 60S48 | 1999 | 1999 | Mazda | B2500 SE | Pickup Truck | 4F4YR12C6XTM31254 | $ 500 | $ 500 | 100.0% |
| 188 | 60S54 | 2003 | 2003 | Chevrolet | Silverado 1500 Extended Cab | Pickup Truck | 2GCEC19V731105693 | $ 1,000 | $ 1,000 | 100.0% |

| final report order 2018 | Equip. No. | Year Prov | CONF YR | Manufacturer | Model | Product Type | Serial Number / PIN / Vehicle Identification Number | 5-19-18 Estimated Liquidation Value | Purchase Price Allocation | % of Estimated Liquidation Value |
|---|---|---|---|---|---|---|---|---|---|---|
| 189 | 60S59 | 2008 | 2008 | Ford | F-450XL Super Duty Crew Cab | Mechanics Truck - S/A | 1FDXW46RX8EA57889 | $ 11,000 | $ 11,000 | 100.0% |
| 190 | 60S60 | 2008 | 2008 | Ford | F-250 SD Crew Cab | Pickup Truck | 1FTSW20548EA31247 | $ 3,500 | $ 3,500 | 100.0% |
| 191 | 60S61 | 2008 | 2008 | Ford | F-250 SD Crew Cab | Pickup Truck | 1FTSW20528EB26907 | $ 3,500 | $ 3,500 | 100.0% |
| 192 | 60S62 | 2008 | 2008 | Ford | F-250 SD Crew Cab | Pickup Truck | 1FTSW20548EC24773 | $ 1,250 | $ 500 | 40.0% |
| 193 | 60S64 | 2002 | 2002 | Chevrolet | Silverado 1500LT Extended Cab | Pickup Truck - 4x4 | 1GCEK19T72E198536 (Poor Condition Per BRI) | $ 500 | $ 500 | 100.0% |
| 194 | 60S65 | 2007 | 2007 | Toyota | Tundra SR5 Crew Cab | Pickup Truck | 5TFRV54177X013693 | $ 4,000 | $ 4,000 | 100.0% |
| 195 | 60S69 | 2009 | 2009 | Ford | F-150 Lariat Crew Cab | Pickup Truck | 1FTPW12V59FB41071 | $ 7,000 | $ 7,000 | 100.0% |
| 196 | 60S71 | 2009 | 2009 | Chevrolet | Silverado 1500 Crew Cab | Pickup Truck | 3GCEC13C59G270455 | $ 4,500 | $ 4,500 | 100.0% |
| 197 | 60S72 | 2010 | 2010 | Ford | F-250XL Super Duty Extended Cab | Utility Truck - S/A | 1FDSX2A52AEA85594 | $ 8,000 | $ 8,000 | 100.0% |
| 198 | 60S75 | - | 2012 | Ford | F-350 SD Crew Cab | Pickup Truck | 1FD8W3G64CEA10403 | $ 13,000 | $ 13,000 | 100.0% |
| 199 | 60S77 | 2012 | 2012 | Ford | F-250XL SD Crew Cab | Pickup Truck | 1FT7W2A66CEC74824 | $ 7,000 | $ 7,000 | 100.0% |
| 200 | 60S78 | 2012 | 2012 | Ford | F-250 SD Crew Cab | Pickup Truck | 1FT7W2A64CED12079 | $ 8,000 | $ 8,000 | 100.0% |
| 201 | 60S79 | 2012 | 2012 | Ford | F-250XL SD Crew Cab | Pickup Truck | 1FT7W2A60CED12080 | $ 7,000 | $ 7,000 | 100.0% |
| 202 | 60S80 | 2012 | 2012 | Ford | F-250 SD Crew Cab | Pickup Truck | 1FT7W2A63CED12848 | $ 7,000 | $ 7,000 | 100.0% |
| 203 | 60S81 | 2013 | 2013 | Ford | F-150 Crew Cab | Pickup Truck | 1FTEW1CM0DKD03301 | $ 7,500 | $ 7,500 | 100.0% |
| 204 | 60S82 | 2013 | 2013 | Ford | F-150 Crew Cab | Pickup Truck - 4x4 | 1FTFW1ET8DFA27094 | $ 10,000 | $ 10,000 | 100.0% |
| 205 | 60S83 | 2010 | 2010 | Ford | F-150 Extended Cab | Pickup Truck | 1FTEX1CW5AFA30486 | $ 3,750 | $ 3,750 | 100.0% |
| 206 | 60S84 | 2013 | 2013 | Ford | F-250XLT SD Crew Cab | Pickup Truck | 1FT7W2A60DEA72918 | $ 9,500 | $ 9,500 | 100.0% |
| 207 | 60S85 | 2013 | 2013 | Ford | F-250 SD Crew Cab | Pickup Truck | 1FT7W2A62DEA72919 | $ 9,000 | $ 9,000 | 100.0% |
| 208 | 60S87 | 2011 | 2011 | Ford | F-150XL Extended Cab | Pickup Truck | 1FTFX1CF7BKD74091 | $ 5,000 | $ 5,000 | 100.0% |
| 209 | 60S88 | 2010 | 2010 | Ford | F-150XL Extended Cab | Pickup Truck | 1FTFX1CV5AKB68337 | $ 4,500 | $ 4,500 | 100.0% |
| 210 | 60S89 | 2010 | 2010 | Ford | F-150XL Extended Cab | Pickup Truck | 1FTFX1CVXAFB81397 | $ 3,750 | $ 3,750 | 100.0% |
| 211 | 60S90 | 2010 | 2010 | Ford | F-150XL Extended Cab | Pickup Truck | 1FTFX1CV3AKB68319 | $ 3,750 | $ 3,750 | 100.0% |
| 212 | 60S91 | 2011 | 2011 | Ford | F-150XL Extended Cab | Pickup Truck | 1FTFX1CF4BKD74095 | $ 5,000 | $ 5,000 | 100.0% |
| 213 | 60S92 | 2010 | 2010 | Ford | F-150XL Extended Cab | Pickup Truck | 1FTFX1CV2AFB81393 | $ 3,000 | $ 500 | 16.7% |
| 214 | 60S93 | 2014 | 2014 | Ford | F-550XL Super Duty | Service Truck - S/A | 1FDUF5GTSEEA11496 (Wrecked But Not Totalled Per BRI) | $ 25,000 | $ 23,000 | 92.0% |
| 215 | 60S94 | 2010 | 2010 | Ford | F-150 Extended Cab | Pickup Truck | 1FTFX1CV9AFC63329 | $ 4,000 | $ 4,000 | 100.0% |
| 216 | 60S95 | 2010 | 2010 | Ford | F-150 Extended Cab | Pickup Truck | 1FTFX1CV0AFB81392 | $ 4,000 | $ 4,000 | 100.0% |
| 217 | 60S96 | 2011 | 2011 | Ford | F-250 SD Crew Cab | Pickup Truck | 1FT7W2A66BEC15509 | $ 6,500 | $ 6,500 | 100.0% |
| 220 | 60S101 | 2015 | 2015 | Ford | F-250 SD Crew Cab | Pickup Truck | 1FT7W2A62FEC39962 | $ 16,500 | $ 13,000 | 78.8% |
| 221 | 60S102 | 2009 | 2009 | Toyota | Tacoma Extended Cab | Pickup Truck | 5TETX22N19Z648652 | $ 7,000 | $ 5,000 | 71.4% |
| 222 | 60S103 | 2013 | 2013 | Toyota | Tacoma Extended Cab | Pickup Truck | 5TFTX4CNXDX021913 | $ 9,000 | $ 8,000 | 88.9% |
| 223 | 60S104 | 2000 | 2000 | Toyota | Tundra SR5 Extended Cab | Pickup Truck | 5TBRT341XYS008305 | $ 2,500 | $ 2,500 | 100.0% |
| 224 | 60S105 | 2000 | 2000 | Freightliner | FL-60 | Service Truck - S/A | 1FV6GFAC2YHG52141 | $ 14,000 | $ 14,000 | 100.0% |
| 225 | | | | | | | | $ 250,000 | 236,500 | 94.6% |
| 226 | *Power Links* | | | | | | | | | |
| 227 | 2PL10 | - | 2001 | J&R Engineering | 100 Ton Single Beam | Power Link (Self-Propelled) (Qty 4) | PL100S-0103135-1 / -2 / -3 / -4 | $ 47,500 | $ 40,000 | 84.2% |
| 228 | 2PL11 | - | 2002 | J&R Engineering | 100 Ton Single Beam | Power Link (Self-Propelled) (Qty 4) | PLSB104-0202154-1 / -2 / -3 / -4 | $ 47,500 | $ 40,000 | 84.2% |
| 229 | | | | | | | | $ 95,000 | $ 80,000 | 84.2% |
| 230 | *Rollback Truck* | | | | | | | | | |
| 231 | 50014 | 1997 | 1997 | Peterbilt | 379 | Rollback Truck - T/A | 1XP5DR8X3VN407500 | $ 14,000 | $ 10,000 | 71.4% |
| 232 | | | | | | | | $ 14,000 | $ 10,000 | 71.4% |
| 233 | *Sport Utility Vehicles & Van* | | | | | | | | | |
| 234 | 60S16 | 1996 | - | Jeep | Cherokee | Sport Utility Vehicle | 1J4FX58S2TC320359 | $ 500 | $ 500 | 100.0% |
| 236 | 60S106 | 2011 | 2011 | Ford | Econoline E150 | Passenger Van | 1FDNE1BW0BDA64738 | $ 6,500 | $ 5,000 | 76.9% |
| | | 2001 | | AM General | H1 Hummer | SUV | | $ 35,000 | $ 35,000 | 100.0% |
| 238 | | | | | | | | $ 42,000 | $ 40,500 | 96.4% |
| 239 | *Stator Frame* | | | | | | | | | |
| 240 | 20920 | - | - | Shopmade | - | Stator Frame | Not Available | $ 5,000 | $ 5,000 | 100.0% |
| 241 | | | | | | | | $ 5,000 | $ 5,000 | 100.0% |
| 242 | *Strand Jacks* | | | | | | | | | |
| 243 | 20904 | - | - | Enerpac | ST-132 | 4-Strand Jack System | Not Available (For Use With Equip. No. 20908) | $ 30,000 | $ 20,000 | 66.7% |
| 244 | 20908 | - | - | Enerpac | PST-8418 | Strand Jack Pump - Double Acting | Not Available (For Use With Equip. No. 20904) | $ 5,000 | $ 4,000 | 80.0% |

| final report order 2018 | Equip. No. | Year Prov | CONF YR | Manufacturer | Model | Product Type | Serial Number / PIN / Vehicle Identification Number | 5-19-18 Estimated Liquidation Value | Purchase Price Allocation | % of Estimated Liquidation Value |
|---|---|---|---|---|---|---|---|---|---|---|
| 245 | 20930 | - | 2007 | Hydrospex | HSL2000 | 4-Strand Jack System | 20070648-1 20070648-2 20070648-3 20070648-4 | $ 110,000 | $ 70,000 | 63.6% |
| 246 | 20940 | - | 2008 | Hydrospex | HSL3000 | 4-Strand Jack System | 20080077-1 20080077-2 20080077-3 20080077-4 | $ 120,000 | $ 80,000 | 66.7% |
| 247 | 20941 | 2009 | 2009 | Enerpac | HSL700 | 4-Strand Jack System | 20090950/08, 20090950/11, 2009050/13, and 2009050/16 | $ 75,000 | $ 40,000 | 53.3% |
| 248 | | | | | | | | $ 340,000 | $ 214,000 | 62.9% |
| 249 | *Support Equipment* | | | | | | | | | |
| 250 | 20921 | - | - | Burkhalter | W40x324x55' | Runway Girder | Not Available (Appraised With Beam Inventory) | $ - | $ - | |
| 251 | 95010 | | - | Clemco | - | Sandblaster | Not Available | $ 1,000 | $ 1,000 | 100.0% |
| 252 | 95110 | | - | Unknown | 8'x8' | Man / Material Basket | Not Available | $ 750 | $ 750 | 100.0% |
| 253 | 95111 | | | Unknown | | Man / Material Basket | Not Available | $ 500 | $ 500 | 100.0% |
| 255 | 95250 | | 1992 | USA | FI066, 20' | Storage Container | 30/105596 | $ 1,000 | $ 1,000 | 100.0% |
| 256 | 95256 | - | - | Unknown | 12'x4'x12" Oak | Wood Mat (Qty 116) | Not Available | $ 8,250 | $ 5,000 | 60.6% |
| 257 | 95257 | - | - | Unknown | 20'x4'x12" Oak | Wood Mat (Qty 24) | Not Available | $ 3,000 | $ 2,000 | 66.7% |
| 258 | 95270 | - | - | Kubota | ZD331-72 | Zero Turn Mower | Not Available | $ 5,500 | $ 4,000 | 72.7% |
| 259 | 95271 | - | - | Yazoo | YTBSV18 | Zero Turn Mower | 6J975952 | $ 1,750 | $ 1,000 | 57.1% |
| 260 | 95272 | - | - | Industrial Products | - | Dual Burner Pressure Washer | 0410 4850 | $ 500 | $ 500 | 100.0% |
| 261 | 95291 (95020) | - | 2013 | ALLtra | EG14-10 | Cutting System | 6337 | $ 50,000 | $ 25,000 | 50.0% |
| 262 | 95292 | - | 2013 | HEM | Cyclone 22"x16" | Horizontal Metal Cutting Band Saw | 1174513 | $ 14,000 | $ 6,000 | 42.9% |
| 263 | 95293 | 2014 | - | Unknown | - | Storage Container (Office) | Not Available | $ 2,750 | $ 2,750 | 100.0% |
| 264 | 95294 | - | - | Bridgeport | - | Vertical Milling Press | Not Available | $ 1,200 | $ 1,000 | 83.3% |
| 265 | 95295 | | - | Unknown | 6 Ton | Rotating Skate | Not Available | $ 500 | $ 500 | 100.0% |
| 266 | 95296 | 2014 | - | Unknown | - | All Terrain Vehicle | Not Available | $ 1,000 | $ 1,000 | 100.0% |
| 267 | 95297 | - | 2001 | Amada | HFT220-3L, 220T | Hydraulic Press Brake | N010516 | $ 11,000 | $ 6,000 | 54.5% |
| 268 | 95298 | - | - | MicroStep | CombiCut 6001.30 GGT | Cutting System | 1409/12 | $ 7,500 | $ 2,000 | 26.7% |
| 269 | 95299 | - | 2015 | Sage | - | Lube System | Ref. No. 91153/615 | $ 12,000 | $ 6,000 | 50.0% |
| 270 | 95300 | - | - | Unknown | - | Storage Container | TRIU161120 | $ 1,000 | $ 1,000 | 100.0% |
| 271 | 95301 | | - | Angelim Vermelho | 30"x3.625"x5.625" | Wood Cribbing (Qty 1,433) | Not Available | $ 17,000 | $ 6,000 | 35.3% |
| 272 | 95302 | - | - | Unknown | 16'x8'x6" | Laminated Mats (Qty 126) | Not Available | $ 12,600 | $ 6,000 | 47.6% |
| 273 | 95303 | - | - | Unknown | - | Beams (Qty 7) | Not Available (Appraised With "Beam" Inventory) | $ - | $ - | |
| 274 | 95304 | | 2015 | Miller Lifting Products | KK-212, 150 Ton | Swivel (Eye To Eye Y-Link Bearings) | 25450 | $ 10,000 | $ 5,000 | 50.0% |
| 275 | 95305 | | - | Hillman | - | Rollers (Qty 4) | Not Available | $ 400 | $ 400 | 100.0% |
| 276 | 95306 | | - | Unknown | W12 x 152 18' | Beams (Qty 15) | Not Available (Appraised With "Beam" Inventory) | $ - | $ - | |
| 277 | 90BD1 | 1965 | 1965 | Caterpillar | D6C | Crawler Tractor | 76A02429 | $ 8,500 | $ 4,000 | 47.1% |
| 278 | 90BH1 | 1986 | 1986 | Case | 580 Super E | Tractor Loader | 17033298 (Hour Meter Inoperable) | $ 7,500 | $ 6,000 | 80.0% |
| 279 | 95LC1 | | | Tractel Dynafor | LLX-5, 50 Ton | Tensile Load Indicator | 960929 | $ 1,500 | $ 1,000 | 66.7% |
| 280 | 95LC2 | | | Tractel Dynafor | LLX-5 | Tensile Load Indicator | H99057 | $ 1,500 | $ 1,000 | 66.7% |
| 281 | 95LC3 | | | Tractel Dynafor | LLX-5 | Tensile Load Indicator | H01003 | $ 1,500 | $ 1,000 | 66.7% |
| 282 | 95LC4 | | | Tractel Dynafor | LLX-5 | Tensile Load Indicator | H00048 | $ 1,500 | $ 1,000 | 66.7% |
| 283 | 9SB01 | | | Unknown | 45 Ton | Spreader Bar | TSB-045-8-14-001 | $ 2,500 | $ 1,000 | 40.0% |
| 284 | 9SB02 | | | Unknown | 45 Ton | Spreader Bar | TSB-045-8-14-002 | $ 2,500 | $ 1,000 | 40.0% |
| 285 | 9SB03 | | | Unknown | 45 Ton | Spreader Bar | TSB-045-8-14-003 | $ 2,500 | $ 1,000 | 40.0% |
| 286 | 9SB04 | | | Unknown | 45 Ton | Spreader Bar | TSB-045-8-14-004 | $ 2,500 | $ 1,000 | 40.0% |
| 287 | | | | | | | | $ 195,200 | $ 102,400 | 52.5% |
| 288 | *Tractors* | | | | | | | | | |
| 289 | 40003 | 1976 | - | Autocar | DC9964 | Truck Tractor - T/A | VRIF2QU078891 | $ 500 | $ 500 | 100.0% |

| final report order 2018 | Equip. No. | Year Prov | CONF YR | Manufacturer | Model | Product Type | Serial Number / PIN / Vehicle Identification Number | 5-19-18 Estimated Liquidation Value | Purchase Price Allocation | % of Estimated Liquidation Value |
|---|---|---|---|---|---|---|---|---|---|---|
| 290 | 40007 | 1970 | - | Mack | DM863SX | Truck Tractor - T/A | DM863SX1358 | $ 4,000 | $ 4,000 | 100.0% |
| 291 | 40031 | - | 1974 | Pacific | P12W3 | Prime Mover - T/A | T74118744 | $ 20,000 | $ 15,000 | 75.0% |
| 292 | 40033 | 2000 | 2000 | Peterbilt | 378 | Truck Tractor - T/A | 1XPFDB9X6YN487776 | $ 14,000 | $ 12,000 | 85.7% |
| 293 | 40039 | 2001 | 2001 | Peterbilt | 379 | Truck Tractor - Tri/A | 1XP5PBEX81N550746 | $ 22,000 | $ 16,000 | 72.7% |
| 294 | 40041 | 1977 | 1977 | Pacific | P12W | Prime Mover - T/A | T77148993 | $ 32,500 | $ 15,000 | 46.2% |
| 295 | 40043 | 1977 | 1977 | Pacific | P12W | Prime Mover - T/A | T77148981 | $ 32,500 | $ 15,000 | 46.2% |
| 297 | 40047 | 2006 | 2006 | Volvo | VNL64T | Truck Tractor - T/A | 4V4NC9THX6N430962 | $ 11,000 | $ 9,000 | 81.8% |
| 298 | 40051 | 2006 | 2006 | Volvo | VNL64T | Truck Tractor - T/A | 4V4NC9TH36N430964 | $ 11,000 | $ 9,000 | 81.8% |
| 301 | 40057 | 2006 | 2006 | Volvo | VNL64T | Truck Tractor - T/A | 4V4NC9TH96N430967 | $ 11,000 | $ 9,000 | 81.8% |
| 302 | 40059 | 2006 | 2006 | Volvo | VNL64T | Truck Tractor - T/A | 4V4NC9TH06N430968 | $ 11,000 | $ 9,000 | 81.8% |
| 303 | 40063 | 2005 | 2005 | Volvo | VNL64T | Truck Tractor - T/A | 4V4NC9GH25N376307 | $ 11,000 | $ 9,000 | 81.8% |
| 304 | 40064 | 2013 | 2013 | Western Star | 4900XD | Prime Mover - Tri/A | 5KJRALD19DPBY2518 (New Rear Differential Per BRI) | $ 160,000 | $ 100,000 | 62.5% |
| 305 | 40065 | 2009 | 2009 | International | ProStar Premium | Truck Tractor - T/A | 2HSCUAPR09C091831 | $ 17,000 | $ 15,000 | 88.2% |
| 307 | BST503 | 1999 | 1999 | Peterbilt | 379 | Truck Tractor - T/A | 1XP5DR0X7XD462195 | $ 16,000 | $ 14,000 | 87.5% |
| 308 | BST535 | 2001 | 2001 | Peterbilt | 379 | Truck Tractor - Tri/A | 1XP5DB0X21N521307 | $ 25,000 | $ 22,000 | 88.0% |
| 309 | BST536 | 2009 | 2009 | Peterbilt | 389 | Truck Tractor - Tri/A | 1XPXD4EX99D790368 | $ 52,500 | $ 40,000 | 76.2% |
| 310 | BST537 | 2009 | 2009 | Peterbilt | 389 | Truck Tractor - Tri/A | 1XPXD4EX09D790369 | $ 52,500 | $ 40,000 | 76.2% |
| 311 | | | | | | | | $ 503,500 | $ 353,500 | 70.2% |
| 312 | *Trailers* | | | | | | | | | |
| 313 | 70DL4 | - | - | AMC | 100 Ton | Dolly (16-Wheel) | Not Available | $ 4,000 | $ 2,000 | 50.0% |
| 314 | 70DL5 | - | - | Krupp | 90 Ton | Boom Dolly | Not Available | $ 10,000 | $ 5,000 | 50.0% |
| 315 | 70DL6 | - | - | Liebherr | 225 Ton | Boom Dolly | Not Available | $ 15,000 | $ 10,000 | 66.7% |
| 316 | 70DL7 | - | 2009 | Master Solutions | 60 Ton | Low Profile Dolly (6-Axle Rear Steer) & Jeep (3-Axle) - 9-Axle | 1M9DS43319C692030 (Dolly) 1M9DS43609C692031 (Jeep) | $ 125,000 | $ 100,000 | 80.0% |
| 317 | 70F01 | 1977 | 1977 | Lufkin | 40' | Flatbed Trailer - T/A | 47460 | $ 1,500 | $ 1,000 | 66.7% |
| 318 | 70F02 | 1977 | - | Fontaine | 40' | Flatbed Trailer - T/A | 27949 | $ 1,500 | $ 1,000 | 66.7% |
| 319 | 70F03 | - | 1981 | Loadcraft | 42' | Flatbed Trailer - T/A | 1EDH42208BB810337 | $ 1,750 | $ 1,750 | 100.0% |
| 320 | 70F04 | 1977 | - | Loadcraft | PSD-30-S, 40' | Drop Deck Trailer - T/A | CB-770017 | $ 3,000 | $ 3,000 | 100.0% |
| 321 | 70F06 | - | 1985 | Great Dane | 45' | Flatbed Trailer - T/A | 1GRDM9020FM115801 | $ 2,000 | $ 2,000 | 100.0% |
| 322 | 70F07 | - | 1988 | Utility | FS2CHE, 48' | Flatbed Trailer - T/A | 1UYFS2482JA913405 | $ 3,500 | $ 3,000 | 85.7% |
| 323 | 70F08 | - | 1984 | Dorsey | DGTL-84, 45' | Flatbed Trailer - T/A | 1DTP10W23EA167756 | $ 2,250 | $ 2,250 | 100.0% |
| 324 | 70F10 | - | 1988 | Utility | 45' | Flatbed Trailer - T/A | 1UYFS2454JA857117 | $ 2,000 | $ 2,000 | 100.0% |
| 325 | 70F12 | - | 2001 | Fruehauf | PBA-F2S-48N, 48' | Flatbed Trailer - T/A | 1H2P04821MW031201 | $ 5,000 | $ 4,000 | 80.0% |
| 326 | 70F13 | - | 1985 | Dorsey | 45' | Flatbed Trailer - T/A | 1DTP10W29FP021165 | $ 2,000 | $ 1,000 | 50.0% |
| 327 | 70F14 | - | 1985 | Dorsey | 45' | Flatbed Trailer - T/A | 1DTP10W26FA169375 | $ 2,000 | $ 2,000 | 100.0% |
| 328 | 70F15 | - | 1981 | Hobbs | 75K40, 40' | Flatbed Trailer - T/A | 1H5P04024BN003118 | $ 1,750 | $ 1,750 | 100.0% |
| 329 | 70F16 | 1978 | - | Aztec | FCB, 42' | Flatbed Trailer - T/A | 3505 | $ 1,750 | $ 1,750 | 100.0% |
| 330 | 70F17 | - | 1990 | Fruehauf | PBH-F2S-48N, 48' | Flatbed Trailer - T/A | 1H2P04824LW002001 | $ 3,500 | $ 2,000 | 57.1% |
| 331 | 70F18 | - | 1999 | Shopmade | 37' | High Beam Trailer - T/A | MS99HM00800001913 | $ 1,250 | $ 500 | 40.0% |
| 332 | 70F19 | - | 1984 | Great Dane | GPHS-45, 45' | Flatbed Trailer - T/A | 1GRDM9029EM031507 | $ 2,000 | $ 2,000 | 100.0% |
| 333 | 70F20 | - | 1984 | Great Dane | GPHS-45, 45' | Flatbed Trailer - T/A | 1GRDM9022EM031509 | $ 1,750 | $ 1,750 | 100.0% |

| final report order 2018 | Equip. No. | Year Prov | CONF YR | Manufacturer | Model | Product Type | Serial Number / PIN / Vehicle Identification Number | 5-19-18 Estimated Liquidation Value | Purchase Price Allocation | % of Estimated Liquidation Value |
|---|---|---|---|---|---|---|---|---|---|---|
| 334 | 70F21 | - | 1987 | Utility | 48' | Flatbed Trailer - T/A | 1UYFS2483HA686414 | $ 2,000 | $ 1,000 | 50.0% |
| 335 | 70F22 | - | 1986 | Great Dane | GPS-45, 48' | Flatbed Trailer - T/A | 1GRDM9024GM007604 | $ 2,000 | $ 2,000 | 100.0% |
| 336 | 70F24 | - | 1995 | Wabash | 48' | Flatbed Trailer - T/A | 1JJF48262SL324977 | $ 4,000 | $ 3,000 | 75.0% |
| 337 | 70F25 | - | 1995 | Wabash | 48' | Flatbed Trailer - T/A | 1JJF48267SL324988 | $ 4,000 | $ 3,000 | 75.0% |
| 338 | 70F26 | - | 1996 | Wabash | 48' | Flatbed Trailer - T/A | 1JJF48261TL355770 | $ 4,000 | $ 3,000 | 75.0% |
| 339 | 70F27 | - | 1996 | Wabash | 48' | Flatbed Trailer - T/A | 1JJF48263TL355771 | $ 4,000 | $ 3,000 | 75.0% |
| 340 | 70F29 | - | 1996 | Wabash | CL-96, 48' | Flatbed Trailer - T/A | 1JJF48267TL355773 | $ 4,000 | $ 3,000 | 75.0% |
| 341 | 70F30 | - | 1996 | Wabash | 48' | Flatbed Trailer - T/A | 1JJF48269TL355774 | $ 4,000 | $ 3,000 | 75.0% |
| 342 | 70F31 | - | 1996 | Wabash | 48' | Flatbed Trailer - T/A | 1JJF48260TL355775 | $ 4,000 | $ 3,000 | 75.0% |
| 343 | 70F32 | - | 1995 | Wabash | 48' | Flatbed Trailer - T/A | 1JJF48264SL324978 | $ 4,000 | $ 3,000 | 75.0% |
| 344 | 70F33 | - | 1995 | Wabash | 48' | Flatbed Trailer - T/A | 1JJF48266SL324979 | $ 4,000 | $ 3,000 | 75.0% |
| 345 | 70F34 | - | 1995 | Wabash | 48' | Flatbed Trailer - T/A | 1JJF4826XSL324984 | $ 4,000 | $ 3,000 | 75.0% |
| 346 | 70F35 | - | 1995 | Wabash | 48' | Flatbed Trailer - T/A | 1JJF48266SL324982 | $ 4,000 | $ 3,000 | 75.0% |
| 347 | 70F36 | - | 1995 | Wabash | 48' | Flatbed Trailer - T/A | 1JJF48264SL324981 | $ 4,000 | $ 3,000 | 75.0% |
| 348 | 70F37 | - | 1995 | Wabash | 48' | Flatbed Trailer - T/A | 1JJF48261SL324985 | $ 4,000 | $ 3,000 | 75.0% |
| 349 | 70F38 | - | 1995 | Wabash | 48' | Flatbed Trailer - T/A | 1JJF48263SL324986 | $ 4,000 | $ 3,000 | 75.0% |
| 350 | 70F39 | - | 1996 | Wabash | 48' | Flatbed Trailer - T/A | 1JJF48265TL355769 | $ 4,000 | $ 3,000 | 75.0% |
| 351 | 70F40 | - | 1995 | Wabash | 48' | Flatbed Trailer - T/A | 1JJF48268SL324983 | $ 4,000 | $ 3,000 | 75.0% |
| 352 | 70F41 | - | 1995 | Wabash | 48' | Flatbed Trailer - T/A | 1JJF48265SL324987 | $ 4,000 | $ 3,000 | 75.0% |
| 353 | 70F42 | - | 1996 | Wabash | 48' | Flatbed Trailer - T/A | 1JJF48262TL355776 | $ 4,000 | $ 3,000 | 75.0% |
| 354 | 70F43 | - | 1985 | Transcraft | TL90K-45, 45' | Flatbed Trailer - T/A | 1TTF45208F1026619 | $ 2,500 | $ 2,500 | 100.0% |
| 355 | 70F44 | - | 1995 | Wabash | 48' | Flatbed Trailer - T/A | 1JJF48265SL324980 | $ 4,000 | $ 3,000 | 75.0% |
| 356 | 70F45 | - | 1995 | Dorsey | DGTC-45, 45' | Flatbed Trailer - T/A | 1DTP80W26SP036356 | $ 4,000 | $ 3,000 | 75.0% |
| 357 | 70F46 | - | 1993 | Dorsey | DGTC, 45' | Flatbed Trailer - T/A | 1DTP80W25RP034950 | $ 3,750 | $ 1,000 | 26.7% |
| 358 | 70F47 | - | 1994 | Dorsey | DGTL, 45' | Flatbed Trailer - T/A | 1DTP16W27RP033581 | $ 3,000 | $ 3,000 | 100.0% |
| 359 | 70F48 | - | 1989 | Fontaine | FTW-3-8045SL, 45' | Flatbed Trailer - T/A | 13N1452C2K1544831 | $ 2,500 | $ 2,500 | 100.0% |
| 360 | 70F49 | - | 2003 | Transcraft | TL-2000W2, 48' | Flatbed Trailer - T/A | 1TTF4820031071065 | $ 7,500 | $ 6,000 | 80.0% |
| 361 | 70F50 | - | 2003 | Transcraft | TL-2000W2, 48' | Flatbed Trailer - T/A | 1TTF4820231071066 | $ 7,500 | $ 6,000 | 80.0% |
| 362 | 70F51 | - | 2003 | Transcraft | TL-2000W2, 48' | Flatbed Trailer - T/A | 1TTF4820431071067 | $ 7,500 | $ 6,000 | 80.0% |
| 363 | 70F52 | - | 2003 | Transcraft | TL-2000W2, 48' | Flatbed Trailer - T/A | 1TTF4820131071074 | $ 7,500 | $ 6,000 | 80.0% |
| 364 | 70F53 | - | 2003 | Transcraft | TL-2000W2, 48' | Flatbed Trailer - T/A | 1TTF4820331071075 | $ 7,500 | $ 6,000 | 80.0% |
| 365 | 70F54 | - | 2003 | Transcraft | TL-2000W2, 48' | Flatbed Trailer - T/A | 1TTF4820531071076 | $ 7,500 | $ 6,000 | 80.0% |
| 366 | 70F55 | - | 2003 | Transcraft | TL-2000W2, 48' | Flatbed Trailer - T/A | 1TTF4820731071077 | $ 7,500 | $ 6,000 | 80.0% |
| 367 | 70F59 | - | 2011 | Trail King | TK110ES-532, 53' | Drop Deck Extendable Trailer - T/A | 1TKH05321BM022994 | $ 32,500 | $ 27,000 | 83.1% |
| 368 | 70F60 | - | 2011 | Trail King | TK22FA-051 | Flip-Up Axle | 1TKR00519BM022995 | $ - | $ - | |
| 369 | 70F61 | - | 2011 | Trail King | TK110ES-532, 53' | Drop Deck Extendable Trailer - T/A | 1TKH05325BM022996 | $ 32,500 | $ 27,000 | 83.1% |
| 370 | 70F62 | - | 2011 | Trail King | TK22FA-051 | Flip-Up Axle | 1TKR00512BM022997 | $ - | $ - | |
| 371 | 70F65 | 2016 | 2016 | Fontaine | HAVSF12WSA, 48' | Flatbed Trailer - T/A | 13N148205G1515709 | $ 18,000 | $ 16,000 | 88.9% |
| 372 | 70F66 | 2016 | 2016 | Fontaine | Velocity, 48' | Flatbed Trailer - T/A | 13N148201G1515710 | $ 18,000 | $ 16,000 | 88.9% |

| final report order 2018 | Equip. No. | Year Prov | CONF YR | Manufacturer | Model | Product Type | Serial Number / PIN / Vehicle Identification Number | 5-19-18 Estimated Liquidation Value | Purchase Price Allocation | % of Estimated Liquidated Value |
|---|---|---|---|---|---|---|---|---|---|---|
| 373 | 70L01 | 1978 | - | Talbert | 50 Ton | Detachable Lowbay Trailer - Tri/A | 5284 | $ 7,500 | $ 2,000 | 26.7% |
| 374 | 70L05 | - | 1996 | Landoll | 317, 50 Ton | Traveling Axle Trailer - Tri/A | 1LH317UJ6T1008252 | $ 20,000 | $ 15,000 | 75.0% |
| 375 | 70L06 | - | 1988 | Trail King | TS100HG-483, 50 Ton | Double Detachable Lowboy Trailer - Tri/A | 1TKS04834JM100068 | $ 12,500 | $ 7,000 | 56.0% |
| 376 | 70L07 | - | 1999 | Fontaine Specialized | 653+2M, 65 Ton | Double Detachable Lowboy Trailer - Tri/A | 4LF4S5430X3508075 | $ 30,000 | $ 26,000 | 86.7% |
| 377 | 70L08 | - | 1999 | Fontaine Specialized | 653+2M (2+3+2), 65 Ton | Double Detachable Lowboy Trailer - Tri/A | 4LF4S5437X3508297 | $ 65,000 | $ 55,000 | 84.6% |
| 378 | 70L09 | - | 1999 | Fontaine Specialized | 352J | Jeep - T/A | 4LF3N2721X3508669 | $ - | $ - | |
| 379 | 70L10 / 70L11 | - | 1999 | Fontaine Specialized | 101A, 9'4" | Articulated Stinger T/A | 4LF5N0519X3508670 | $ - | $ - | |
| 380 | 70L12 | - | - | Fontaine Specialized | 10' | Deck Extension | Not Available | $ - | $ - | |
| 381 | 70SF5 | - | 1973 | Great Dane | 48' | Extendable Flatbed Trailer - Tri/A | 310817 | $ 2,750 | $ 2,000 | 72.7% |
| 382 | 70UT6 | 2014 | 2014 | Lark | 10' | Cargo Trailer - S/A | 5RTBE1011ED039641 | $ 1,500 | $ 1,500 | 100.0% |
| 383 | 70UT7 | - | 2015 | C&W | 24' | Tag-A-Long Trailer - T/A | 46CFB2422FM024714 | $ - | $ - | |
| 384 | 7DDS1 | - | 2008 | Fontaine | Renegade LXTN - 40 Ton | Detachable Extendable Lowboy Trailer - Tri/A | 13N65020083529768 | $ 27,500 | $ 24,000 | 87.3% |
| 385 | 7DDS2 | - | 2008 | Fontaine | Renegade LXTN - 40 Ton | Detachable Extendable Lowboy Trailer - Tri/A | 13NE5029783529597 | $ 27,500 | $ 24,000 | 87.3% |
| 386 | 7DDS3 | - | 2008 | Fontaine | Renegade LXTN - 40 Ton | Detachable Extendable Lowboy Trailer - Tri/A | 13N65020183529598 | $ 27,500 | $ 24,000 | 87.3% |
| 387 | 7SD01 | - | 1998 | Trail King | TK70LCS-533, 53' | Drop Deck Trailer - Tri/A | 1TKB05330WG080209 | $ 9,500 | $ 8,000 | 84.2% |
| 388 | 7SD02 | - | 1998 | Trail King | TK70LCS-533, 53' | Drop Deck Trailer - Tri/A | 1TKB05337WG080207 | $ 9,500 | $ 8,000 | 84.2% |
| 389 | 7SD03 | - | 1995 | Great Dane | GPDWSAR-24, 48' | Drop Deck Trailer - T/A | 1GRDM9623SM004001 | $ 5,500 | $ 5,000 | 90.9% |
| 390 | 7SD04 | - | 2003 | Transcraft | DTL-2100W2, 48' | Drop Deck Trailer - T/A | 1TTE4820731071057 | $ 8,500 | $ 7,000 | 82.4% |
| 391 | 7SD05 | - | 2003 | Transcraft | DTL-2100W2, 48' | Drop Deck Trailer - T/A | 1TTE4820931071058 | $ 8,500 | $ 7,000 | 82.4% |
| 392 | 7SD06 | - | 2003 | Transcraft | DTL-2100W2, 48' | Drop Deck Trailer - T/A | 1TTE4820031071059 | $ 8,500 | $ 7,000 | 82.4% |
| 393 | 7SD07 | - | 2003 | Transcraft | DTL-2100W2, 48' | Drop Deck Trailer - T/A | 1TTE4820131071068 | $ 8,500 | $ 5,000 | 58.8% |
| 394 | 7SD08 | - | 2003 | Transcraft | DTL-2100W2, 48' | Drop Deck Trailer - T/A | 1TTE4820331071069 | $ 8,500 | $ 7,000 | 82.4% |
| 395 | 7SD09 | - | 2003 | Transcraft | DTL-2100W2, 48' | Drop Deck Trailer - T/A | 1TTE4820X31071070 | $ 8,500 | $ 7,000 | 82.4% |
| 396 | BST10522 | - | 2000 | Trail King | TK100JDS-333 | Jeep Dolly - Tri/A | 1TKS03331YM110522 | $ - | $ - | |
| 397 | BST10523 | - | 2000 | Trail King | TK160MDG-733, 80 Ton | Detachable Lowboy Trailer - Tri/A | 1TKJ0733XYM110523 | $ 95,000 | $ 85,000 | 89.5% |
| 398 | BST10524 | - | 2000 | Trail King | 12' | Booster - Tri/A | 1TKS01839YM110524 | $ - | $ - | |
| 399 | BST11108 | - | 2001 | Trail King | TK120SD-344 | Steerable Dolly - Quad/A | 1TKS034461M083816 | $ 22,500 | $ 20,000 | 88.9% |
| 400 | BST11109 | - | 1998 | Trail King | TK100J-383 | Jeep - Tri/A | 1TKS00381WM032832 | $ 18,000 | $ 18,000 | 100.0% |
| 401 | BST11905 | 1991 | 1992 | Trail King | TK42B | Booster - T/A | 1TKS01528NM120047 | $ 10,000 | $ 10,000 | 100.0% |
| 402 | BST11906 | 1991 | 1992 | Trail King | | Booster - T/A | 1TKS02629NM120045 | $ 3,000 | $ 2,000 | 66.7% |
| 403 | BST11910 | - | 2000 | Trail King | TK70LCS-482, 48' | Drop Deck Trailer - Tri/A | 1TKB04820YB042490 | $ 7,500 | $ 6,000 | 80.0% |
| 404 | BST11911 | - | 2000 | Trail King | TK70LCS-482, 48' | Drop Deck Trailer - Tri/A | 1TKB04824YB042489 | $ 7,500 | $ 6,000 | 80.0% |
| 405 | BST16241 | - | 2004 | Trail King | TK80J | Jeep - Tri/A | 1TKS0302943016741 | $ 16,000 | $ 12,000 | 75.0% |
| 406 | BST48228 | - | - | Fontaine | 48' | Extendable Flatbed Trailer - Tri/A | 13N4482CH7H1542175 | $ 6,000 | $ 5,000 | 83.3% |

| final report order 2018 | Equip. No. | Year Prov | CONF YR | Manufacturer | Model | Product Type | Serial Number / PIN / Vehicle Identification Number | 5-19-18 Estimated Liquidation Value | Purchase Price Allocation | % of Estimated Liquidation Value |
|---|---|---|---|---|---|---|---|---|---|---|
| 407 | BST48252 | - | 1997 | Trail King | TK100HDG-533, 50 Ton | Detachable Lowboy Trailer - Tri/A | 1TKJ05338VM086206 | $ 20,000 | $ 18,000 | 90.0% |
| 408 | BST48254 | - | 2001 | Trail King | TK110HDG-563, 55 Ton | Detachable Lowboy Trailer - Tri/A | 1TKJ056321M094632 | $ 25,000 | $ 14,000 | 56.0% |
| 409 | BST51 | 1991 | - | Trail King | M0523M | Transformer Deck | 1TKJ0733XYM110523 | $ 7,500 | $ 6,000 | 80.0% |
| 410 | BST5300 | - | 1995 | Trail King | TK100CS-533, 53' | Drop Deck Trailer - Tri/A | 1TKB05334SM052666 | $ 11,000 | $ 9,000 | 81.8% |
| 411 | BST5301 | - | 1997 | Trail King | TK90ES-502, 50' | Drop Deck Extendable Trailer - T/A | 1TKB05024VM076112 | $ 14,000 | $ 12,000 | 85.7% |
| 412 | BST5309 | - | 1998 | Trail King | TK70LCS-533, 53' | Drop Deck Trailer - Tri/A | 1TKB05339WG080208 | $ 9,500 | $ 8,000 | 84.2% |
| 413 | BST5311 | - | 1999 | Trail King | TK100CS-533, 53' | Drop Deck Trailer - Tri/A | 1TKB05337XM016669 | $ 12,000 | $ 11,000 | 91.7% |
| 414 | BST5700 | - | 2001 | Trail King | TK110CS-533, 53' | Drop Deck Trailer - Tri/A | 1TKB0533X1M066411 | $ 15,000 | $ 11,000 | 73.3% |
| 415 | BSTDD141 | - | 1998 | Fontaine | DDRGT-4-5052AWK, 35 Ton | Double Drop Detachable Lowboy Trailer - T/A | 13ND52292W1581722 | $ 15,000 | $ 14,000 | 93.3% |
| 416 | BSTTK692 | - | 1996 | Trail King | TK130HDG-573, 65 Ton (2+3+2) | Detachable Lowboy Trailer - Tri/A | 1TKJ05735TM113692 | $ 60,000 | $ 50,000 | 83.3% |
| 417 | BSTTK693 | - | 1996 | Trail King | TK42MB-132 | Articulated Stinger T/A | 1TKS01329TM103693 | $ - | $ - | |
| 418 | BSTTK694 | - | 1996 | Trail King | TK80J-252 | Jeep - T/A | 1TKS02522TM113694 | $ - | $ - | |
| 419 | | | | | | | | $ 1,113,500 | $ 908,250 | 81.6% |
| 420 | *Trolleys* | | | | | | | | | |
| 422 | 2TR01 | - | 2000 | J&R Engineering | 110 Ton | Beam Trolley | BT450-006121-1 | $ 12,000 | $ 6,000 | 50.0% |
| 423 | 2TR02 | - | 2000 | J&R Engineering | 110 Ton | Beam Trolley | BT450-006121-2 | $ 12,000 | $ 6,000 | 50.0% |
| 424 | 2TR03 | - | 2000 | J&R Engineering | 110 Ton | Beam Trolley | BT450-006121-3 | $ 12,000 | $ 6,000 | 50.0% |
| 425 | 2TR04 | - | 2000 | J&R Engineering | 110 Ton | Beam Trolley | BT450-006121-4 | $ 12,000 | $ 6,000 | 50.0% |
| 428 | 2TR07 | - | 2004 | J&R Engineering | WTDB-50, 50 Short Ton | Winch Trolley | WTDB501-0402187-1 | $ 15,000 | $ 6,000 | 40.0% |
| 429 | | | | | | | | $ 63,000 | $ 30,000 | 47.6% |
| 430 | *Welders* | | | | | | | | | |
| 431 | 80W01 | - | - | Lincoln | SA-250 | Welder | A1100860 | $ 1,000 | $ 500 | 50.0% |
| 432 | 80W02 | - | - | Lincoln | SA-250 | Welder | Not Available | $ 1,000 | $ 500 | 50.0% |
| 433 | 80W03 | - | - | Lincoln | SA-250 | Welder | A1096491 | $ 1,000 | $ 500 | 50.0% |
| 434 | 80W05 | - | - | Lincoln | - | Welder | Not Available | $ 1,000 | $ 500 | 50.0% |
| 435 | 80W06 | - | - | Lincoln | - | Welder | A1173698 | $ 1,000 | $ 500 | 50.0% |
| 436 | 80W08 | - | 1994 | Miller | - | Welder / Wire Feeder | KE649693 / KE661736 | $ 500 | $ 500 | 100.0% |
| 437 | 80W09 | - | 2010 | Lincoln | CV-400, 400 Amp | Welder / Wire Feeder | U1010514599 / U1010625 | $ 1,500 | $ 1,000 | 66.7% |
| 438 | 80W10 | - | 2014 | Lincoln | Ranger 10,000 | Welder | K1419411151 | $ 1,500 | $ 1,000 | 66.7% |
| 439 | 80W11 | 2016 | - | Lincoln | - | Welder | Not Available | $ 3,750 | $ 2,000 | 53.3% |
| 440 | | | | | | | | $ 12,250 | $ 7,000 | 57.1% |
| 441 | *Inventories Provided By BRI:* | | | | | | | | | |
| 442 | | - | - | | Barge Stands: | | | $ 295,000 | $ 200,000 | 67.8% |
| 443 | | - | - | | Beam: | | | $ 630,000 | $ 150,000 | 23.8% |
| 444 | | - | - | | End Caps & Hanger Links: | | | $ 50,000 | $ 25,000 | 50.0% |
| 445 | | - | - | | Endless Slings: | | | $ 25,000 | $ 12,000 | 48.0% |
| 446 | | - | - | | Gantry Track: | | | $ 100,000 | $ 100,000 | 100.0% |
| 447 | | - | - | | Hydraulic Jacks: | | | $ 19,000 | $ 12,000 | 63.2% |
| 448 | | - | - | | Modulift Spreader Bar: | | | $ 50,000 | $ 20,000 | 40.0% |
| 449 | | - | - | | Mud Boats / Steel Mats | | | $ 500,000 | $ 300,000 | 60.0% |
| 450 | | - | - | | Rolling Blocks: | | | $ 10,000 | $ 6,000 | 60.0% |
| 451 | | - | - | | Shackles: | | | $ 120,000 | $ 40,000 | 33.3% |
| 452 | | - | - | | Spreader Bar Pipe: | | | $ 55,000 | $ 15,000 | 27.3% |
| 453 | | - | - | | Wire Rope Slings: | | | $ 40,000 | $ 5,000 | 12.5% |
| 454 | | | | | | | | $ 1,894,000 | $ 885,000 | 46.7% |
| | | | | | | | | $ 21,039,300 | $ 13,682,650 | 65.0% |
| | | | | | | | | | $ - | |
| | | | | | | | | | $ - | |
| | | | | All Furniture, Office Equipment, computers, and software | | | | $ 150,000 | $ 25,000 | 16.7% |
| | | | | All Tools, Parts, cabinets, containers, and Supplies | | | | $ 250,000 | $ 25,000 | 10.0% |
| | | | | All miscellaneous items except excluded items (BSET) | | | | $ 350,000 | $ 27,350 | 7.8% |

| final report order 2018 | Equip. No. | Year Prov | CONF YR | Manufacturer | Model | Product Type | Serial Number / PIN / Vehicle Identification Number | 5-19-18 Estimated Liquidation Value | Purchase Price Allocation | % of Estimated Liquidation Value |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | All Intangibles including name, website, documents, drawings, etc | | | | $ 40,000 | $ 40,000 | 100.0% |
| | | | | | | | TOTAL | $21,829,300 | $ 13,800,000 | 63.2% |
| | | | | | | | | | | |

**Exhibit B:  Excluded Assets**

1.      all cash and cash equivalents, short-term investments and investment securities;

2.      all Seller Contracts not listed in Schedule 1.3(h);

3.      all tax returns, company minute books, ownership ledgers and corporate seals or other records having to do with the corporate organization of Seller;

4.      All pre-Closing privileged documents, communications, and confidences;

5.      all accounts, accounts receivable, notes, contract or other rights to payments of Seller of whatever kind or nature, including all current or deferred rights to payment for goods or services rendered on or prior to the Closing (collectively, "Accounts Receivable");

6.      the Burkhalter Self-Erecting Tower;

7.      all insurance policies and rights thereunder (except to the extent specified in Section 1.3(c));

8.      copies of all personnel records Seller is required by law to retain in its possession;

9.      all claims for refund of taxes and other governmental charges of whatever nature;

10.      all rights in connection with and assets of the "Employee Plans" (as hereinafter defined);

11.      all rights of Seller under this Agreement or any other document executed in connection with the Transaction;

12.      any and all causes of action arising under chapter 5 of the Bankruptcy Code;

13.      all defenses, rights of set-off and counter-claims arising out of or relating to the "Retained Liabilities" (as defined herein);

14.      all items of personal property which the Purchaser determines in its sole discretion that it does not want (the "Unwanted Items"), including, but not limited to, hazardous materials, select barrels, old tires, junk, and rotten wood;

15.      any claim, interest, or right to Buckner Burkhalter, LLC or assets of Buckner Burkhalter, LLC;

16.      any claim, cause of action, or right to recover arising from or related to any commercial tort claim;

17.      any claim, cause of action, or right to recovery arising from or related to the BP oil spill, including (a) that certain claim of Burkhalter Rigging, Inc., identified as Claim ID 100928 pursuant to the Deepwater Horizon Economic and Property

Damages Settlement Program, for the loss of business economic benefit to Burkhalter Rigging, Inc. (the "BP Claim"), and (b) that certain claim of Burkhalter Rigging, Inc. as to the Halliburton Energy Services, Inc./Transocean Punitive Damages & Assigned Claims Settlements (the "HESI Settlement");

18. all revenues/amounts due or to be due and owed on projects/contracts for worked performed by the Sellers up to and through the Closing Date; and

19. all assets of Buckner Heavylift Crane, LLC that are in the Debtors' possession.

**Exhibit C:  Form of Escrow Agreement (Intentionally Omitted)**

**Exhibit D:  Form of Bill of Sale, Assignment and Assumption Agreement**

## BILL OF SALE, ASSIGNMENT AND ASSUMPTION AGREEMENT

### May 31, 2019

THIS BILL OF SALE, ASSIGNMENT AND ASSUMPTION AGREEMENT ("Bill of Sale") is executed and delivered by Burkhalter Rigging, Inc., Burkhalter Transport, Inc., and Burkhalter Specialized Transport, LLC (each a "Seller" and collectively, the "Sellers"), to Barnhart Crane and Rigging Co., a Delaware corporation (the "Purchaser").

### BACKGROUND

Pursuant to that certain Asset Purchase Agreement dated as of May 20, 2019 (as amended or otherwise modified, the "Agreement"), by and among the Sellers and the Purchaser, and in accordance with the authority granted the undersigned pursuant to the *Order (I) Approving The Asset Purchase Agreement Among Seller and Buyer, (II) Authorizing the Sale of Substantially All the Assets of the Debtors Free and Clear Of All Liens, Claims, Encumbrances, and Interests, (III) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases in Connection Therewith and (IV) Granting Related Relief*, [Bankruptcy Dkt No. __] (the "Sale Order") in the bankruptcy proceeding, In re: Burkhalter Rigging, Inc. et al., Case No. 19-30495 (jointly administered) pending in the United States Bankruptcy Court for the Southern District of Texas, Houston Division, the Sellers have agreed to sell, assign, transfer and deliver to the Purchaser the Assets[1].

### AGREEMENT

NOW, THEREFORE, in consideration of the representations, warranties, covenants and agreements contained herein and in the Agreement, and for other good and valuable consideration, the receipt and adequacy of which are conclusively acknowledged, and intending to be legally bound hereby, the Sellers hereby agree as follows:

1.    **Sale and Assignment of Assets.** The Sellers do hereby sell, assign, transfer and deliver unto the Purchaser all of the Sellers' right, title and interest in and to the Assets, excluding all of the Excluded Assets, to have and to hold all of the Assets hereby conveyed to the Purchaser and its successors and assigns, free and clear of any claims, liens, and encumbrances pursuant to section 363(f) of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code").

2.    **Assumption of the Assumed Liabilities.** Subject to the terms and conditions of the Agreement, Purchaser does hereby assume and agree to discharge the debts, obligations, liabilities, and commitments of all of the Assumed Liabilities, excluding the Retained Liabilities.

3.    **Representations and Warranties.**  Sellers make no representations or warranty, either express or implied, with respect to the personal property's present condition, merchantability or its fitness or suitability for any particular purpose; and, accordingly, Sellers'

---

[1] Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to such term as in the Agreement or the Sale Order, as applicable.

interest in the Assets is being transferred to Purchaser in its "As-Is," "Where-is" Condition, with all faults associated therewith except as otherwise expressly set forth herein.

4.     **Further Assurances**. At any time after the date hereof, the Sellers shall take such other action, and shall execute and deliver, or shall cause to be executed and delivered, to the other party such other instruments as may reasonably be requested to transfer and convey the Assets to the Purchaser in the manner and to the extent provided for in the Agreement.  The execution and delivery of any such additional documents or instruments shall not affect the validity of this Bill of Sale.

5.     **Power of Attorney.** The Sellers hereby constitute and appoint Purchaser the true and lawful agent and attorney in fact of the Sellers, with full power of substitution and resubstitution, in whole or in part, in the name and stead of the Sellers, but on behalf and for the benefit of Purchaser and its successors and assigns, from time to time:

(a)     to demand, receive and collect any and all of the Assets and to give receipts and releases for and with respect to the same, or any part thereof;

(b)     to institute and prosecute in the name of the Sellers or otherwise, but at the expense and for the benefit of Purchaser, any and all proceedings at law, in equity or otherwise that Purchaser or its successors and assigns may deem proper to collect or reduce to possession any of the Assets and to enforce any claim or right of any kind hereby assigned, conveyed or transferred, or intended so to be; and

(c)     to do all things legally permissible, required or reasonably deemed by Purchaser to be required to recover and collect the Assets and to use the Sellers' names in such manner as Purchaser may reasonably deem necessary for the recovery and collection of the same, the Sellers hereby declaring that the foregoing powers are coupled with an interest and are and shall be irrevocable by the Sellers.

6.     **Terms of the Asset Purchase Agreement**. The terms of the Agreement are incorporated herein by this reference. The parties acknowledge and agree that the representations, warranties, covenants, agreements, and indemnities contained in the Agreement shall not be superseded hereby but shall remain in full force and effect to the full extent provided therein. In the event of any conflict or inconsistency between the terms of the Agreement and the terms hereof, the terms of the Agreement shall govern.

7.     **Governing Law.** This Bill of Sale shall be governed by, and construed in accordance with, the Laws of the State of Texas applicable to contracts executed in and to be performed in that state without giving effect to any choice or conflict of law provision or rule that would cause the application of the law of any jurisdiction other than the State of Texas.

8.     **Counterparts.**  This Bill of Sale may be executed in any number of counterparts, each of which shall deemed an original, and all of which, shall constitute one and the same instrument.

9.     **Agreement Binding On Successors and Assigns; No Assignment**. This Bill of Sale and the Agreement shall be binding upon and inure to the benefit of the parties and their

respective successors and assigns. No party hereto shall assign this Bill of Sale, in whole or in part, whether by operation of law or otherwise, without the prior written consent of the other party.

[SIGNATURE PAGE FOLLOWS]

IN WITNESS WHEREOF, the undersigned has caused this Bill of Sale and Assignment and Assumption Agreement as of the date first written above.

**SELLERS:**

**BURKHALTER RIGGING, INC.**

By:_____
Name: Delynn Burkhalter
Title:   Chief Executive Officer

**SELLERS:**

**BURKHALTER TRANSPORT, INC.**

By:_____
Name: Delynn Burkhalter
Title:   President

**SELLERS:**

**BURKHALTER SPECIALIZED TRANSPORT, LLC**

By:_____
Name: Delynn Burkhalter
Title:   Managing Member

**PURCHASER:**

**BARNHART CRANE AND RIGGING CO**

By: _____
Name:
Title:

*[Signature Page to Bill of Sale]*

**Exhibit E:  Seller Intellectual Property Assets**

1.  Trademark – Burkhalter Logo

2.  Domain Names – www.burkhalter.net ; www.burkhalterequipment.net

**Appendix 4.3:  Form of Proposed Sale Order**